# In The Matter Of:

## *MITZI PADILLA, ET. AL v.*
## *DWIGHT MCINTURFF, ET.AL*

---

*RODNEY WRIGHT*
*November 6, 2025*

---

*SKYE'S THE LIMIT COURT REPORTING*

Original File Deposition Transcript Rodney Wright.prn
**Min-U-Script® with Word Index**

IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


MITZI PADILLA, personally and as the
special administrator of the estate of
Jeremy Dale Adams                                    PLAINTIFF


VS.                          CASE NO. 2:24-cv-0071-BSM


DWIGHT MCINTURFF
and SHERIFF RODNEY WRIGHT                             DEFENDANT



ORAL DEPOSITION

OF

RODNEY WRIGHT

TAKEN NOVEMBER 6, 2025, AT 12:54 P.M.



SKYE'S THE LIMIT COURT REPORTING, LLC

SKYE R. WRIGHT, CCR

844 Bee Branch Road

Quitman, Arkansas  72131


Phone: 501-206-8336


skyesreporting@gmail.com

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

MR. JOHN OGLES
OGLES LAW FIRM, P.A.
P.O. BOX 891
JACKSONVILLE, ARKANSAS  72078
jogles@aolcom


ON BEHALF OF THE DEFENDANTS:

MS. KAYLEN LEWIS
OWENS & PARKER LAW FIRM, P.A.
1160 MARKHAM ST., SUITE 2
CONWAY, ARKANSAS  72032
lewis@jowenslawfirm.com

MR. CHRIS MADISON
MADISON LAW FIRM
501 WOODLANE STREET, STE. 122 SOUTH
LITTLE ROCK, ARKANSAS  72201
rcmlaw@livecom

I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES  . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CAPTION PAGE . . . . . . . . . . . . . . . . . . . . . . . . 4

WITNESS:  RODNEY WRIGHT

     Examination by Mr. Ogles . . . . . . . . . . . . . . . . 5

COURT REPORTER'S CERTIFICATE  . . . . . . . . . . . . . . . . 36

E X H I B I T S

EXHIBITS:                                    IDENTIFIED:

1.  Training History Report . . . . . . . . . . . . . . . 20

2.  Video . . . . . . . . . . . . . . . . . . . . . . . . 20

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF RODNEY WRIGHT, a witness produced at the request of the Plaintiff, taken in the above-styled and numbered cause on the 6th day of November, 2025, at 12:54 p.m., at the offices of Owens & Parker Law Firm, P.A., Conway, Arkansas, pursuant to the Federal Rules of Civil Procedure.

P R O C E E D I N G S

THEREUPON,

RODNEY WRIGHT,

THE WITNESS HEREINBEFORE NAMED,

having been first duly cautioned and

sworn by me to testify to the truth,

the whole truth, and nothing but the

truth, testified on his oath as

follows, to-wit:

EXAMINATION

BY MR. OGLES:

Q    Sheriff, I'm John Ogles, I'm a lawyer in Jacksonville and I'm going to ask you some questions on this Jeremy Adams case.  If you don't understand my questions just tell me, I'll be glad to rephrase it for you.

A    Okay.

Q    So for the record, state your name.

A    Rodney Wright.

Q    And what is your position in Saline County?

A    I'm the Sheriff.

Q    How long have you been the Sheriff?

A    Eleven years now.

Q    And are you familiar with the Jeremy Adams case?

A    Yes.

Q     As far as reserve deputies go in Saline County, how many reserve deputies do you have?

A     Approximately 15, maybe.

Q     And why do you --

A     I think.  I don't have the number exact, but I can get it.

Q     That's fine.  Around 15?

A     (Witness nods head.)

Q     That's a yes?  You've got to say yes or no.

A     Yes.  I'm sorry.

Q     And I know you've given your deposition before.

A     Yes.

Q     And I know you've been involved in litigation before so I'm not going through all that.  But I guess I need to ask you this.  Other than being Sheriff, have you ever been sued personally?

A     No.

Q     Only as your position as Sheriff?

A     Yes.

Q     Are you originally from Saline County?

A     Yes.

Q     Do you have a lot of relatives in Saline County?

A     Yes.

Q     I guess you're married.

A     No.

Q    You're not married?

A    Not anymore.

Q    I'm asking this for the jury.  Who are your relatives in Saline County?

A    My relatives?  Donna and Bill Wright were my mom and dad.

Q    Are they still alive?

A    My mom is, my dad is not.

Q    Whoever is alive right now.

A    My mom.  I have A twin brother and two older sisters.

Q    What is your twin brother's name?

A    Randy.

Q    What is your sisters' names?

A    Pam and Waynette.

Q    What's their last names?

A    Earhart is Waynette's last name, and Wright is Pam's last name.

Q    Do you have any children that are over the age of 18?

A    I do.

Q    Are they in Saline County?

A    Yes.

Q    What are their names?

A    Sawyer Wright and Samantha Wright.

Q    What do they do for a living?

A    Sawyer is a firefighter and Samantha is an RN.

Q    And are you divorced?

A    Yes.

Q    And what was your ex-wife's name?

A    Kayce.

Q    Is she still in Saline County?

A    Yes.

Q    Is her last name still Wright?

A    No, it is -- I'm trying to think.

Q    I can look it up.

A    Stallmann.

Q    Pardon?

A    Stallmann.

Q    So no other relatives in Central Arkansas?

A    I've got a lot of cousins and uncles and just like anybody has.  I can start at the family tree.

Q    So you are from Central Arkansas?

A    Yes.  I was born and raised in Benton.

Q    So I guess, how many can you think of the top of your head that are over the age of 18?

A    I've got nieces, I've got -- they've had kids.  I don't know, probably 20.

Q    Can we have an agreement that if there's any relatives of yours on the jury panel that you'll let

your lawyer know and she'll let me know?

A    Oh, absolutely.

Q    That's where I'm headed with this.  I don't care other than that.  So do you live in Saline County?

A    I do.

Q    Do you belong to any organizations in Saline County?

A    Fraternal Order of Police.

Q    Anything else?

A    No -- Sheriff's Association.

Q    Where do you go to church?

A    Holland Chapel Church.

Q    Pardon?

A    Holland Chapel.

Q    Okay.  Is that in Benton?

A    Yes, it's in Benton.

Q    So as far as reserve deputies go, how do you train your reserve deputies?  What training do they receive from your office?

A    They're required to go through the 120-hour class, and then also they have to get so many hours each year of training.

Q    And who gives them the hours?  Who trains them?

A    Captain Shamlin.

Q    At Saline County?

A     Yes, or CJI or ALETA.

Q     So some do go to ALETA?

A     Uh-huh.

Q     That's a yes?

A     Yes.  They take classes through ALETA, that ALETA puts on.  Most of them are online.

Q     I got you.  But they don't go down to ALETA?

A     They could possibly if there was a class down there, but not typically, no.

Q     Do you know if Deputy McInturff had classes from ALETA?

A     He did.  He had over 300 and something hours of training online courses as well.

Q     Online?

A     Yes.  Along with the other 120 hours of training that's required for mandatory reserves.

Q     And he's still a reserve deputy, right?

A     Correct.

Q     Is there an age limit on your reserve deputy?

A     No, sir.

Q     Why do you have reserve deputies?

A     I'm sorry?

Q     Why do you have reserve deputies?

A     Why do I have reserve deputies?  To help supplement.

Q   Why do you need help supplementing?

A   Because we only have so many officers.

Q   How many do you-all have?

A   Total?  Patrol deputies we have approximately 30.

Q   And I think you asked Deputy McInturff to come back in January 2023; does that ring a bell?

A   We had a conversation about him coming back, yes.

Q   And do you remember what that conversation was about?

A   He wanted to come back and work for the Saline County Sheriff's Office.

Q   What was his job description when he came back?

A   Reserve.

Q   What was he going to do?

A   Whatever reserve will do for us, whether it be school, patrol.

Q   Did you want him to work for the schools?

A   I wanted him to be there for us for whatever we needed.

Q   You don't pay them, right?

A   No.

Q   Do you know when his official start time was?

A   No.

Q   Would it have been before he got his training?

A   No.

Q   I'm going to show you what was introduced in the last deposition, Exhibit Number 1.  And it looks like Deputy McInturff's training started in June of '23.  Right there.  Do you see it?

A   Let me get my glasses.

Q   I just want you to confirm the date, I don't really care what he did.

A   Yes, '22.

Q   '22 or '23?

A   It says '22.

            MS. LEWIS:  Up here.

A   Oh, I'm sorry.  He was with us in '22 as well.

Q   Did he quit and go to Shannon Hills as a reserve deputy?

A   It was either Shannon Hills or Haskell, I'm not sure which one.

Q   And so when you reached out to him he wasn't a reserve deputy at Saline County, correct?

A   He was at -- I think the last place he had worked, I believe, was Haskell.  I believe, but I'm not certain for that.

Q   All I'm trying to do is lock down, best we can, his start date.

A   The second time?

Q   Yes.

MS. LEWIS: What I think, he's looking at these two right here. So this one.

A   I don't know if it was started before that or not. I'd have to look and see. We could get those records though.

Q   But you're telling me at the time he took this class in June of '23 and July of '23, he had just started back for a second time; is that correct?

A   I think that would be correct, yes, sir.

Q   Okay. And did he ever go out on patrol by himself?

A   Yes.

Q   Did he ever do any stops by himself?

A   Yes.

Q   Did he ever use his gun before, to your knowledge, Deputy McInturff?

A   Not to my knowledge. No, not that I'm --

Q   That's who I'm talking about.

A   No.

Q   What about a taser? Did he ever use his taser before?

A   I don't recall.

Q   Okay. So what do you remember what happened on November the 16th of 2023 with Jeremy Adams?

A   I remember them calling into the office saying that an officer had been involved in a shooting.

Q   And what kind of vehicle did Mr. Adams drive from Saline County?

A   Who?

Q   I'm sorry.  What kind of vehicle did Deputy McInturff drive from Saline County?

A   I believe he was in his marked patrol truck.

Q   Did it have a CAD?

A   A what?

Q   A CAD, C-A-D.

A   Are you talking about a computer in there?

Q   Yes, I'm just saying what --

A   Most reserve vehicles do not.

Q   And how come?

A   Money.  They're expensive.

Q   Do they have them now?

A   No.

Q   Do you know if he was on patrol with another office at the time he got a call?

A   You mean was someone else in the vehicle with him?

Q   Yes.

A   I was aware he was by himself.

Q   Do you know where he was when he got a call from Saline County Sheriff's Office, or dispatch to go to Mr. Adams' house?

A   No, sir.

Q    Do you know who he was with on patrol?

A    No, sir.

Q    What is the policy on use of force in Saline County?

A    You're able to use it to defend yourself or others.

Q    Okay.  And is there anything else?

A    Well, it's extensive, it's long.  I don't have it in front of me.

Q    Okay.  Was he trained in that policy?

A    Yes.

Q    Deputy McInturff was?

A    Yes.

Q    And who would have trained him on that?

A    That would have been in the training records and that's Captain Shamlin.

Q    And do you know what year he was trained on that?

A    I do not.

Q    Is he the oldest reserve deputy you've got?

A    I'm unaware -- I don't ask their ages, but I would probably say so.

Q    We know in November of '23 he was 75.

A    Okay.

Q    I'm just --

A    Yes.

Q    Would that have been the oldest at the time?

A    Probably.

Q    Was he certified?

A    As a reserve deputy, yes.

Q    Was he certified as a deputy?

A    Yes.

Q    So other than reserve deputy, was he certified as a deputy sheriff for Saline County?  Is there any distinction?

A    He is certified to do the duties of a deputy.

Q    And that's on the online courses he took?

A    Yes.

Q    Did he have to pass any physical test?

A    There was -- we don't have a mandatory physical test.

Q    Okay.  Did you ever go out to Mr. Adams' house after the shooting?

A    I went that day.

Q    That day?  What did you see?

A    When I arrived on scene there was multiple vehicles there and State Police arrived the exact same time that I did and took over the scene.

Q    The State Police did?

A    Yes.

Q    How come?

A    Because we asked them to work the investigation.

Q    Because of the shooting?

A    Yes, sir.

Q    Is that the first time that Deputy McInturff has ever been involved in a shooting?

A    As far as I know.

Q    Was he allowed to call for backup?

          MS. LEWIS:  Object to form.  You can answer.

A    What do you mean?

Q    Was Deputy McInturff allowed to call for backup?

A    Was he allowed to?

Q    Yes.

A    Well, anyone can call for backup, yes.

Q    Did he ever tell you why he didn't call for backup?

A    No.

Q    Okay.  Did you ever ask him?

A    No.

Q    Did you ever ask anyone why they weren't there with him at Mr. Adams' house?

A    No, sir.

Q    You did not?  Did you do any investigation on this case after the shooting?

A    There was a use of force investigation.

Q    And what was the outcome of that?

A    That it was justified.

Q     Who made that decision?

A     The lieutenant and the chief deputy.

Q     Pardon?

A     The lieutenant who did the review and then the chief deputy signed off on it.

Q     So that's one Brian Clary signed off on, or is that a different one?

A     No.  I don't know that for sure.

Q     Do you know why there were not more deputies sent to Mr. Adams' house?

A     No.

Q     Do you know what the nature of the call was?

A     I think it was a terroristic threatening.

Q     And Deputy McInturff was qualified to handle that terroristic threatening?

A     Yes.

Q     Has he ever handled a terroristic threatening case before by himself?

A     I'm not sure.

Q     Has he ever handled a domestic disturbance by himself?

A     I know he's been to several.  I'm not sure if he was there by himself or not.

Q     That's what I'm asking, by himself.

A     I don't know.

Q    Okay.  Have you ever seen the video in this case?

A    I have not.

Q    You haven't?

A    No.

Q    Have you ever listened to his statement to Internal Affairs?

A    I've read his statement that was given through that, but no.

Q    I think he gave a statement to the State Police and Internal Affairs.  You didn't listen to that?

A    No.

Q    Is there a reason why?

A    I counted on the State Police to do their investigation and get one hundred percent information, and then make the determination of whether or not.  I didn't want to get in the middle of that.

Q    Okay.  And then you are aware there's a video in this case of the shooting, correct?

A    Taken by --

Q    His sister.

A    -- the sister?

Q    Mitzie Padilla?

A    Yes.

Q    And you are aware of that, correct?

A    Yes.

Q    And you've never seen it?

A    No.

Q    I'm going to show it to you.

A    Sure.

Q    You may have to watch it twice.  Unfortunately your lawyer may have to help me.

A    That's fine.

MR. OGLES:  This will be our Exhibit 1.

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

MS. LEWIS:  Those training records, those are not going to be an exhibit to this one?

MR. OGLES:  Yes, they will.  I'm sorry, we'll let this be Exhibit 1.  And we're referring to Exhibit 1 in the last deposiiton.

Q    I'll let you watch it the first time.

A    And who's video is this?

Q    This is a video taken by Mitzi Padilla, the sister of Jeremy Adams --

A    Okay.

Q    -- at the time of this incident.

A    Okay.

Q    It's not the complete -- it's not from beginning to the end.  You'll see where it picks up.

A    Okay.

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

(VIDEO IS PLAYED)

FEMALE VOICE:  Damn.  Brother, please calm down.

JEREMY ADAMS:  I don't give a fuck.

FEMALE VOICE:  Please.  Jeremy, stop.

DWIGHT MCINTURFF:  Back up.

FEMALE VOICE:  Brother, please.

DWIGHT MCINTURFF:  (Inaudible)  Right now.

JEREMY ADAMS:  (Inaudible).

DWIGHT MCINTURFF:  Do you want to die here today?

JEREMY ADAMS:  Yes, I do.

DWIGHT MCINTURFF:  I'll make it happen.

JEREMY ADAMS:  (Inaudible).

FEMALE VOICE:  Jeremy, please stop.

JEREMY ADAMS:  I don't give a fuck.  I don't give a fuck.

FEMALE VOICE:  Jeremy, please.

DWIGHT MCINTURFF:  I asked you what was going on.

JEREMY ADAMS:  Get the fuck -- get the fuck from around me.

FEMALE VOICE:  No, no, no, no, no, no, no, no, no, no, please.

JEREMY ADAMS:  If you ever grab me by the

goddamn hair again --

DWIGHT MCINTURFF:  I said back up and turn around.

JEREMY ADAMS:  No, I ain't.  You're not going to (inaudible).

DWIGHT MCINTURFF:  It's jail or the morgue.  It's jail or the morgue.  Come on.

FEMALE VOICE:  Please, Jeremy, let him help you.  Please

JEREMY ADAMS:  I don't give a fuck.  Let's do that then.  I don't give a fuck.

DWIGHT MCINTURFF:  I came out here to (inaudible).

JEREMY ADAMS:  I'm not (inaudible).

FEMALE VOICE:  Brother, just let him help you, please.

JEREMY ADAMS:  I can't (inaudible).  I'm (inaudible) --

DWIGHT MCINTURFF:  You came out and beat on my truck.

JEREMY ADAMS:  No, I --

DWIGHT MCINTURFF:  Then you threatened me.

JEREMY ADAMS:  No, I --

DWIGHT MCINTURFF:  I said you're not going in --

FEMALE VOICE:  Jeremy, Jeremy.

JEREMY ADAMS:  (Inaudible).

FEMALE VOICE:  Jeremy.  No, no.  Please stop.  No, no.  Jeremy.  Call 911, please.  Please.  (Inaudible).  Help.  Brother.

A    That's when I'm on the radio.

FEMALE VOICE:  Jeremy.  Call 911.  Call 911.

(VIDEO ENDS)

Q    (By Mr. Ogles)  So that's the first time you've seen that.

A    Yes.

Q    I'm going to show it to you again and ask you some questions, okay?

A    Okay.

Q    We're going to start it again.

(VIDEO IS PLAYED)

FEMALE VOICE:  Damn.  Brother, please calm down.

JEREMY ADAMS:  I don't give a fuck.

FEMALE VOICE:  Please.  Jeremy, stop.

DWIGHT MCINTURFF:  Back up.

FEMALE VOICE:  Brother, please.

DWIGHT MCINTURFF:  (Inaudible)  Right now.

JEREMY ADAMS:  (Inaudible).

DWIGHT MCINTURFF:  Do you want to die here today?

JEREMY ADAMS:  Yes, I do.

MR. OGLES:  I don't know what time it is, Kaylen, you'll just have to tell me.  I'm probably going to mess it up.

MS. LEWIS:  It's at 2:16.  And, again, it's going in reverse, so it starts at 3 and counts down.

Q    (By Mr. Ogles)  So you see Deputy McInturff and Mr. Adams.

A    Yes.

Q    Is Deputy McInturff doing anything wrong in your opinion?

A    I don't know what's been going on prior to all this.  I'm just seeing what I'm seeing on the video is he's having a conversation with him, trying to calm him down.

Q    Is he too close to Mr. Adams?

A    That would be just --

MS. LEWIS:  I'm going to object to this just because he doesn't know the full context of the situation.  You can answer.

MR. OGLES:  Well, he can still answer.

MS. LEWIS:  Yes.

MR. OGLES:  You can object to the form, but you can't give him the answers.

A    I think he's in a reasonable distance.

Q    Does an officer have the opportunity to back up and call for -- back up and give some distance and call for backup?

MS. LEWIS:  Object to form.

A    He always has that opportunity.,

Q    Okay.  Do you know why he didn't?

A    I have no idea.

Q    Have you talked to him about that?

A    No.

Q    Is this how you would have handled it yourself, being this close with Mr. Adams?

MS. LEWIS:  Object to form.

A    I'm not -- I don't know how I would handled it as far as being there and having the whole situation.

Q    You don't know how you would have handled it?

A    I may have handled it like that, I may have handled it differently.

Q    Okay.

DWIGHT MCINTURFF:  I'll make it happen.

JEREMY ADAMS:  (Inaudible).

FEMALE VOICE:  Jeremy, please stop.

JEREMY ADAMS:  I don't give a fuck.  I

don't give a fuck.

FEMALE VOICE: Jeremy, please.

DWIGHT MCINTURFF: I asked you what was going on.

JEREMY ADAMS: Get the fuck -- get the fuck from around me.

FEMALE VOICE: No, no, no, no, no, no, no, no, no, no, please.

MR. OGLES: What time is it, Kaylen? I can't see it, otherwise I would do it.

MS. LEWIS: It's at 1:55

Q    (By Mr. Ogles)  You saw Deputy McInturff pull him down on the ground by his hair, correct?

A    Correct.

Q    Have you ever done that?

A    Not to my knowledge.

Q    Is that proper from your office, Saline County Sheriff's Office?

MS. LEWIS: Object to form.

A    I don't -- I wouldn't say that it is or it isn't. I would say that not letting him go back into that residence would be the correct --

Q    How come?

A    Because at this particular state you don't know what he's going to go in there and do, go in there and

get a weapon.

Q    Could Deputy McInturff also call for backup?

A    Yes.  Was he not talking on his radio?

Q    I'm just asking you the questions.  Can he call for backup?

A    Yes.

Q    Okay.  I can tell you, he testified this morning he didn't call for backup.

A    Okay.

Q    So should he have called for backup?

MS. LEWIS:  Object to form.

A    Probably.

Q    Okay.  I will tell you Deputy McInturff said this morning that if there had been another sheriff's deputy there, or two more sheriff's deputies there this probably wouldn't have happened.  Do you agree with that?

MS. LEWIS:  Object to form.

A    No, I don't agree with that.

Q    How come?

A    I don't know.  I don't have a crystal ball, I don't know.

Q    I know you don't have a crystal ball.

A    So, no, I don't know.

Q    But that's not part of your training to have more

than one deputy on the scene in a terroristic

threatening case?

A    Not particularly, no.

Q    That's not your policy?

A    No.

Q    To call for backup is not in your policy?

A    To call for backup when needed, yes.

Q    Do you think he needed it?

A    I wasn't there, but --

Q    Well, you looked at the video.

MS. LEWIS:  Object to form.

A    I would say that probably he should have called for

backup.

Q    Okay.

JEREMY ADAMS:  If you ever grab me by the

goddamn hair again --

DWIGHT MCINTURFF:  I said back up and turn

around.

JEREMY ADAMS:  No, I ain't.  You're not

going to (inaudible).

DWIGHT MCINTURFF:  It's jail or the morgue.

It's jail or the morgue.  Come on.

FEMALE VOICE:  Please, Jeremy, let him help

you.  Please

JEREMY ADAMS:  I don't give a fuck.  Let's

do that then.  I don't give a fuck.

DWIGHT MCINTURFF:  I came out here to (inaudible).

Q    (By Mr. Ogles)  While we're looking at this --

MR. OGLES:  Katelyn, I don't know what time it is.

MS. LEWIS:  It's 1:30 -- it's about 1:32.

Q    What are his options right there?  You're the sheriff of Saline County, what are some things Deputy McInturff could have done?

MS. LEWIS:  I'm going to object to the form.  You can answer.

MR. OGLES:  Yes, he can answer.

A    He has the opportunity to call for backup.  His radio is in his hand it looks like.

Q    What else -- what other options could he do?

A    I think he's got his taser on him.

Q    Let's assume he's already tased him.

A    Okay.

Q    So what are the other options he can do?

A    Detain him with -- by just using his hands.

Q    Okay.  Is one of the options retreating and going to your car and calling for backup?

A    He could put some distance between him and -- but he couldn't let him go back in that residence.

Q    I understand.  But de-escalation could have happened; is that correct?

                    MS. LEWIS:  Object to form.

Q    Is that right?

A    Methods of de-escalation, yes.

Q    Or do you think he de-escalated, Deputy McInturff?

                    MS. LEWIS:  Object --

A    I think he was trying to calm him.

Q    You do?  With a gun in his hand?

                    MS. LEWIS:  Object to form.

Q    You think he was trying to calm him?

A    I think he was trying to make sure that he didn't get hurt.

Q    Do you think pulling him down with his hair was trying to calm him?

                    MS. LEWIS:  Object to form.

A    I don't know what he was thinking when he did that.

Q    I understand.

                    JEREMY ADAMS:  I'm not (inaudible).

                    FEMALE VOICE:  Brother, just let him help you, please.

                    JEREMY ADAMS:  I can't (inaudible).  I'm (inaudible) --

                    DWIGHT MCINTURFF:  You came out and beat on my truck.

JEREMY ADAMS:  No, I --

DWIGHT MCINTURFF:  Then you threatened me.

JEREMY ADAMS:  No, I --

DWIGHT MCINTURFF:  I said you're not going in --

FEMALE VOICE:  Jeremy, Jeremy.

MR. OGLES:  Kaylen, I don't know what time it is, I'm sorry.

MS. LEWIS:  1:07.

Q    (By Mr. Ogles)  Do you think when he pulled him by his hair the second time that that was de-escalation?

A    I don't know what he was thinking when he did that.

Q    I'm asking you by looking at it.  I'm not asking you what Deputy McInturff was --

A    I think he was making sure he didn't go back into that residence.

Q    Okay.  What are the other options he had?  Could he have put handcuffs on him?

A    At some point, yes.

Q    I mean, when he threw him on the ground could he have put handcuffs on him?

A    Yes.

JEREMY ADAMS:  (Inaudible).

FEMALE VOICE:  Jeremy.  No, no.  Please stop.  No, no.

32

(VIDEO ENDS)

MR. OGLES: That's all I have for that.

Q   (By Mr. Ogles)  So you've never seen this video before?

A   No.

Q   So you have several options before you use deadly force; is that correct?

A   Force continuum, yes.

Q   And do you know what they are just sitting here today?

A   I couldn't -- verbal commands, obviously less lethal.  And then if it escalates up -- less lethal, several different things, baton, taser.

Q   You've got taser, you've got baton.  Have you ever been in a situation where you have to de-escalate and wait on backup?

A   Yes.

Q   Have you ever dealt with someone that's mentally ill before?

A   Yes.

Q   How do you handle someone that is mentally ill?

MS. LEWIS: I'm going to object to the form.

A   I think there's many forms of mentally ill.

Q   All right.  Let's talk about it.  Just give me an

example, what form?  You saw this gentleman here, how would you have handled him, Mr. Adams?

A    Well, I don't know.  Was he just mentally ill or was he on substance?

Q    Well, you saw the video, okay?

A    He was acting erratic.

Q    All right.  How would you have handled him acting erratic?

MS. LEWIS:  I'm going to object to the form.

Q    How would you, the Sheriff of Saline County, how would you have treated the situation?

A    I would have tried to de-escalate and calm the situation down by not letting him also go back into that residence.

Q    And how would you stop him from going back in the residence?

A    I'd probably reached and grabbed him.

Q    Would you put handcuffs on him?

A    At some point, yes.

Q    Okay.  Do you know why there wasn't a body cam on Deputy McInturff?

A    Our reserve deputies don't have one.

Q    Okay.  Do reserve deputies normally go out by themselves on these types of cases?

A    In some cases, yes.

Q    Can you think of another one?

A    Well, they'll go to different calls, accidents, schools.

Q    Have you ever had a reserve deputy shoot someone before?

A    Not that I'm aware of.

Q    This is the first time?

A    Yes.

Q    Were you aware of Jeremy, Mr. Adams -- Jeremy Adams?

A    No.

Q    Were you aware of any of the problems they'd had in the past over there?

A    No.

Q    Are you now?

A    Just being aware from what the lawsuit says.

Q    Other than what the lawsuit --

A    No.

Q    No other investigation?

A    Huh-uh.

Q    That's a no?

A    No, no.

Q    You've got to say yes or no.

A    I'm sorry, no.

Q    That's fine.  You're fine.  So if I ask you at the jury trial after looking at this video, what would you do different, what would your answer be?

MS. LEWIS:  I'm going to object to the form.

A    What would I do differently?

Q    Uh-huh.  I'm going to ask you at the jury trial, so what would you do different?

A    Call for backup at some point.

Q    Pardon?

A    I guess call for backup at some point.

Q    Okay.  And we can all agree Deputy McInturff never called for backup.  He's testified to that this morning.

A    Okay.

MS. LEWIS:  Object to form.

Q    So that's one thing you would do different than Deputy McInturff, is you would call for backup?

A    Yes.

Q    Okay.

MR. OGLES:  That's all I have.  Thank you.

(WHEREUPON, the proceedings were concluded in the matter at 1:25 p.m.)

(WITNESS EXCUSED)

* * * * * *

REPORTER'S CERTIFICATE

I, Skye Wright, Certified Court Reporter in and for the State of Arkansas, do hereby certify as follows:

(1) that on November 6, 2025, Rodney Wright was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein;

(2) that the foregoing pages contain and are a true and correct transcript of the proceedings as reported verbatim by me via the voice-writing method to the best of my ability and transcribed and reduced to typewritten form by myself or under my direction and supervision;

(3) that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and that I am not a relative or employee of any attorney employed by the parties hereto;

(4) that I am not financially or otherwise interested in the outcome of this action that affects or has a substantial tendency to affect impartiality or requires me to relinquish control of an original or copies of a deposition transcript before it is certified, or that requires me to provide any service not made available to all parties to the action; and

(5) that I have no contract with the parties, attorneys, or persons with an interest in the action; and that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter.

This transcript is prepared at the request of Plaintiff's counsel and all fees are billed in compliance with the Arkansas Board of Court Reporter Examiners Regulations Section 19.

WITNESS MY HAND AND SEAL this 24th day of November, 2025.

_____
SKYE WRIGHT, CCR 686
My Commission Expires:  2/21/2026



## A

**able (1)**
15:5
**absolutely (1)**
9:2
**accidents (1)**
34:3
**acting (2)**
33:6,7
**Adams (39)**
5:14,24;13:23;14:1;
20:18;21:4,9,12,14,
16,21,25;22:4,10,14,
17,21,23;23:2,20,25;
24:3,11,19;25:14,23,
25;26:5;28:15,19,25;
30:19,22;31:1,3,23;
33:2;34:10,11
**Adams' (4)**
14:24;16:15;17:19;
18:10
**Affairs (2)**
19:6,10
**again (5)**
22:1;23:13,16;24:7;
28:16
**age (3)**
7:19;8:21;10:19
**ages (1)**
15:19
**agree (3)**
27:16,19;35:12
**agreement (1)**
8:24
**ain't (2)**
22:4;28:19
**ALETA (6)**
10:1,2,5,5,7,11
**alive (2)**
7:7,9
**allowed (3)**
17:6,10,11
**Along (1)**
10:15
**always (1)**
25:8
**anymore (1)**
7:2
**Approximately (2)**
6:3;11:4
**Arkansas (2)**
8:15,18
**Around (5)**
6:7;21:22;22:3;
26:6;28:18
**arrived (2)**
16:19,20
**Association (1)**
9:10
**assume (1)**
29:18

**aware (7)**
14:21;19:17,24;
34:7,10,13,17

## B

**back (16)**
11:5,7,10,12;13:8;
21:6;22:2;23:22;25:4,
5;26:21;28:17;29:25;
31:15;33:14,16
**backup (19)**
17:6,10,13,14;25:6;
27:2,5,8,10;28:6,7,13;
29:14,23;32:16;35:9,
11,13,17
**ball (2)**
27:21,23
**baton (2)**
32:13,14
**beat (2)**
22:19;30:24
**beginning (1)**
20:22
**bell (1)**
11:6
**belong (1)**
9:6
**Benton (3)**
8:19;9:15,16
**best (1)**
12:22
**Bill (1)**
7:5
**body (1)**
33:21
**born (1)**
8:19
**Brian (1)**
18:6
**brother (8)**
7:10;21:2,7;22:15;
23:5,18,23;30:20
**brother's (1)**
7:12

## C

**CAD (2)**
14:7,9
**C-A-D (1)**
14:9
**call (21)**
14:18,22;17:6,10,
13,14;18:12;23:4,7,7;
25:5,5;27:2,4,8;28:6,
7;29:14;35:9,11,17
**called (3)**
27:10;28:12;35:13
**calling (2)**
13:24;29:23
**calls (1)**
34:3

**calm (7)**
21:2;23:18;24:17;
30:8,11,15;33:13
**cam (1)**
33:21
**came (5)**
11:12;22:12,19;
29:2;30:24
**can (18)**
6:5;8:11,17,20,24;
12:22;17:7,13;24:23,
24;25:1;27:4,7;29:12,
13,20;34:2;35:12
**Captain (2)**
9:24;15:15
**car (1)**
29:23
**care (2)**
9:3;12:7
**case (7)**
5:14,24;17:22;
18:17;19:1,18;28:2
**cases (2)**
33:25;34:1
**cautioned (1)**
5:5
**Central (2)**
8:15,18
**certain (1)**
12:20
**certified (4)**
16:2,4,6,9
**Chapel (2)**
9:12,14
**chief (2)**
18:2,5
**children (1)**
7:19
**church (2)**
9:11,12
**CJI (1)**
10:1
**Clary (1)**
18:6
**class (3)**
9:20;10:8;13:7
**classes (2)**
10:5,10
**close (2)**
24:19;25:14
**coming (1)**
11:7
**commands (1)**
32:11
**complete (1)**
20:22
**computer (1)**
14:10
**concluded (1)**
35:21
**confirm (1)**
12:6
**context (1)**

24:22
**continuum (1)**
32:8
**conversation (3)**
11:7,8;24:17
**counted (1)**
19:13
**counts (1)**
24:8
**County (20)**
5:20;6:1,20,22;7:4,
22;8:7;9:4,7,25;
11:11;12:18;14:2,5,
23;15:4;16:7;26:17;
29:9;33:11
**courses (2)**
10:13;16:10
**cousins (1)**
8:16
**crystal (2)**
27:21,23

## D

**dad (2)**
7:6,8
**Damn (2)**
21:2;23:18
**date (2)**
12:6,23
**day (2)**
16:17,18
**deadly (1)**
32:6
**dealt (1)**
32:18
**decision (1)**
18:1
**de-escalate (2)**
32:15;33:13
**de-escalated (1)**
30:6
**de-escalation (3)**
30:1,5;31:11
**defend (1)**
15:5
**deposiiton (1)**
20:14
**deposition (2)**
6:11;12:2
**deputies (12)**
6:1,2;9:17,18;
10:21,23,24;11:4;
18:9;27:15;33:23,24
**Deputy (35)**
10:10,17,19;11:5;
12:3,14,18;13:15;
14:4;15:11,18;16:3,4,
6,7,9;17:3,10;18:2,5,
14;24:10,13;26:12;
27:2,13,14;28:1;29:9;
30:6;31:14;33:22;
34:5;35:12,17

**description (1)**
11:12
**Detain (1)**
29:21
**determination (1)**
19:15
**die (2)**
21:10;24:1
**different (6)**
18:7;32:13;34:3;
35:3,8,16
**differently (2)**
25:20;35:6
**dispatch (1)**
14:23
**distance (3)**
25:3,5;29:24
**distinction (1)**
16:8
**disturbance (1)**
18:20
**divorced (1)**
8:3
**domestic (1)**
18:20
**done (2)**
26:15;29:10
**Donna (1)**
7:5
**down (10)**
10:7,8;12:22;21:3;
23:19;24:9,18;26:13;
30:14;33:14
**drive (2)**
14:1,5
**duly (1)**
5:5
**duties (1)**
16:9
**DWIGHT (22)**
21:6,8,10,13,19;
22:2,6,12,19,22,24;
23:22,24;24:1;25:22;
26:3;28:17,21;29:2;
30:24;31:2,4

## E

**Earhart (1)**
7:17
**either (1)**
12:15
**Eleven (1)**
5:23
**else (4)**
9:9;14:19;15:6;
29:16
**end (1)**
20:23
**ENDS (2)**
23:9;32:1
**erratic (2)**
33:6,8

**escalates (1)**
32:12
**exact (2)**
6:5;16:20
**EXAMINATION (1)**
5:10
**example (1)**
33:1
**EXCUSED (1)**
35:23
**Exhibit (7)**
12:2;20:8,9,11,13,
14,25
**expensive (1)**
14:14
**extensive (1)**
15:7
**ex-wife's (1)**
8:5

**F**

**familiar (1)**
5:24
**family (1)**
8:17
**far (4)**
6:1;9:17;17:5;
25:17
**FEMALE (21)**
21:2,5,7,15,18,23;
22:8,15;23:1,3,7,18,
21,23;25:24;26:2,7;
28:23;30:20;31:6,24
**fine (4)**
6:7;20:7;35:1,1
**firefighter (1)**
8:2
**first (5)**
5:5;17:3;20:15;
23:10;34:8
**follows (1)**
5:9
**force (4)**
15:3;17:23;32:7,8
**form (17)**
17:7;25:1,7,15;
26:19;27:11,18;
28:11;29:12;30:3,10,
16;32:23;33:1,10;
35:5,15
**forms (1)**
32:24
**Fraternal (1)**
9:8
**front (1)**
15:8
**fuck (14)**
21:4,16,17,21,21;
22:10,11;23:20;
25:25;26:1,5,5;28:25;
29:1
**full (1)**

24:22

**G**

**gave (1)**
19:9
**gentleman (1)**
33:1
**given (2)**
6:11;19:7
**gives (1)**
9:23
**glad (1)**
5:15
**glasses (1)**
12:5
**goddamn (2)**
22:1;28:16
**grab (2)**
21:25;28:15
**grabbed (1)**
33:18
**ground (2)**
26:13;31:20
**guess (4)**
6:14,24;8:20;35:11
**gun (2)**
13:14;30:9

**H**

**hair (5)**
22:1;26:13;28:16;
30:14;31:11
**hand (2)**
29:15;30:9
**handcuffs (3)**
31:18,21;33:19
**handle (2)**
18:14;32:21
**handled (9)**
18:17,20;25:13,16,
18,19,19;33:2,7
**hands (1)**
29:21
**happen (2)**
21:13;25:22
**happened (3)**
13:22;27:16;30:2
**Haskell (2)**
12:15,20
**head (2)**
6:8;8:21
**headed (1)**
9:3
**help (8)**
10:24;11:1;20:6;
22:8,15;23:5;28:23;
30:20
**HEREINBEFORE (1)**
5:4
**Hills (2)**
12:13,15

**himself (7)**
13:10,12;14:21;
18:18,21,23,24
**Holland (2)**
9:12,14
**hours (4)**
9:21,23;10:12,15
**house (4)**
14:24;16:15;17:19;
18:10
**Huh-uh (1)**
34:21
**hundred (1)**
19:14
**hurt (1)**
30:13

**I**

**idea (1)**
25:10
**IDENTIFICATION (2)**
20:9,25
**ill (4)**
32:19,21,24;33:3
**Inaudible (19)**
21:8,9,14;22:5,13,
14,17,18;23:2,5,24,
25;25:23;28:20;29:3;
30:19,22,23;31:23
**incident (1)**
20:20
**information (1)**
19:14
**Internal (2)**
19:5,10
**into (4)**
13:24;26:21;31:15;
33:14
**introduced (1)**
12:1
**investigation (5)**
16:25;17:21,23;
19:14;34:20
**involved (3)**
6:13;13:25;17:4

**J**

**Jacksonville (1)**
5:13
**jail (4)**
22:6,7;28:21,22
**January (1)**
11:6
**Jeremy (50)**
5:14,24;13:23;
20:18;21:4,5,9,12,14,
15,16,18,21,25;22:4,
8,10,14,17,21,23;
23:1,1,2,3,4,7,20,21,
25;24:3;25:23,24,25;
26:2,5;28:15,19,23,

25;30:19,22;31:1,3,6,
6,23,24;34:10,10
**job (1)**
11:12
**John (1)**
5:12
**July (1)**
13:7
**June (2)**
12:3;13:7
**jury (4)**
7:3;8:25;35:2,7
**justified (1)**
17:25

**K**

**Katelyn (1)**
29:5
**Kayce (1)**
8:6
**Kaylen (3)**
24:5;26:9;31:7
**kids (1)**
8:22
**kind (2)**
14:1,4
**knowledge (3)**
13:14,16;26:16

**L**

**last (7)**
7:16,17,18;8:9;
12:2,19;20:14
**lawsuit (2)**
34:17,18
**lawyer (3)**
5:12;9:1;20:6
**less (2)**
32:11,12
**lethal (2)**
32:12,12
**letting (2)**
26:21;33:14
**LEWIS (25)**
12:11;13:1;17:7;
20:10;24:7,21,25;
25:7,15;26:11,19;
27:11,18;28:11;29:7,
11;30:3,7,10,16;31:9;
32:22;33:9;35:4,15
**lieutenant (2)**
18:2,4
**limit (1)**
10:19
**listen (1)**
19:10
**listened (1)**
19:5
**litigation (1)**
6:13
**live (1)**

9:4
**living (1)**
8:1
**lock (1)**
12:22
**long (2)**
5:22;15:7
**look (2)**
8:11;13:4
**looked (1)**
28:10
**looking (4)**
13:1;29:4;31:13;
35:2
**looks (2)**
12:2;29:15
**lot (2)**
6:22;8:16

**M**

**making (1)**
31:15
**mandatory (2)**
10:16;16:13
**many (6)**
6:2;8:20;9:21;11:2,
3;32:24
**marked (3)**
14:6;20:9,25
**married (2)**
6:24;7:1
**matter (1)**
35:22
**may (4)**
20:5,6;25:19,19
**maybe (1)**
6:3
**McInturff (41)**
10:10;11:5;13:15;
14:5;15:11;17:3,10;
18:14;21:6,8,10,13,
19;22:2,6,12,19,22,
24;23:22,24;24:1,10,
13;25:22;26:3,12;
27:2,13;28:17,21;
29:2,10;30:6,24;31:2,
4,14;33:22;35:12,17
**McInturff's (1)**
12:3
**mean (3)**
14:19;17:9;31:20
**mentally (4)**
32:18,21,24;33:3
**mess (1)**
24:6
**Methods (1)**
30:5
**middle (1)**
19:16
**Mitzi (1)**
20:17
**Mitzie (1)**

19:22
**mom (3)**
7:5,8,10
**Money (1)**
14:14
**more (3)**
18:9;27:15,25
**morgue (4)**
22:6,7;28:21,22
**morning (3)**
27:7,14;35:13
**Most (2)**
10:6;14:12
**multiple (1)**
16:19

**N**

**name (6)**
5:18;7:12,17,18;
8:5,9
**NAMED (1)**
5:4
**names (3)**
7:14,16,24
**nature (1)**
18:12
**need (2)**
6:15;11:1
**needed (3)**
11:19;28:7,8
**nieces (1)**
8:22
**nods (1)**
6:8
**normally (1)**
33:24
**November (2)**
13:23;15:21
**number (2)**
6:5;12:2

**O**

**oath (1)**
5:8
**Object (18)**
17:7;24:21;25:1,7,
15;26:19;27:11,18;
28:11;29:11;30:3,7,
10,16;32:22;33:9;
35:4,15
**obviously (1)**
32:11
**off (2)**
18:5,6
**office (7)**
9:19;11:11;13:24;
14:17,23;26:17,18
**officer (2)**
13:25;25:4
**officers (1)**
11:2

**official (1)**
11:22
**OGLES (19)**
5:11,12;20:8,12;
23:10;24:4,10,24;
25:1;26:9,12;29:4,5,
13;31:7,10;32:2,3;
35:20
**older (1)**
7:10
**oldest (2)**
15:18,25
**one (11)**
12:16;13:2;18:6,7;
19:14;20:11;28:1;
29:22;33:23;34:2;
35:16
**online (4)**
10:6,13,14;16:10
**Only (2)**
6:18;11:2
**opinion (1)**
24:14
**opportunity (3)**
25:4,8;29:14
**options (6)**
29:8,16,20,22;
31:17;32:6
**Order (1)**
9:8
**organizations (1)**
9:6
**originally (1)**
6:20
**others (1)**
15:5
**otherwise (1)**
26:10
**out (8)**
12:17;13:10;16:15;
22:12,19;29:2;30:24;
33:24
**outcome (1)**
17:24
**over (5)**
7:19;8:21;10:12;
16:21;34:14

**P**

**Padilla (2)**
19:22;20:17
**Pam (1)**
7:15
**Pam's (1)**
7:18
**panel (1)**
8:25
**Pardon (4)**
8:13;9:13;18:3;
35:10
**part (1)**
27:25

**particular (1)**
26:24
**particularly (1)**
28:3
**pass (1)**
16:12
**past (1)**
34:14
**Patrol (6)**
11:4,16;13:10;14:6,
17;15:1
**pay (1)**
11:20
**percent (1)**
19:14
**personally (1)**
6:16
**physical (2)**
16:12,13
**picks (1)**
20:23
**place (1)**
12:19
**PLAYED (2)**
21:1;23:17
**please (22)**
21:2,5,7,15,18,24;
22:8,9,16;23:3,4,5,18,
21,23;25:24;26:2,8;
28:23,24;30:21;31:24
**pm (1)**
35:22
**point (4)**
31:19;33:20;35:9,
11
**Police (5)**
9:8;16:20,22;19:9,
13
**policy (4)**
15:3,9;28:4,6
**position (2)**
5:20;6:18
**possibly (1)**
10:8
**prior (1)**
24:15
**probably (8)**
8:23;15:20;16:1;
24:6;27:12,16;28:12;
33:18
**problems (1)**
34:13
**proceedings (1)**
35:21
**proper (1)**
26:17
**pull (1)**
26:12
**pulled (1)**
31:10
**pulling (1)**
30:14
**put (4)**

29:24;31:18,21;
33:19
**puts (1)**
10:6

**Q**

**qualified (1)**
18:14
**quit (1)**
12:13

**R**

**radio (3)**
23:6;27:3;29:15
**raised (1)**
8:19
**Randy (1)**
7:13
**reached (2)**
12:17;33:18
**read (1)**
19:7
**really (1)**
12:6
**reason (1)**
19:12
**reasonable (1)**
25:3
**recall (1)**
13:21
**receive (1)**
9:18
**record (1)**
5:18
**records (3)**
13:4;15:14;20:10
**referring (1)**
20:14
**relatives (5)**
6:22;7:4,5;8:15,25
**remember (3)**
11:8;13:22,24
**rephrase (1)**
5:15
**required (2)**
9:20;10:16
**reserve (20)**
6:1,2;9:17,18;
10:17,19,21,23,24;
11:13,15;12:13,18;
14:12;15:18;16:3,6;
33:23,24;34:5
**reserves (1)**
10:16
**residence (5)**
26:22;29:25;31:16;
33:15,17
**retreating (1)**
29:22
**reverse (1)**
24:8

**review (1)**
18:4
**right (11)**
7:9;10:17;11:20;
12:4;13:2;21:8;23:24;
29:8;30:4;32:25;33:7
**ring (1)**
11:6
**RN (1)**
8:2
**RODNEY (2)**
5:3,19

**S**

**Saline (20)**
5:20;6:1,20,22;7:4,
22;8:7;9:4,6,25;
11:10;12:18;14:2,5,
23;15:3;16:7;26:17;
29:9;33:11
**Samantha (2)**
7:25;8:2
**same (1)**
16:20
**saw (3)**
26:12;33:1,5
**Sawyer (2)**
7:25;8:2
**saying (2)**
13:24;14:11
**scene (3)**
16:19,21;28:1
**school (1)**
11:16
**schools (2)**
11:17;34:4
**second (3)**
12:24;13:8;31:11
**seeing (2)**
24:16,16
**sent (1)**
18:9
**several (3)**
18:22;32:6,13
**Shamlin (2)**
9:24;15:15
**Shannon (2)**
12:13,15
**Sheriff (8)**
5:12,21,22;6:15,18;
16:7;29:9;33:11
**Sheriff's (6)**
9:10;11:11;14:23;
26:18;27:14,15
**shoot (1)**
34:5
**shooting (6)**
13:25;16:16;17:1,4,
22;19:18
**show (3)**
12:1;20:3;23:13
**signed (2)**

18:5,6
**sister (3)**
19:20,21;20:17
**sisters (1)**
7:11
**sisters' (1)**
7:14
**sitting (1)**
32:9
**situation (5)**
24:23;25:17;32:15;
33:12,14
**someone (4)**
14:19;32:18,21;
34:5
**sorry (7)**
6:10;10:22;12:12;
14:4;20:12;31:8;
34:25
**Stallmann (2)**
8:12,14
**start (4)**
8:17;11:22;12:23;
23:16
**started (3)**
12:3;13:3,8
**starts (1)**
24:8
**state (6)**
5:18;16:20,22;19:9,
13;26:24
**statement (3)**
19:5,7,9
**still (5)**
7:7;8:7,9;10:17;
24:24
**stop (7)**
21:5,15;23:4,21;
25:24;31:25;33:16
**stops (1)**
13:12
**substance (1)**
33:4
**sued (1)**
6:16
**supplement (1)**
10:25
**supplementing (1)**
11:1
**sure (7)**
12:16;18:8,19,22;
20:4;30:12;31:15
**sworn (1)**
5:6

**T**

**talk (1)**
32:25
**talked (1)**
25:11
**talking (3)**
13:17;14:10;27:3

**tased (1)**
29:18
**taser (5)**
13:19,19;29:17;
32:13,14
**telling (1)**
13:6
**terroristic (4)**
18:13,15,17;28:1
**test (2)**
16:12,14
**testified (3)**
5:8;27:7;35:13
**testify (1)**
5:6
**THEREUPON (1)**
5:2
**thinking (2)**
30:17;31:12
**though (1)**
13:5
**threatened (2)**
22:22;31:2
**threatening (4)**
18:13,15,17;28:2
**threw (1)**
31:20
**today (3)**
21:11;24:2;32:10
**took (3)**
13:6;16:10,21
**top (1)**
8:20
**Total (1)**
11:4
**to-wit (1)**
5:9
**train (1)**
9:17
**trained (3)**
15:9,13,16
**training (9)**
9:18,22;10:13,15;
11:24;12:3;15:14;
20:10;27:25
**trains (1)**
9:23
**treated (1)**
33:12
**tree (1)**
8:17
**trial (2)**
35:2,7
**tried (1)**
33:13
**truck (3)**
14:6;22:20;30:25
**truth (3)**
5:6,7,8
**trying (7)**
8:10;12:22;24:17;
30:8,11,12,15
**turn (2)**

22:2;28:17
**twice (1)**
20:5
**twin (2)**
7:10,12
**two (3)**
7:10;13:2;27:15
**types (1)**
33:25
**typically (1)**
10:9

**U**

**unaware (1)**
15:19
**uncles (1)**
8:16
**Unfortunately (1)**
20:5
**up (11)**
8:11;12:11;20:23;
21:6;22:2;23:22;24:6;
25:4,5;28:17;32:12
**use (6)**
13:14,19;15:3,5;
17:23;32:6
**using (1)**
29:21

**V**

**vehicle (3)**
14:1,4,19
**vehicles (2)**
14:12;16:19
**verbal (1)**
32:11
**video (13)**
19:1,17;20:16,17;
21:1;23:9,17;24:16;
28:10;32:1,3;33:5;
35:2
**VOICE (21)**
21:2,5,7,15,18,23;
22:8,15;23:1,3,7,18,
21,23;25:24;26:2,7;
28:23;30:20;31:6,24

**W**

**wait (1)**
32:16
**watch (2)**
20:5,15
**Waynette (1)**
7:15
**Waynette's (1)**
7:17
**weapon (1)**
27:1
**weren't (1)**
17:18

**What's (2)**
7:16;24:15
**WHEREUPON (1)**
35:21
**whole (2)**
5:7;25:17
**who's (1)**
20:16
**WITNESS (3)**
5:4;6:8;35:23
**work (3)**
11:10,17;16:25
**worked (1)**
12:19
**WRIGHT (7)**
5:3,19;7:5,17,25,
25;8:9
**wrong (1)**
24:13

**Y**

**year (2)**
9:21;15:16
**years (1)**
5:23
**you-all (1)**
11:3

**1**

**1 (5)**
12:2;20:8,9,13,14
**1:07 (1)**
31:9
**1:25 (1)**
35:22
**1:30 (1)**
29:7
**1:32 (1)**
29:7
**1:55 (1)**
26:11
**120 (1)**
10:15
**120-hour (1)**
9:20
**15 (2)**
6:3,7
**16th (1)**
13:23
**18 (2)**
7:20;8:21

**2**

**2 (1)**
20:25
**2:16 (1)**
24:7
**20 (1)**
8:23
**2023 (2)**

11:6;13:23
**22 (4)**
12:8,9,10,12
**23 (5)**
12:3,9;13:7,7;15:21

**3**

**3 (1)**
24:8
**30 (1)**
11:4
**300 (1)**
10:12

**7**

**75 (1)**
15:21

**9**

**911 (3)**
23:4,7,8