IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION

MITZI PADILLA, personally and as the
Special administrator of the estate of
Jeremy Dale Adams                                    PLAINTIFF


         VS.      CASE NO. 2:24-CV-00771-BSM


DWIGHT MCINTURFF
and SHERIFF RODNEY WRIGHT                             DEFENDANT

---

ORAL DEPOSITION

OF

MITZI PADILLA

TAKEN NOVEMBER 4, 2025, AT 12:47 P.M.

---



# Arkansas Diamond Court Reporting

*21043 Natalie Lane*

*Little Rock, Arkansas  72206*

*www.arkansasdiamondcourtreporting.com*

*PHONE: 501.319.4807*

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS:

MR. JOHN OGLES
OGLES LAW FIRM
200 S. JEFF DAVIS
JACKSONVILLE, AR   72078
jogles@aol.com


ON BEHALF OF THE DEFENDANT:

MS. KAYLEN LEWIS
JASON OWENS LAW FIRM P.A.
1312 W. OAK STREET
CONWAY, ARKANSAS   72033
lewis@jowenslawfirm.com


ALSO PRESENT:

CHRIS MADISON, ATTORNEY REPRESENTING F.O.P.

I N D E X

STYLE AND NUMBER ...........................................1

APPEARANCES ................................................2

STIPULATION PAGE ...........................................4

WITNESS:  **Mitzi Padilla**

    Examination by Ms. Lewis ............................. 5

    Examination by Mr. Ogles ............................ 94

    Examination Concluded ...............................96

  COURT REPORTER'S CERTIFICATE ...........................97

    Errata Sheet .......................................99

E X H I B I T S

Exhibit                                    Page Identified

1. 911 MESSAGE ........................................... 45

2. PHOTOGRAPH ............................................ 56

3. 911 AUDIO ............................................. 61
(Each counsel were provided mp3 file and it is not attached to
the transcript)

4. 911 AUDIO ............................................. 74
(Each counsel were provided mp3 file and it is not attached to
the transcript)

5. LAB RESULTS ........................................... 80

4

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF **MITZI PADILLA**, a witness produced at the request of the defendants taken in the above-styled and numbered cause on the 4th day of November, 2025, at 12:47 p.m., at Ogles Law Firm, 200 S. Jeff Davis, Jacksonville, Arkansas, pursuant to the Arkansas Rules of Civil Procedure.

**P R O C E E D I N G S**

THEREUPON,

**MITZI PADILLA**,

THE WITNESS HEREINBEFORE NAMED, having

been first duly cautioned and sworn by me

to testify to the truth, the whole truth,

and nothing but the truth, testified on her

oath as follows, to-wit:

**EXAMINATION**

BY MS. LEWIS:

Q    I just introduced myself off the record, but my name is

Kaylen Lewis.  I represent the defendants in this lawsuit that

you have filed.  Can you please state your name for the record?

A    Mitzi Padilla.

Q    Okay.  Can you tell me where you live?

A    8983 Wasson Lane, Mabelvale, Arkansas.

Q    Okay, great.  And, Mitzi, can you tell me about your

family that live in that area?  Any family members, list their

names.

A    What do you mean?

Q    Like, but for jury selection, we like to get a list of

names of people who might be in the area that might have a

conflict of interest.

A    I don't have -- we don't have family, like, anywhere,

like, off my mom or dad's side here.  Just my mom, brother and

dad.

Q    Okay.  Can you tell me your mom's name for the record?

A    Doris Hubbard.

Q    Okay.  And what's your dad's name?

A    Donny Adams.

Q    And they both live --

A    In the home.

Q    Okay.  And do you have any other siblings that live in the area?

A    No, ma'am.  My brother was all I had.

Q    Are you married?

A    Yes.

Q    Okay, what's your husband's name?

A    Diego Padilla.

Q    Okay.  And does he also live at the address?

A    Yes.

Q    Okay, and do you have any other, any children, adult age, children?

A    Yes, three.

Q    Okay, can you give me their names?

A    Jasmine Padilla, Layla Padilla and Diego Padilla.

Q    Okay, and they are all over 18?

A    Oh, no, they're under.

Q    Okay.  All three are under 18 years old?

A    Yeah.

Q    And can you tell me what do you do?

A    I'm a notary public and I clean houses.

Q    Okay.  Do you use your notary degree or your notary license?

A    Well, I just received it so it's kind of new to me right now.

Q    Okay, great.  Congratulations on that.  So have you done anything or work with any law firms or anything like that?

A    Not yet, no.

Q    Okay, and you clean houses full time?

A    Yes, ma'am.  Well, when I can, yeah.  Because I take care of my mom.

Q    Okay, great.  Do you have any education?  Like, what's your education level?  Did you graduate high school?

A    No, ma'am.

Q    Did you -- how far did you make it in school?

A    Tenth grade, almost 11th.

Q    What school did you go to?

A    North Side High School.

Q    Where is that located?

A    Fort Smith, Arkansas.

Q    And then do you have any other degrees or specialized training in any field other than your notary?

A    No.

Q    We're here today to talk about an incident that happened

on November 16th of 2023. I know that it is a sensitive topic, and so I just want to go over a few rules of the deposition and how this is going to proceed. And if at any point you ever need to take a break or anything at all, let me know. I just ask that you finish whatever question I ask you before we take the break.

A    Yes, ma'am.

Q    But at any point, just let me know if you need to take a break; okay?

A    Yes, ma'am.

Q    It's natural in conversation for us to talk over one another. That's just how people talk naturally. But if you'll let me finish my question before you respond fully, that will create a cleaner transcript. Also, if you answer your questions with yes or no or full complete answers. We tend to say uh-huh and huh-uh in depositions or in natural conversation, but that doesn't come across on the transcript. Uh-huh and huh-uh, when typed out, looks the same. So if you can say yes or no, that would be better. I might correct you and say, please say yes or no. I'm not trying to be rude, I just want a clear transcript.

I tend to talk really quickly and I know I have a strong accent as well. And so if I ever speak too quickly or you misunderstand my question, feel free to ask me to repeat it. Or if you don't understand, please let me know and I'll try to

word it differently; okay?

A    Okay.

Q    I'm first going to ask you about you allege in your complaint loss of consortium allegations. And so I'm going to just go into the history of your brother and ask some questions about him; okay?

A    Okay.

Q    Part of your allegations is you said you lost services. What services do you claim your brother provided to you or other members of your family?

A    My mom, cared for my mother.

Q    Okay. How did he care for your mother?

A    My mom's paralyzed. And so pretty much he would stay home, like, stay around my house to care for my mother, lift her up and down. She can't even get in a wheelchair by herself.

Q    Okay. When was your mom paralyzed?

A    I think it was in '21.

Q    And what happened to her?

A    She was diagnosed with Guillain-Barre syndrome. So it's affected her joints, her bones, like her feet go downwards. She still has feelings in her legs, but she can't move them.

Q    Okay. What about her -- and when -- so she was diagnosed in 2021. Was it a gradual progression to being paralyzed? I mean, you said she still has some feeling or did it happen kind

of suddenly?

A   It happened suddenly.  She almost died.  She was on life support at the hospital for a long time.

Q   Okay.  How long was that?

A   In '21, she went in for about six months.  She was in the hospital.  Then they moved her to rehab, and she had an infection in her backside that was an open wound, like, two fists, hand fists put together.  And so me and my brother stayed day in and day out to help heal her wound, her open wound.

Q   And you stayed in the hospital or at their home?

A   My brother mostly stayed at the hospital with my mom.

Q   Okay.  What hospital was she in?

A   St. Vincent's.

Q   And then when did she get out of the hospital?

A   It was '21 and then they moved her to a rehabilitation center, kind of like a nursing home, but it was supposed to make her better.  And then she ended up wanting to come home.

Q   So when she came out of the hospital in 2021 and went to the rehabilitation facility, was she in a wheelchair at that point?

A   Yeah, she was completely bedridden.

Q   Okay, and then what rehab facility was she in?

A   I forgot the name of it.

Q   And then did she have -- do you remember what month or day

that she came home from the rehab facility?

A    No, ma'am, not exactly the date.

Q    And does your dad, Donny Adams, did he live in the home as well?

A    Yes.

Q    Did he care for her as well?

A    I mean, he's disabled himself so he was kind of limited. I mean, he had helped me and my brother out, like bring her food, water, you know, what he could.

Q    What is Mr. Adams or Donny Adams's disability.

A    He can't read or spell. His, like, he can't lift. A whole bunch of stuff. I can't remember all of it. He has kidney problems, his liver is shutting down.

Q    Okay. And so did yourself, your mom, your dad and your brother all live in the same home?

A    Me, my husband, my children, my mom and dad, we've lived in the same home. My brother was in and out just for my mom.

Q    Okay. So where was his full-time address?

A    At 611 -- wait -- off of Arch Street. It was 16611 Arch Street, I think. I think.

Q    And was that in Little Rock or Saline County or where was that?

A    I think it was Saline County side.

Q    Okay.

A    He had an RV that he, you know, went out there, so --

Q Okay, so he lived in his RV at that location?

A Yeah.

Q Was your brother older or younger than you?

A Older.

Q What was his date of birth?

A 10/13/84.

Q And what's your date of birth?

A 9/27/85.

Q Did your brother graduate from high school?

A No.

Q Do you know how far he made it in school?

A I think 11th grade, maybe. I'm not too sure.

Q Okay. Did he have any other specialized training or schooling after completing 11th grade?

A No.

Q I'm going to try to get into his employment history a little bit and just let me know what you remember. So after he dropped out of school in 11th grade, where did he work? Where's the first place you remember him working?

A It was my Uncle Fred.

Q Okay. What was that company?

A I don't know the company's name, but it was doing highway construction, like, cleanup, like on the sides of the freeways.

Q And do you know how long he worked for your Uncle Fred?

A For about four years.

Q   So say he dropped out around when he was around, when he was 16 years old.  He would have done that till about when he was 20 years old?

A   Something like that.  And then he had an injury.

Q   Okay.  Do you know if he did that full time?

A   I believe so, yeah.  He traveled with my uncle.

Q   Just in the state of Arkansas or --

A   I believe so, yeah.

Q   And do you know how much he was paid?

A   No.

Q   Okay, and then tell me about his injury.

A   He was working on the freeway, and a car had went on the side and hit him off of the tractor.

Q   Okay.  And what injuries did he suffer because of the accident?

A   He had back pain, his leg and knee.  He was -- it was on the freeway.  He was knocked off of his tractor.  A car ran into him.

Q   Okay.

A   I just remember that.

Q   Did -- was there any legal action regarding that injury that you remember?

A   I don't remember, no.

Q   Did he have to have any surgeries or anything?

A   I don't think so, no.

Q    Okay.  Due to that injury, how long was he off work?

A    I really don't remember.

Q    Okay.  Do you know where he worked after he worked for your Uncle Fred?

A    No.

Q    Did he ever work again?

A    He did.  Taking care of my mom and then helping me clean homes.

Q    Okay.  So --

A    He did landscaping, like, around people's yards and stuff.  And then he worked with my husband.

Q    So he would have been -- turned 16 in the year 2000, approximately.  And then he worked for your Uncle Fred until approximately 2004 when he was injured.  And then your mom was paralyzed in 2021.  Did he have to care for her before she was paralyzed?

A    No.

Q    Okay.  So from approximately 2004 till approximately the end of 2021, I'm curious about what he did in those -- in that time period.  Was he on Social Security disability?

A    No, he -- before, when we were younger, we used to get SSI.  And then he was cut off, like, I think he was 17 or 18.

Q    Why did you get SSI when you were younger?

A    For disabilities, like, I had learning disabilities, comprehension, speech problems.  My brother was ADHD, ADD.  He

couldn't write or spell his name that great. He didn't know how to read.

Q Okay. And so you believe that you received SSI benefits until you were, I guess, turned 18 because of those disabilities?

A Yeah.

Q And then so in 2004, approximately, he was injured. And then he didn't have any official jobs or pay taxes or get a W-2 at all after that that you know of?

A No, he worked cash. Like, he got paid cash.

Q Okay. You said that he took care of your mom, but that was after 2021 and probably towards the end of 2021 because she was in the hospital and rehab for so long. He said that he helped you clean homes. Do you have a business name that you clean homes under?

A Padilla's House Cleaning.

Q Okay. Is that an LLC or just --

A No, it's just --

Q When did you start that company?

A Probably ten years ago.

Q Okay, so in approximately 2015?

A Yeah.

Q How often did he help you clean homes?

A Just as needed.

Q Okay. Can you give me, like, in a month or in a year?

How often he would help you?

A   He'd clean, help me clean, like, four or five houses within a month, probably.

Q   Okay.  And you just paid him cash?

A   Yeah.

Q   Do you have any other employees?

A   No.

Q   How much, approximately a month, were you paying him?

A   It just depended on the job.  Like, whenever I would go price the house, how big the house was to clean it, and what all they needed done, and then I'd just half it with my brother --

Q   Okay.

A   -- if he went.

Q   Okay.  Is he your only employee?

A   Yeah.

Q   Did he do that, help you clean houses, four to five houses a month, from 2015 until 2023?

A   No.  It was just as needed.

Q   Okay. Do you have any records of how much you paid him or when he helped?

A   No.

Q   Okay. And are you still cleaning houses right now?

A   Off and on, sometimes.  Whenever it comes available, yeah.

Q   So it's not like you have regular clients that you clean

every month.  They just reach out to you and ask you to --

A    Yeah, pretty much.  When everything happened, I lost my clients, just lost work.  A whole lot of work.

Q    So before the incident in 2021, how many houses were you cleaning per month and how -- what was your income from that?

A    I don't know.  A month, probably like ten to 20.  Like every week, I'd line up, like, at least three houses a week so it just depend.

Q    Okay.  And what was your approximate income?  Let me ask this.  Did you have homes that you cleaned regularly?

A    Yeah.

Q    Every month or twice a month?  Do you have any record of that?

A    Just receipts where they paid me.

Q    Okay.  Did you get paid cash or did you --

A    Cash.

Q    Okay.  Did you file taxes on the income that you received from cleaning homes?

A    Yes, ma'am.

Q    And then you provided the people, your clients, with receipts after you cleaned their homes?

A    Yes.

Q    Okay.  And that was from 2015 till 2023, you had between ten and 12 homes a month?

A    Yes, ma'am.

Q   Okay.  About how much approximately, would you charge per home?

A   It just depends, like, how big the home is.  Like, if it was two-story, like, two to $400, depending on what they needed done and if it was a deep clean or a regular clean.

Q   Okay.  And then you said that your brother helped you some, but then he went through seasons where he did not help you clean homes.  So I'm going to ask you a little bit about that.  So when you started your business in 2015, did he immediately start helping you then?

A   No.

Q   All right.  When did he start helping you?

A   Just whenever I asked him, like, a few times before he passed.

Q   Just -- okay.  So you said a few times.  So can you define that for me?

A   Like, maybe three or four times before he passed recently, you know.

Q   Okay.

A   And then, you know, prior, I don't remember how many he had actually went with me to do.

Q   Okay.  So it wasn't a regular occurrence that he was helping you all the time?

A   No.

Q   Okay.  You also said that he did some landscaping.  Do you

know who he did that with?

A    My husband with Alvarez Masonry.

Q    Okay.  And is that his business?  Because you also said he worked with your husband.  You said he did landscaping, and then he said worked with your husband.  Is that the same?

A    Yeah.

Q    Okay.  Did your husband own that company?

A    No.

Q    Okay.  Do you know who does own that company?

A    Yes, his uncle.

Q    What's his name?

A    Javier Alvarez.

Q    And is it just a landscaping company or do they do other things?

A    They do like masonry brickwork, and then, you know, landscaping.  And then his other cousins, they do roofing so it's all kind of like jointed together.

Q  Okay.  How often did your brother help him with that business?

A    A lot.

Q    By a lot can you -- well, I guess first.  When did your husband start working for that company?

A    Before we met.

Q    Okay.  So when did you meet him?

A    2013.

Q   And when did your brother start helping him?

A   Like, around 2014.

Q   Okay.

A   And that was like odd jobs.  Like, if they needed help, my brother would go so, I mean, like, he would be the laborer, my brother.

Q   Okay.  Do you know approximately how many hours a week he was helping?

A   Huh-uh.

Q   Or a month or a year?

A   No.

Q   Okay.  Do you know was he paid on, like, with a W-2 or a 1099?

A   Cash.

Q   Okay.  Is there any record of what he was paid?

A   No.

Q   Okay.  Did he do that up until 2023?

A   Off and on, yeah.

Q   Were there any other jobs that you know of that your brother did from 2004 until 2023?

A   No.

Q   Okay.  You already mentioned that your brother was diagnosed with ADD, ADHD.  Did he have any other medical diagnosis that you know of?

A   Yeah, but I don't remember each one.  I know, kind of like

schizophrenia or where his mood swing, his moods changed.

Q    Okay.  You mentioned bipolar disorder in one of your statements.  Was he diagnosed schizophrenic and with bipolar disorder?

A    Yeah.

Q    Do you remember who his doctor was that diagnosed him with this illnesses?

A    It was the rehabilitation that he was at.

Q    Is that the Pinnacle Point Rehab?

A    Off of Highway 5.

Q    Okay.  Yeah, and in one of your statements, you mentioned Pinnacle Point.  That's the only rehab facility that's mentioned.  Do you believe that's it?

A    I think so, yeah.

Q    How long was he and when was he at Pinnacle Point Rehab?

A    He was in there a lot of.  He was in there a week before he passed.

Q    Okay.

A    That's who he was trying to actually talk to.

Q    Okay.  You said he was in there a lot.  Do you know the first time he went to Pinnacle Point?

A    I don't remember the dates.

Q    Would he -- was that the only rehab facility he went to?

A    It's the only one he felt comfortable at.  No, he went to UAMS Baptist.  Like, he would check, like, if he knew that

there was something wrong, he would check himself in.

Q   Okay.  Did he ever do extended stays at any of these facilities?

A   What do you mean?

Q   Would he ever stay longer than, like, a 72-hour hold?

A   Yeah.

Q   Okay.  Do you have any recollection of any dates or time periods that he stayed at any of these facilities?

A   Yeah.

Q   Okay, can you tell me those?

A   Oh, well, I don't remember, like, off the top of my head, but I have it on paper.

Q   Okay.  Can you have your attorney -- we'll talk and we -- maybe he can provide that to us.

A   Yeah.

MR. OGLES:  What are you asking for?

MS. LEWIS:  The dates that her brother was at the rehab facilities.  She said she has it on a piece of paper somewhere.

MR. OGLES:  I'll look at it.

MS. LEWIS:  Okay.

MR. OGLES:  If she has it, I'll give it to you.

MS. LEWIS:  Okay.

Q   (Ms. Lewis continuing)  Did you know of any therapist or medical doctor he was seeing for his mental health problems?

A    I don't know their names, but they were there, like, with him.

Q    With -- at Pinnacle?

A    Yeah.

Q    Do you know if he was prescribed medication?

A    Yes.

Q    What medication was he prescribed, if you know?

A    I'm not sure of the name of it.  I just know that his insurance was having a hard time covering it so that -- he was trying to get it fixed.

Q    Okay.  Did he have any other physical ailments other, I mean, besides bipolar disorder and schizophrenia and ADHD and ADD that prevented him from working?  I know you said he was hit in 2004.  Did he have ongoing back pain or anything like that?

A    No.

Q    Okay.  Did he have substance abuse problems?  So did he ever go to rehab for drug use or alcohol use?

A    Yes.

Q    Okay.  What were the substances that he went to rehab for?

A    Methamphetamines and alcohol.

Q    All right.  Do you recall the first time he went to rehab for meth and alcohol?

A    No.

Q    Do you remember when the first time you encountered him

using illegal drugs or alcohol?

A    No.

Q    Okay.  Did you ever see his use of meth and alcohol affect his schizophrenia or bipolar disorder?

A    No.  The alcohol sometimes, yeah.  So he didn't really like drinking, but he would drink occasionally.

Q    Because -- how did it affect his mental health disorders?

A    It just made him different, like, angry.

Q    Did the meth affect it, or did you ever see him use meth or how that affected his behavior?

A    No.

Q    Was he married or ever married?

A    Not that I know of.

Q    And did you know of any children he may have had?

A    No.

Q    What about arrests?  Do you know of any arrests or convictions for your brother?

A    A lot, but I don't know exactly what they're for, I mean.

Q    Can you just tell me what you do know and approximately when they might have been?  And even if you don't know the dates, just tell me what you know he's been arrested for.

A    One day, he was down the street at his camp, down the street from my house --

Q    At his RV?

A    Yeah.  Well, in his car.

Q   Okay.

A   He just parked right there, you know, to get away from everybody.  That was him.  He liked being away to think.  And because he had just bought his car, somebody called the cops and said that he was impersonating a cop because he had a retired cop car.

Q   Okay.

A   So they arrested my brother for that.

Q   And did he get -- go to jail?

A   He went to jail, but I don't remember what it was for.  Like, he didn't understand it.

Q   To your knowledge, did he ever get arrested for drug or drug possession or anything like that?

A   Not that I'm aware of.

Q   Anything alcohol related?

A   I mean, he probably had, but I don't remember.  I mean, I don't remember.

Q   Had he ever been incarcerated at ADC, the Department of Corrections?

A   No.

Q   I know that you said that he helped care for your mother after she got out of the hospital and rehab in 2021.  From the end of 2021 until this incident happened, was approximately two years.  In that two-year time period, do you know was he at UAMS, Baptist, or Pinnacle Point rehab during any of that two-

year time period?

A   Yeah, in the Pinnacle, I think.

Q   Okay.  Do you know how long he was there?

A   For like a week.  They would only keep him a week.

Q   Okay.

A   And there was a place in Hot Springs, but I don't remember -- I don't remember the name.

Q   When did he go to the place in Hot Springs?

A   It was, like, three or four months before he passed.

Q   Do you know how long he was there?

A   For about a month maybe.  I mean, just a guess.

Q   Okay.  So when he helped with your mom, did he come in daily when he was not in the rehab facilities and help with her or how often was that?

A   Every day.  He would, you know, hang around.  He was a mama's boy.

Q   Okay, so he would just go to the house and hang around all day?

A   Yeah.

Q   Did any of his drug or alcohol use affect his ability to help care for your mom?

A   No.

Q   Okay.  Tell me exactly what he would -- a day-to-day would look like for him when he was helping your mom.

A   He would change my mom's diaper.  My mom would ask him.

He'd change her diaper, make her breakfast, make sure she had something to drink, put her in her wheelchair, bring her on the front porch, make sure that she had her up time. He helped my mom quit smoking cigarettes. That was a plus. I mean, he was helpful to me because I couldn't do it by myself, and it's hard on me now to do it myself.

Q   Okay. During the times that he was in rehab or was unavailable for whatever reason before the incident in 2023, did you just take it on full time?

A   Yeah, pretty much.

Q   Okay.

A   When she was brought home, yeah.

Q   Okay.

A   My brother was there to, you know, support me if I needed him.

Q   But it was pretty much you full time. And then if he was in the -- at Pinnacle or the rehab in Hot Springs, you just did it full time?

A  Yeah.

Q  When you were caring for your mother full time before 2023, were you able to clean houses and care for your mom or did you have to take a break from cleaning houses?

A   No, I cleaned my houses. She had a paid caregiver that came in.

Q   Okay. Oh, your mom did?

A    Yeah.

Q    Okay, so tell me about that.  The paid caregiver, how often did she come in?

A    If I had a job, I'd call her and she'd come in for, like, maybe four hours.

Q    Okay, and who helped -- who paid for that?

A    Sometimes I paid out of pocket, and sometimes her insurance covered it.

Q    Okay.  When would insurance not cover it?

A    When she didn't have the hours.

Q    What does that mean?

A    Like, her insurance, it only gives you so many hours for a caregiver to come out.  And she's only got, like, I think, 15 to 20 hours a month.

Q    Okay.

A    So when that was used during the week, we would have to pay out of pocket.

Q    Okay.  Did y'all use a medical care provider or a company to bring the in-home care to you?

A    Yes.  I forgot the name of it.  She switched the companies.

Q    Okay.

A    I think it's Pinnacle in Bryant.

Q    So you would use home health to come in and help care for her and then when that would be -- and you used that as soon as

she came home from the rehab facility?

A    No, it wasn't as soon as she came home because her insurance wouldn't cover it.  We had to do a process and the application and everything and get it approved first.

Q    Do you know when it was approved?

A    Huh-uh.

Q    Okay.  And then after it was approved, y'all would use whatever hours were available under insurance and then you would self-pay?

A    Yes, ma'am.

Q    Do you know approximately how many hours a month you would have home health come to the house?

A    Not a whole lot because I like being there with my mom.

Q    Okay.  Do you still have home health come to the house now?

A    Yeah, now to help me a little bit, yeah.

Q    Okay.  Do you know how many hours a month home health comes to the house now?

A    Like, two hours a day.

Q    Okay.  You mentioned that he helped your mom quit cigarettes or quit smoking cigarettes.  Does she still smoke now?

A    No.

Q    I'm going to ask about some specific -- sorry -- specific allegations in the complaint.

MR. OGLES: I need to take a break. I want to get the complaint.

MS. LEWIS: Okay.

MR. OGLES: I need a copy of it. I didn't bring it.

**(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)**

Q     (Ms. Lewis continuing)  I was going to ask you about a specific paragraph in your amended complaint filed on December 16th of 2024.  It says, As a direct and proximate cause of defendants conduct which caused Adams's wrongful death, Padilla and Adam, survivors and heirs, suffered a financial loss associated in large part with mental anguish, lost services, society, guidance, companionship and comfort.

MR. OGLES: Is that paragraph 82?

MS. LEWIS: It is paragraph 82.

MR. OGLES: Okay, we're there.

Q     (Ms. Lewis continuing)  So I want to ask about -- so lost services, that would be defined, you're saying, as the helping with take care of your mom after she was paralyzed?

A     My work as well.

Q     Oh, and your work as well.  Okay.  And then society, what do you -- how do you define society?

A     The harassments, like, people driving by, throwing stuff in our ditches after everything happened.  Like, me being scared

to even go inside of a grocery store.

Q    Okay.  So explain that to me.  And I'm, I guess, I've not heard, not seen that in any of your statements.  What exactly has happened?

A    Like, after everything happened, what was stated on the news as if my brother was the aggressor.  Like, there was people that came driving by and just throwing out harassment comments.  Every time I'd bring my kids to school, you know, like it was somebody that had something to say about it.  And it just terrified me that something was going to happen in my family.  So we stayed inside for a good while.  We didn't like coming outside.  We didn't work.  We had people bring us stuff, you know, like food.  We just didn't want to go anywhere.

Q    Because people -- not -- and I want to make sure it wasn't the law enforcement officers.  It was just people in the community that made comments?

A    Yeah, comments, their opinions.

Q    Okay.

A    Yeah.

Q    And that was due to a news or, I guess, something on the news about the incident that happened?

A    Yeah, like how it happened.

Q    And then you stated a financial loss associated in large part with mental anguish.  And you've indicated in this deposition that you have lost some cleaning clients because of

that. Do you have any record that you keep track of when you had clients and clients you've lost or anything like that?

A Just my receipts and stuff where, you know, they pay me when I go in to clean it.

Q Do you have receipts dating back to 2015?

A I probably do, yeah.

Q Okay.

A I'm not too positive.

Q And all the income associated with your cleaning services, you've claimed on your tax returns?

A It's not all from cleaning services.

Q But you -- but all of that is included?

A Yeah.

Q Okay. Do you know off the top of your head how much less you made in 2024?

A No, not off the top of my head.

Q You said that you got your notary recently. When did you complete that?

A A few months ago. A couple months ago.

Q Okay. Have you made any money from that yet?

A Not yet, no.

Q And I just want to ask one more time, and this might be repetitive, but do you know of any convictions that your brother had off the top of your head?

A No.

Q      Okay.

                    MR. OGLES:  Let me make sure.  That means
            arrest.  Are you aware of him being arrested and
            convicted?

                    THE WITNESS:  I know he's been to jail, but I
            don't know exactly what it's for.

                    MR. OGLES:  I'm going to re-ask the question to
            help her out.  So you know he's been to jail?

                    THE WITNESS:  Yes.

                    MR. OGLES:  Do you know what for?

                    THE WITNESS:  No.

Q      (Ms. Lewis continuing)  But you said you don't know that
he's ever been incarcerated at, like, the prison, like, Arkansas
Department of Corrections?

A      I'm not aware of him being in prison, no.  I know he's
been in jail before.

Q      Saline County Jail?

A      Saline County, Pulaski County.

Q      Did -- I know that you said y'all finished high school or
y'all didn't finish high school, but y'alls last year of high
school was in Fort Smith.  When did y'all move to Saline County?

A      2007.

Q      And did y'all move together?

A      No.

Q      Okay, so when did -- you moved here first, or did your

brother?

A    I moved here first.

Q    Okay.  When did he move to Saline County?

A    It was like, 2008, maybe 2000 -- yeah.  It was, like, around 2008.

Q    Okay.  Do you have any law enforcement training?

A    No.

Q    Did your brother have any law enforcement training?

A    No.

Q    Do you have any medical training?

A    No.

Q    Okay.  Did your brother have any medical training?

A    No.

Q    Have you ever called 911 in the past to calm your brother down?

A    Yes.

Q    Can you tell me the first time you had to do that?  Do you remember the date?

A    I don't remember the dates, no.

Q    Do you remember where you were?  I'm going to ask about each incident.  So if there's several, I want you to tell me about it, even if you don't remember the date.  Do you remember where you were the first time you had to do that?

A    I think on Arch Street.

Q    And that was where his RV was?

A     Yeah.

Q     Okay.  And when did he park his RV there?  Do you know what year?

A     No, I don't remember.

Q     Was it several years before 2023?

A     No, it was probably, like, in '22 or '23.  It was right before he passed.

Q     Okay.  And that was the first time you ever had to call 911 --

A     No.

Q     -- for him?  Do you remember the very first time, approximately?

A     No, I don't.

Q     Well, just tell me what happened the first time.

A     I really don't remember.  I just know that he was angry and he needed somebody to talk to.

Q     Okay.

A     He got into it, I think it was with my husband on Arch Street.  Just words and I was either pregnant or had already had my son or my daughter.  Don't remember if she was already born or if she wasn't.  And I asked my brother to leave, and he was just being mouthy.  That's it.  And so I called to have him removed off the premises.

Q     Okay, but y'all were at his RV?

A     No.  At the time, we were renting a trailer out there --

Q     Okay.

A     -- because our trailer burnt.

Q     So you had a trailer on the same street where he moved his RV in around 2022?

A     It was the same yard, but it was kind of fenced off.

Q     Okay.  When did your trailer burn?

A     It burned at Gibbons Loop.  I don't remember the exact date.

Q     Do you remember the year?

A     Not off the top of my head.

Q     Okay.  Do you know what he got into it with your husband about?

A     No.

Q     Were there -- and then the cops -- you called 911 and what did you tell the cops?

A     That my brother -- I needed somebody out there to pretty much tell my brother that he had to leave.

Q     Okay.  And did the cops come and make him leave?

A     Yeah, he walked off.

Q     Before the cops got there?

A     No, they let him walk off.  They talked to my brother, and he just left.

Q     Okay.  Did you ever call 911 again?

A     At my home that I'm at now.

Q     Before the incident in 2023?

A     Yeah.

Q     Okay.  At the home you're at now, what happened then?

A     A deputy came and talked to my brother, told him to calm down.  He was just upset and angry, and he let my brother walk off.  He let my brother walk down the road.

Q     But what was your brother doing leading up to it before you called 911?

A     Nothing.  He was just sitting there in the house.  He was just angry.

Q     Okay, so what -- so are you calling 911 just when he's angry, but there's no real threat?

A     There wasn't a threat, no.  I mean, he asked me to call because he can't calm himself down sometimes.

Q     Okay, so you said he was angry.  So tell me what he was doing.

A     I really don't remember.

Q     Is he yelling?

A     Just talking loud, yeah.

Q     Is he cussing?

A     Yeah.

Q     Okay.  Is he intoxicated on these incidents?

A     No.

Q     He's not drunk?  He's not on drugs?

A     No.

Q     Can you remember any other times he called 911 before the

incident in 2023?

A    No.

Q    Okay.  The reason I ask is in several interviews you indicated that that was something that you had done.  So that -- you've only done it two other times?

A    Yeah.  I called the MEMS for my brother.  I thought he was hit by a car.

Q    Okay.

A    But not the police.

Q    Okay.  So you've only -- before the incident on November 16th of 2023, you've only called 911 twice.  Both times was he was angry, but there was no physical threat.  But you just called 911 to calm him down?

A    Yeah.  And there was one, it was before all of this happened.  One time, me and my husband wasn't home.  Him and my mom, my parents were home and we were on our way, driving down the road, and my brother's van was loud.  So my brother liked to mash the gas to make the mufflers sound mean.  And I thought he was angry when I was passing by the house.  And I was like, huh-uh, just keep going.  Maybe he's upset.  Let's just drive around and let him calm down, but he wasn't angry.  He was trying to tell me somebody came to my house for us and he was trying to stop us.  He didn't have a phone to tell us to stop.

Q    Okay.

A    So I ended up -- I was scared that day.  I was like, what

is his problem? And he was like, sister, I was trying to stop you because somebody came to the house for you, but I didn't have your phone number. I didn't have a phone.

Q You said you were scared. Why were you scared?

A The sound of his van, the way the mufflers sound when he gave it gas. I thought he was just trying to get closer to my car.

Q Like to hit you?

A Well, at the stop sign, yeah. But it wasn't --

Q Has he done something like that before?

A No.

Q You just -- was he intoxicated?

A No.

Q What would make you think that he would hit you with his vehicle?

A He wouldn't. It was just the sound of his muffler.

Q Just scared you?

A Yeah.

Q Did you call 911 then?

A Yeah.

Q Okay.

A Because I thought he was angry, but he said he wasn't.

Q And did the cops come then?

A Yeah, the deputy that actually -- Deputy McInturff.

Q When was that?

A    I don't remember the exact dates.

Q    And did he come to the house that you live in now?

A    He came to the -- down the road to the grocery store, and then he came to my house.

Q    What grocery store?

A    The little grocery store around the corner from my house in Sardis.  I really don't remember the name of it.  I don't shop there a whole lot.

Q    Okay.  I'm going to move on to a different complaint in your claim, in your amended complaint.  There's a lot of claims that are made, but regarding Officer McInturff's training.  Do you have any knowledge of Officer McInturff's training?

A    No, ma'am.

Q    Have you ever reviewed his training file?

A    No, ma'am.

Q    Do you have any basis for those allegations?

A    What do you mean?

Q    Do you, I mean, do you have a reason to think that he wasn't trained?

         MR. OGLES:  Other than what I told her?

         MS. LEWIS:  Yeah.

         MR. OGLES:  You can't tell her what I told you.

         MS. LEWIS:  I mean, I can't, yeah --

Q    (Ms. Lewis continuing)  Other than what your attorney told her?  Yeah.

A    No.

MR. OGLES:  If you do, tell her.

THE WITNESS:  I'm not understanding.

MS. LEWIS:  Do you know --

MR. OGLES:  Try to ask it a little bit easier.

Q    (Ms. Lewis continuing)  Do you know anything about Officer McInturff's training?

A    No, ma'am.

Q    You allege in the complaint that he was not qualified to go alone to the incident, but do you have any knowledge or information to support the allegation?

A    No.

Q    Okay.  I think I asked this already, but you have not reviewed any of Officer McInturff's training files; correct?

A    Correct.

Q    On the day of the incident, November 16th of 2023, tell me what led up to that incident.  I've read a lot of your statements, but I just wanted to hear from your own words.

A    Like what?

Q    Like, that he called you and that he had been drinking with your dad and all that.  So can you tell me a little bit about that?

A    That morning we woke up, got my kids ready for school.  We were sitting in the driveway before I took my kids to school.  My brother said, Well, I'm going with dad to help Tommy clean

his yard, and we're going to go scrap the stuff before he gets a ticket because his yard needed cleaning.

Q    Who's Tommy?

A    He's a friend that lives down the road.

Q    Okay.  Okay.

A    And they went to clean the yard, and they went to the scrapyard a couple of times that day.  And I was running errands after dropping my kids off from school, and then I get a phone call.  My brother said, Sister, we have a bonfire at Tommy's house, but I messed up, and I drank a little bit.  I don't want to drive home.  Can you pick me up?  So I said, "Okay, I'm on my way."  Pick him up and we're fine.  We get on my road and there's a car that gets behind my truck.  And me and my brother's fine.  The car keeps revving the engine and swerving back and forth as if he was going to hit me off the road.  So my brother's like, slow down, sister.  And I'm like, why?  I'm slow.  I'm only doing, like, 25.  I was trying to see if the car was going to pass, but it didn't.  It kept on and on.

And I put my blinker to turn into my driveway.  Well, he didn't see me and he swerves.  When he swerves, he almost hit the ditch next door, but he didn't.  My brother said, you know, what the hell?  And I was like, no, no, brother.  Let's just go inside and sleep it off.  I'm not even in the driveway yet. The guy throws his hands out the window and slams on his brake

as if he wanted to fight with my brother in the road. My brother jumped out of my truck, and I told him, no, come on. Well, the guy kept going.

A    Okay.

Q    My brother looked at me, and he was angry. He said, Sister, reverse your truck, park across the street. I can't calm myself down. Go ahead and call them out here. I need somebody to come help me calm down. I need help. So I was like, all right, brother. He was like, just move your truck. So that's what I did. I parked across the street, and I called 911 and told them that my brother needed somebody out to my house, that he had been drinking. I did not want to put charges on him because he didn't do anything. And I mentioned about the car that passed by.

Q    Okay. I'm going to ask you a couple -- stop you right there and ask you a couple questions; okay? In your interview with the state police, you stated he was highly intoxicated. Was he highly intoxicated when you picked him up?

A    No, he was drinking. He had alcohol in his system.

Q    But you --

A    I never said highly intoxicated, no.

Q    Okay. So you're saying that you did not say that in your interview with the state police?

A    I said he had been drinking.

Q    Okay. Did he act intoxicated when you picked him up?

A     No.

Q     Okay.  So there was no indication that he seemed drunk to you?

A     Not drunk-drunk, no.

Q     Okay.  And then you also stated that he was requesting to go to a rehabilitation facility.

A     Yes.

Q     And so when you picked him up, he was requesting?

A     Yeah, we were actually going to go home.  He was going to sleep it off.  I was going to call the place that he had just got out of.  I think it was Rivendell.

Q     Rivendell?

A     Rivendell.

Q     And then you said, "But was not accepted after conducting a phone interview with the facility."  That he was not accepted in the rehabilitation facility after conducting a phone interview with the facility.

A     I never said that.

Q     You didn't say that in your state police interview?

A     Huh-uh.

Q     Okay, so you don't recall him doing a phone interview with the facility?

A     He never got to it.

Q     But he had not done one previously?

A     That's why the cops were supposed to come out.  To

actually calm him down so he could talk to them on the phone. They had to talk to him to let him go there.

Q   Okay, so you called the cops to calm him down so he could -- but you know 911 is used for, like, emergency services; correct?

A   Yeah, for people that needs help.

Q   And then you went on to say in your interview with the state police that your brother became enraged by a car traveling down the roadway and that she -- that you explained that his mental health disease, which I'm assuming is his bipolar disorder and schizophrenia, but makes him angry when it's coupled with alcohol consumption.  Do you agree that that's correct?

A   Yeah, he gets angry.  He -- I don't know how to explain it.

Q   I want to go ask you -- I'm going to introduce this into evidence as an exhibit.  This is a message that was sent from the 911 facility, and I want you to take a look at it.

**(WHEREUPON, Exhibit 1 was marked for identification and is attached hereto.)**

MR. OGLES:  Can you read okay or you want me to read it to you?  I'm going to read it to her.

MS. LEWIS:  Okay.

MR. OGLES:  Brother was threatening.  The caller was saying that he was going to bust the windows out

of caller's vehicle.  That's what it says.

THE WITNESS:  Yeah.

MR. OGLES:  Okay.  It's at 1:45.  I think it's 1:45.

MS. LEWIS:  Yes, that's correct.

Q   (Ms. Lewis continuing)  So it says terroristic threatening.  Caller's brother was threatening the caller.  Was saying that he was going to bust the windows out of caller's vehicle.  So did you say to the 911 dispatcher that your brother was threatening you?

A   No, I told the 911 dispatch that my brother said he was going to bust windows out of my car if I didn't move my truck. He knew what he was going to do and didn't want to react like that.  So he asked me to move my truck until somebody came out to talk to him.

Q   Okay.  So your statement is that you never said that he was a threat to you or that he was going to bust out the windows of your truck?

A   No.

Q   Okay.  You can go on and tell me what happened after that, after you called 911.

A   After I called 911, the deputy showed up in a Dodge Ram. I seen him pull in so I pulled in behind him.  And my brother was in the yard near my storage building just pacing himself like he always does.  He had his hands behind his back just

kicking stuff, just kicking.  And he was trying to calm down.

Q    How long did it take for the officer to get there after you called 911?

A    It was like five, seven minutes maybe.

Q    Okay.

A    I don't really remember.  It wasn't too long.

Q    Okay.  And then I'm going to go back to the 911 call.  You -- my understanding, when I listen to it says he started to throw rocks at your truck.  Did he throw rocks at your truck ever?

A    No.

Q    Okay.  Did you ever tell the 911 dispatcher, I don't want him at my house?

A    No.

Q    Okay.  Did you ever tell them that the person that was following you had nothing to do with this?

A    No, I told the 911 dispatch about the car.  He was going to stop.  He was throwing his hands out the window, but he kept going.  He didn't stop.

Q    Okay.  Did your brother ever say he doesn't care, he don't care about us?

A    Huh?

Q    He don't care about us.  Did you tell the 911 dispatcher that your brother said that?

A    No.

Q    Okay.  And you never told the 911 dispatcher that he was going to bust the windows out of your truck?

A    No, I said that my brother asked me to move my truck so he didn't bust my windows.  He was angry --

Q    Okay.

A    -- at the car.

Q    Okay.  Did you call 911 a second time?

A    Yes.  To see if they were sending deputy out.

Q    Okay.  And that's just because you wanted them to come calm him down --

A    Yeah.

Q    -- not because you're worried about your safety?

A    No.

Q    Did you tell 911 dispatchers that he flipped out?

A    Not that I'm aware of.  I mean, I don't remember.  Only thing I know that when I called, I told him that he was angry because of the car.  The car that tried to run me off the road, but it kept going.  It didn't stop.  And my brother got angry and I needed somebody out to calm him down.

Q    Okay, so if we listen to your 911 phone call and it said something different --

A    I mean --

Q    -- would you agree with the statements that you said then or what you're saying now?

A    What I'm saying now because, I mean, I didn't fear for my

life.  Nobody feared for their life.  He was wanting help.

Q    Okay.  So you said he was walking around kicking rocks and that's where we left off.  So tell me what happened after that?

A    He kicked some rocks into the deputy's tires.

MR. OGLES:  Were you talking about this?  Do you want her to jump there or do you want to ask her before anything else, before the deputy gets there?

MS. LEWIS:  I think she had gotten to where the deputy was and then I jumped back to 911 calls.

Q    (Ms. Lewis continuing)  So, yes, go ahead.

A    My brother was kicking stuff.  And when the deputy was on the dirt road, my brother was kicking rocks, and he ended up kicking rocks on his tire.  Well, I remember the -- when I was pulling up, I had my phone on.  The deputy got out, yelling back and forth at my brother.  Like, instead of saying calmly, trying to calm him down, it was worse.

Q    Did the deputy ever tell -- do you ever hear him tell your brother to calm down or to let him turn around or get down?

A    He never told my brother to calm down.  He told my brother to automatically get down with your hands up and shot my brother with a Taser.

Q    So whenever he pulled up in his truck, did he drive past your house any and then back up, or did he pull up and stop immediately at your home?

A    No, he pulled up and passed my home.  He was already at

the end of my property.

Q    Okay, and then did he back up or did he keep his truck there?

A    I think he kept his truck there.

Q    Okay.  And then he walked up to your property and I know -- I've watched the video that you took with your phone.  And it starts where he's already up at the property.  How far of a walk is it from where he parked to the property?

A    He was at the -- I can't explain it.  Probably from where we are now to the end of this building --

Q    Okay.

A    -- to the back of past his office is where my front door is.

Q    Okay.  And when Officer McInturff's walking up, what is your brother doing during that time?

A    Just pacing himself, yelling stuff out.  Not doing anything, really.  Just freedom of speech.

Q    And you're parked away on the property across the street?

A    No, I'm on my property at this time.

Q    Okay.

A    I'm parked by my mailbox.

Q    So at one point, you parked away from your property; is that correct?

A    Yes.  When the officer got there, I immediately came in behind him.

Q    Okay.  And so you parked away from your property initially because your brother told you to do so?

A    Yeah.

Q    Because he was angry?

A    Yes.  He didn't -- he was angry at the car, and he didn't want to do something stupid and take it out on my vehicle.

Q    Okay.  And so you said that Officer McInturff pulled up a little bit from your property.  And so whenever he got there, you pulled in behind him?

A    Well, I followed him in.

Q    Okay.

A    Like, he pulled in my driveway, and I pulled in right behind him, but he kept going.  I stopped at the entrance at my mailbox.  He kept going all the way down by my storage buildings.

Q    Okay.  And then he parked and walked up?

A    Yeah.  At that time, my brother was kind of, sort of calm in the yard.  He was just pacing himself back and forth around my house, you know, in the side part.  And whenever my brother seen him, he started walking up, but he was trying to calm himself down, and he was kicking rocks.

Q    Okay.  So when he was walking up towards Officer McInturff, they were walking towards each other and he was kicking rocks, but he was calming himself down.

A    McInturff wasn't even out of his truck.

Q    Okay.

A    My brother was, like, kicking rocks, pea gravel.

Q    Okay.  And -- but he was walking towards McInturff's truck?

A    He was pacing right there, yeah.

Q    Okay.  About how far from the vehicle was he pacing?

A    Probably, like, from you to me.

Q    Okay.  And then what did that first encounter look like again?  Because your video starts, kind of, after they've already encountered each other.  So what happened, to your recollection?

A    It was just my brother yelling out, you know, stuff, trying to calm himself down.

Q    What kind of stuff was he yelling out?

A    He was just, like, cursing a little bit.

Q    Do you remember exactly what he was saying?

A    No, not really, tell you the truth.

Q    So he was yelling and cursing.  Officer McInturff walks up and then what happens?

A    Well, he didn't walk up.  Officer McInturff kind of like power walked.  Like, get down with your hands up, like -- like if my brother had done something.  And that's whenever I was getting out of my truck and I was like, oh, man.  I was like, brother, just calm down.  Because if my brother heard mine or my mom's voice, it would calm him down.

Q    Okay.

A    So that's why I was like, brother, just calm down, you know.

Q    So he was yelling and cursing, and Officer McInturff walked up and said, "Get down and put your hands up."

A    Yeah.  Because my brother had kicked rocks on his tires so it made Officer McInturff mad.

Q    Okay.  And if you stated previously to 911 or in your statement to the -- I believe in your statement to the Arkansas State Police, you stated that he was throwing rocks, but you disagree with that statement now?  You're saying he was not throwing rocks?

A    He wasn't throwing rocks, he was kicking rocks. Everything happened so quick.  And whenever I was interrogated or however you would say that question about what happened, my mind was in a boggle because I sat there and watched my brother be wrongfully shot.  He wasn't doing anything other than speaking words.  He had no weapon.  He had no intention to get a weapon.  He didn't touch the officer or nothing.

Q    Okay.  So you said he was yelling and cursing, and Officer McInturff power walked up and said, "Get down on your hands and knees and put your hands behind your head."  Did your brother comply at that point?

A    No, because my brother really didn't do anything wrong.

Q    But he didn't get down on his hands and knees and put his

hands behind his head?

A    No, my brother told him --

Q    Not on his hands and knees, sorry.  Get down on his knees and then put his hands behind his head?

A    No, my brother told him to call somebody else out, to dismiss himself.  When he started to pull out a Taser on my brother, my brother said, "Call somebody else out here.  Dismiss yourself."  And that's whenever McInturff started yelling back and forth with my brother.  Instead of calming my brother and talking to him like you and me, it was yelling back and forth.  So, yeah, that's going to make me even angry, if I was in my brother's shoes, too.  If I'm asking for you to help me, talk to me like if I'm somebody, not if I'm a criminal.

Q    Okay.  Earlier in your deposition, you stated that your brother had met Officer McInturff at his RV before.

A    Yes.

Q    So why would he tell him to call someone else out if he had encountered him before and had a fine experience the first time?

            MR. OGLES:  Or -- well, she can't testify, what he would do.  I object to the form of that question.

            THE WITNESS:  I don't -- I don't know.

            MR. OGLES:  I mean, she can't testify to what's in his mind.

            MS. LEWIS:  Okay.  All right, so --

MR. OGLES:  While we're on that, before you switch over, we do have an additional exhibit.  This is a picture of him.  You can ask about it.  I didn't have you a copy to give you.  You didn't enter an appearance.  I didn't know you were going to be here.

MR. MADISON:  That's okay.

MS. LEWIS:  Okay.

MR. OGLES:  That goes along with the question you just asked.

MS. LEWIS:  Of what?  What does this --

MR. OGLES:  McInturff had been over there before.

MS. LEWIS:  Oh, okay.  So this is from the previous time before?

MR. OGLES:  Uh-huh.

MS. LEWIS:  Can we go off the record for just a second?

**(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)**

Q    (Ms. Lewis continuing)  And we were just presented with a photograph of a previous time that Officer McInturff had been, I guess, at the decedent's home; is that correct?  Or was this at your property on Lawson?

A    My property.

Q    Okay.  So can you tell me what happened in this

photograph? And I'm going to attach this photograph as Exhibit 2 to the deposition. It was taken off of plaintiff's cell phone, I believe, but we do not know the date or time that it happened. Can you tell me what happened?

**(WHEREUPON, Exhibit 2 was marked for identification and is attached hereto.)**

A    I seen my brother walking from the camp down the road, coming over the hill, and he was bleeding, like something was wrong.

Q    So how far is his camper from your home?

A    No, his camper, his RV was on Arch Street, but he had a camp. Like, he slept in a tent, sometimes by himself. Like, camping outside.

Q    Okay, where was that?

A    On my road, Heinke Road --

Q    Okay.

A    -- but it's where the new bike trail is.

Q    Okay, how far was that from your house?

A    Down the hill.

Q    How often did he stay in a tent?

A    Most, like whenever -- pretty much all the time --

Q    Okay.

A    -- to be closer with my mom.

Q    So how long -- how far was the RV from your mom?

A    I don't know exactly how far. It was on Arch Street,

probably like two miles.

Q    Did he have a vehicle?

A    At the time, no.

Q    Okay, so, I mean, he stayed in a tent most of the time.

A    Yeah, when he was helping me with my mom.

Q    Okay, so you saw him walking from the camp from his tent to your home, where your mom also lived.

A    Yeah.

Q    Do you know what year this was?

A    '23.

Q    Okay.  Do you know approximately what month?

A    It was right when summer first hit.  I know it was hot.

Q    Okay, so May, June, July, 2023?

          MR. OGLES:  When we take a break, I'll go look at the phone, see if I can figure out a date.

A    I don't remember the dates, but I know it was summertime because it was hot.

Q    Okay, and what happened?

A    I walk outside and I see my brother walking, but staggering over the hill.  And then as he was getting closer, I noticed he had blood on him.  So I went to the end of my driveway and I was like, brother, are you okay?  Like, what happened?  What happened?  So I got a chair and I pulled him up to my porch and I sat him down.  And I was trying to get him to talk to me, but he was in so much pain.  He was like --

Q    Where was he bleeding from?

A    His head, his face and stuff was all bloody.  I thought a car maybe had hit him as he was walking up, you know, because our road, people speed all the time and there's no sidewalk or anything.  So I thought maybe he was hit by a car.  But apparently, he never told me, but my dad did, that the neighbors said that he was jumped by some black people and they stole his phone.

Q    Okay.  Did the police department or the sheriff's department pursue that?

A    He never made a report.  Only thing I called was MEMS.

Q    Okay.

A    I didn't know what happened.

Q    So your dad told you that he said he was jumped, but there's no criminal record of that or any claim that was made and that his phone was stolen.

A    No.

Q    Do y'all live on a busy street?

A    His phone was stolen cause it was my mom's phone.

Q    Okay.

A    He never returned with my mom's phone.  Like, he didn't have my mom's phone that day.

Q    Okay.  Do y'all live on a busy street or is --

A    It gets trafficky (sic).

Q    Where he stayed in a tent, was it like a -- were there

multiple unhoused people that stayed there or was it just him?

A    No, just him.

Q    Okay.  So he was bleeding from his face.  Did he have a shirt on or did they remove his shirt for this photograph?

A    I don't think he had his shirt on.

Q    So did you call 911 or did you call MEMS directly?

A    I called 911, I believe.

Q    Okay, so what happened after that?

A    They took him to the hospital.

Q    And were there any injuries as a result or like, what was his diagnosis, I guess?

A    I don't know all of his diagnosis, but I know that he had stitches in his face.

Q    Okay.  And he never told you what happened.

A    Huh-uh.

            MR. OGLES:  Is that a yes or no?

            THE WITNESS:  No.  No, ma'am.  I'm sorry.

            MS. LEWIS:  And I should have corrected you.  That's my fault.

            MR. OGLES:  That's fine.

Q    Did you ever talk to Deputy McInturff when you were there?

A    No.

Q    Okay.  Was he in the hospital for any length of time when this happened?

A    They took him to the hospital.

Q    Okay.  Did he get released the same day or did they keep him for observation?

A    I really don't remember.

Q    Is this man standing over him, (pointing to photograph) is that someone with the ambulance or do you know?  I mean, I just want to -- that's not your dad, is it?  This man right here in this picture?

A    No, that's the fire department or paramedics that came.  I don't know.  I mean, they came in that ambulance.

Q    When they got there, what was your brother doing?  I mean, was he really hurt?

A    Yeah, he was just sitting in a chair like this (slumps head down.)

Q    Okay.  So you just -- so the deputies were just there because you called 911.

A    Yeah.

Q    It was more for medical care.

A    Yeah.

             MS. LEWIS:  I'm going to take a break for just a second and use the restroom.  If you need to take a break, as well.

             **(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)**

Q    (Ms. Lewis continuing)  I'm going to go ahead and -- I am going to play the 911 recording just because there's so many

different statements and changes in the story. So I want to play that for you. It's about three minutes long.

MR. OGLES: And make sure you can hear it, okay?

THE WITNESS: Okay.

Q (Ms. Lewis continuing) I'll turn it up really loudly. Again, if you need to take any break or anything at any moment, let me know. I might pause it throughout and ask specific questions.

**(AUDIO PLAYED.)**

*(MS. PADILLA): 8983 Wasson Lane, Mabelvale, Arkansas.*

*(911 DISPATCHER): Phone number?*

*(MS. PADILLA): 501-516-9846.*

**(AUDIO STOPPED.)**

Q (Ms. Lewis continuing) I just want to confirm. Is that your voice on this 911 recording?

A Yes.

Q I'm going to attach it as Exhibit 3, and I'll email it to you after the deposition.

**(WHEREUPON, Exhibit 3 was marked for identification and is attached hereto.)**

Q But I just want to confirm that's you, that's your address, and that's your phone number; correct?

A Yes, ma'am.

Q And this is the phone call that you made on January or not

January.  November 16th of 2023?

A    Yes.

**(AUDIO PLAYED.)**

(911 DISPATCHER):  Tell me the address one more time.

(MS. PADILLA):  8983 Wasson Lane, Mabelvale, Arkansas.

(911 DISPATCHER):  Is that in Little Rock?

(MS. PADILLA):  Yes.

(911 DISPATCHER):  Pulaski County?

(MS. PADILLA):  Mabelvale, Saline County.

(911 DISPATCHER):  Are you saying Wasson, W-A-S-S?

(MS. PADILLA):  Yes.

(911 DISPATCHER):  Tell me exactly what happened.

(MS. PADILLA):  Well, I went to go pick up my brother down the road, and I pulled in my driveway. Well, there was a car following behind me.  They wasn't doing anything wrong.  My brother kicked open my door to my vehicle.

**(AUDIO STOPPED.)**

Q    (Ms. Lewis continuing)  So you stated that the car behind you was not doing anything wrong.  Do you disagree with that statement now?

A   Well, I mean, yeah.  I couldn't get it out like I wanted to.  I was trying to calm my brother down, too.

Q   Okay, did you -- you also say that your brother kicked your door open.  Did that happen?

A   Yeah.  To get out and fight with him because the guy has slammed on his brakes and he was going to stop.

**(AUDIO PLAYED.)**

> *(MS. PADILLA):  And he was threatening to beat people up, and then he started to throw rocks at my truck.  So I --*

**(AUDIO STOPPED.)**

Q   (Ms. Lewis continuing)  So you stated that he was threatening to beat people up and that he was starting to throw rocks at your truck.  Do you --

A   To beat the guy up.

Q   Yes, threatening to beat the guy up.  Well, you said people, but then also you stated he was starting to throw rocks at your truck.

A   No, not throwing rocks.  He told me to move my truck because he didn't want to throw rocks at my truck.

Q   All right.  I'm going to rewind it and replay that last statement.

**(AUDIO PLAYED.)**

> (MS. PADILLA): *Open my door to my vehicle.  And he was threatening to beat people up.  And then he*

*started to throw rocks at my truck so --*

**(AUDIO STOPPED.)**

Q    (Ms. Lewis continuing)  So you're saying he didn't throw rocks?

A    He didn't throw rocks.

Q    So you were --

A    He told me to move my truck, so I did.

Q    Okay.  So you're saying that what you stated to the 911 people was not true.

A    Before --

MR. MADISON:  Hang on.  One at a time.

MR. OGLES:  You can't say anything.

MR. MADISON:  Sorry.

MR. OGLES:  This is for the record, what's your name?

MR. MADISON:  Chris Madison.

MR. OGLES:  Yeah.  So anyway, this is between these two and me.

Q    (Ms. Lewis continuing)  Okay, go ahead.  So you -- but was that statement not true that you said to 911?  You said he started to throw rocks at your truck.  Is that not true?

A    He was going to.

q    He was going to throw rocks at your truck?

A    Yes.

Q    Okay.

A    But he didn't.

Q    Let me go back.  You said he started to throw rocks at your truck.  So that implies or that means that he had already done it the way you said that.

A    I have a speech problem and I can't get what the correct way, like, out.

Q    Okay.

A    Like, said correctly.

Q    And then previously, just a few minutes ago, you said he was not going to throw rocks at your truck, but now you're saying he was going to throw rocks at your truck?

A    No, I said he didn't want to throw rocks at my truck and asked me to move my truck.  So he didn't want to throw rocks at my truck.

Q    Do you have a diagnosed speech problem?

A    Yes.

Q    Okay, what is your diagnosis?

A    Since born.

Q    Okay.

A    I have comprehension issues.

Q    Okay.

A    I don't, like, it takes me a minute to understand, like, what some things are.

**(AUDIO PLAYED.)**

*(MS. PADILLA):  I don't want him at my house.  I*

*just want him --*

(911 DISPATCHER): *Your brother started doing this or the other people that were following you?*

(MS. PADILLA): *My brother.*

**(AUDIO STOPPED.)**

Q    (Ms. Lewis continuing)  So again, he asked.  You stated that I don't want him at my house.  And then you stated he.  The 911 dispatcher specifically asked, was it the truck or your brother started doing that.  And you said it was your brother, but now you're saying he never threw rocks.

A    He never threw rocks at nobody.  Like, at my truck, he didn't throw rocks.  He asked me to move my truck.  He's the one that asked me to call.  I called.  So I was trying to explain to them what I needed them out there for, to calm my brother down.

Q    But you understand what that, what this is saying is the opposite of what you're telling me now?  You said that he started to throw rocks, and then the 911 dispatcher specifically asked again, did your brother throw rocks?  And you said, yes, but now you're saying that that's not true?

A    No, I never said my brother threw rocks at my truck.  I said he was going to because the car that tried to run me off the road, he kept going.  The car didn't stop, but he slammed on his brakes and threw his hands out the window and pretty much was yelling words at my brother.

Q    So I want to be clear.  Are you saying this is not accurate?  What you said, or do you disagree with -- are you saying that you didn't --

A    I was just trying to get the cops out to my house to calm my brother down, and then I was going to explain why they were called out there.  I never got that chance too.

**(AUDIO PLAYED.)**

*(911 DISPATCHER):  So the person that was following you had nothing to do with this?*

*(MS. PADILLA)  No.*

*(911 DISPATCHER):  What was he threatening you? What was he saying?*

*(MS. PADILLA):  He was just saying that he don't care about us and he's drunk.*

*(911 DISPATCHER):  How did he threaten you?*

*(MS. PADILLA):  Pretty much saying that he was gonna bust my windows out of my truck.*

**(AUDIO STOPPED.)**

A    Saying that he was going to bust my windows out of my truck.  He asked me to move it.

Q    Okay.  Earlier in your deposition, I asked you if he said he did not care about you, and you said he never said that. But do you agree with your 911 dispatch statement or your statement from previous?

A    Whenever I told my brother he needed to calm down, my

brother was like, I don't care. I don't care.

Q Okay. And then did he threaten to bust the windows out of your truck?

A He didn't threaten to bust my windows out. He knew that he was flipped out because the guy had made him mad. So he didn't want to do any harm to me or my mom or anybody. So he asked me to move my truck. I knew how my brother was.

Q Did he say, I'm going to bust your windows out?

A No. He said, sister, move your truck. I don't want to mess your new truck up.

Q Okay.

A And I said, okay, brother --

Q Sorry. I didn't mean to start it. It's delayed a little bit when I press the button. Did -- we'll just keep playing it.

**(AUDIO PLAYED.)**

*(911 DISPATCHER): Is this his address or yours?*

*(MS. PADILLA): It's mine.*

*(911 DISPATCHER): Is he here now?*

*(MS. PADILLA): I'm across the street. He's on my property. I just --*

*(911 DISPATCHER): Are you guys both at this address?*

*(MS. PADILLA): He don't live there, no.*

*(911 DISPATCHER): Is he there now?*

*(MS. PADILLA): He is. I drove off because he was going to try to break my windows out of my truck.*

**(AUDIO STOPPED.)**

Q    (Ms. Lewis continuing.)  Okay.  So you previously stated, I don't want him at my house.  Do you -- can you explain why you did not want him there?

A    We were supposed to get the deputies out to calm him down so he could call the rehabilitation so he could check his stuff back in.

Q    Okay, but why did you not want him at your house?

A    When he gets angry --

             MR. OGLES:  I'm going to object to the form.  She just answered it.  Go ahead.

A    When he's angry --

Q    What does he do when he gets angry?

A    Just talk, like yelling, cursing.  That's it.

Q    And you didn't want him to yell and curse at your house?

A    Well, I have kids, too, and they were fixing to come home from school.

Q    Okay.  And so you wanted him off your property because he was getting angry and he was going to yell and curse?

A    Yeah.

Q    And you didn't want him by your kids, around your kids?

A    Yeah, to yell and scream.

Q    All right.

A    He would eventually calm down.

Q    You said he would eventually calm down.  Like, from previous experiences or --

A    No, I mean, he would have calmed himself down even more, but he didn't have the opportunity to.

Q    On his own?

A    Yeah, he would have calmed himself down.

Q    So why did you call 911?

A    Because he was going chase dude down on foot.  I didn't -- he was drinking.  I didn't want something to happen to my brother either.  I mean, he wasn't fully in his right mind.  He was drinking.

Q    He was drinking?

A    That's why he called me to pick him up.

Q    Okay.  And you said he wasn't fully in his right mind.

A    I mean, he was off his medication.  He knew he needed his medications, too.  And here -- he had already mentioned to me he messed up by drinking.

Q    You said that you were worried about him getting hurt by the people down the road.  But at that point, could you see their vehicle anymore?

A    No, they were on top of the hill.

Q    Okay.  And do you agree with me in this 911 call, it sounds like you're more worried about him hurting your truck?

A    Well, I mean, I was trying to explain myself.  It's just

hard with how to get it out.

Q    Okay.

**(AUDIO PLAYED.)**

*(MS. PADILLA):  I'm across the street.*

*(911 DISPATCHER):  Okay.  What's your name?*

*(MS. PADILLA):  Mitzi Padilla.*

*(911 DISPATCHER):  Okay, what's his name?*

*(MS. PADILLA):  Jeremy Adams.*

*(911 DISPATCHER):  Do you know his date of birth?*

*(MS. PADILLA):  10/13/84.*

*(911 DISPATCHER):  What color shirt and pants is he wearing?*

*(MS. PADILLA):  Blue jeans and I believe, a red shirt.*

*(911 DISPATCHER):  Is he White, Black or Hispanic?*

*(MS. PADILLA):  White.*

*(911 DISPATCHER):  Okay.  Does he have any weapons?*

*(MS. PADILLA):  No.  He called me to pick him up.  He said that he wanted to go back to the rehab that he was in.  So I went to go pick him up --*

*(911 DISPATCHER):  Just stay away from the house until the police get there.  I got him on the way,*

*okay? If anything changes, just call us back.*

*(MS. PADILLA): Okay, yes, sir.*

*(911 DISPATCHER): Uh-huh, bye, bye.*

**(AUDIO STOPPED)**

Q    (Ms. Lewis continuing)  Okay.  So that was your 911 call. And then it looks like that same day, at approximately 3:09 p.m., you gave an interview with the state police; is that correct?

A    Yeah.

Q    And you stated he was highly intoxicated.  You also mentioned that he was drunk in the 911 call, but in your testimony today, you stated that you could not tell he was intoxicated when you picked him up?

A    Now, do what now?

Q    In your 911 call, you said he was drunk.  And then on this, in your interview with the state police, you also state he was highly intoxicated.  Earlier in your deposition, though, you said you could not tell that he was drunk or that he was highly intoxicated.

A    Not when I picked him up.  When I first picked him up, no. It --

MR. OGLES:  She's talking about at your house.

Q    (Ms. Lewis continuing)  Well, when you first picked him up, he didn't act drunk?

A    Yeah.

Q    When you got to your house, how did he act?

A    Yeah, he acted a little drunk.

Q    Okay.  And what was his behavior when he was acting drunk?

A    Just cursing and talking.

Q    And yelling?

A    Yeah, that's it.

Q    And kicking rocks?

A    Kicking rocks.  That's it.

Q    And then you don't know, even though you stated in requesting to go to the rehabilitation facility, but was not accepted after conducting a phone interview with the facility.  You do not know what that's about?  You don't recall him --

A    We never called.  We didn't get the chance to call.

Q    Okay.

A    That was the whole purpose of me actually trying to get somebody out there to calm him down long enough where we could call so he could talk to them.

Q    Okay.  You go on to say that he immediately began throwing rocks at the deputy's patrol vehicle, but you disagree with this statement that was taken shortly after the incident.  And you're saying now he was just kicking rocks?

A    He kicked rocks.  And whenever I said that he was throwing rocks, I was trying to say that for the 911 call.  Like, that's, I said that he was trying.  He was going to throw rocks if I didn't move my truck, to move my truck across the street.

Q   Okay, I'm going to play your second 911 call, too.  I'll email this as Exhibit 4.  I'm going -- I'll reconfirm that it's you when I play it as well.

**(WHEREUPON, Exhibit 4 was marked for identification and is attached hereto.)**

**(AUDIO PLAYED.)**

*(911 DISPATCHER):  911.  What's your emergency?*

*(MS. PADILLA):  Yes, ma'am.  I just got off the phone with somebody.  I was trying to see how long it was going to be.*

*(911 DISPATCHER):  For what?*

*(MS. PADILLA):  For an officer to get to my house.*

**(AUDIO STOPPED*.)***

Q   (Ms. Lewis continuing)  Okay.  I just want to confirm this is the second 911 call you made on November 16th of 2023, and this is your voice; correct?

A   Yes, ma'am.

Q   Okay.

**(AUDIO PLAYED.)**

*(911 DISPATCHER):  The address?*

*(MS. PADILLA):  It's 8983 Wasson, W-A-S-S-O-N Lane, Mabelvale.*

*(911 DISPATCHER):  We have a deputy on the way.  I don't know his exact ETA.  Has anything changed?*

75

*(MS. PADILLA):  Okay.  Well, my brother had went inside my house.  I have my disabled mom there inside her room, and I think he's starting in -- inside my house.  And I'm parked across the street at a friend's house because I didn't want him to break my windows in my car.  I picked him up because he said -- there's the officer right there.*

*(911 DISPATCHER):  Okay.*

*(MS. PADILLA):  He said that he was wanting to go to a rehab so I was trying to help him out.  I pulled up at my house to make sure my mom had everything she needed, and he flipped out.*

*(911 DISPATCHER):  Okay.  Well, if you'll just talk to that deputy that's there.*

*(MS. PADILLA):  Okay.*

*(911 DISPATCHER):  All right.*

*(MS. PADILLA):  Thank you.*

*(911 DISPATCHER):  Uh-huh.  Bye.*

**(AUDIO STOPPED.)**

Q     (Ms. Lewis continuing)  So you called 911 a second time, and he was inside the house at that point.

A     Yes.

Q     Why did you call 911 a second time?

A     Just to see how long they were going to take.

Q     Okay.

A    Because it had been a minute.

Q    Well, you called 911 the first time because you were worried.  You said you were worried about his safety with the people down the road, and then also to calm him down.  If he goes inside, do you still have concerns?

A    No.

Q    Then why did you follow-up?

A    What do you mean?

Q    Why did you call 911 a second time?

A    To see how long the deputy was going to be.

Q    But you weren't concerned anymore?

A    Like, what do you mean?

Q    Were you concerned about --

A    Him harming my mom?

Q    Or his own safety or --

A    No.  No, I was just trying to get the rehab stuff all done before my kids got out of school.

Q    Okay.  And so you called 911 to see how long he'd be, but you felt like at that point, y'all were totally safe?

A    I never felt threatened.

Q    Okay.

A    I never felt threatened.  He's my brother.  He would never hurt me or my family.

Q    Okay.

A    I was trying to help him as he asked me to do, and so I

called 911 so they could come calm him down.

Q    Okay.

A    I mean, it wasn't my fault that I almost got ran off the road by a car that was being stupid behind me and that --

MR. OGLES:  Just wait for her question.

Q    (Ms. Lewis continuing)  You said that it wasn't your fault that there was someone being stupid that almost ran you off the road.  But there's multiple times that you state that the person behind you did nothing wrong, in your 911 call and in your interview with the state police, but you disagree with that now?

A    The car didn't stop.  Yeah, he was in the wrong by trying to knock me off the road and wouldn't slow down.

Q    Okay.

A    But he never stopped.  He slammed on his brakes, throwing his hands out the window, but he kept going.  That's what irritated my brother.  That's why my brother was mad.  I mean, he felt like the car put me at danger.  I'm his only sister, his little sister.

Q    After your brother's autopsy was done, it came back that he had benzos.  Let me pull the records so I can get it exactly -- the toxicology report.

MR. OGLES:  Well, I'm going to look at it and explain to her what you're asking her.  I guess, go ahead and ask the question.

MS. LEWIS: Well, I'm going to read it all off actually, and then you can explain it to her.

Q   (Ms. Lewis continuing)  It said he tested positive for benzos.

MR. OGLES  She may not know what that is.

Q   (Ms. Lewis continuing)  Yeah.  And then he tested positive for methamphetamine.  He tested positive for cannabinoids and then also alcohol.  Did you have any idea that he was on --

MS. LEWIS: Here, you can show it to her now.

MR. OGLES: Well, why don't you explain?  I think she knows what meth is and cannabinoids is marijuana, right?

MS. LEWIS: Yes.

MR. OGLES: Why don't you explain to her your understanding of benzoid?

MS. LEWIS: I mean, my understanding of benzos are like Xanax or Klonopin or anything like a, you know, anti-anxiety, that type of medication.

MR. OGLES: Okay.

Q   (Ms. Lewis continuing)  So did you have any idea that he was on benzos, cannabis, meth, or, I mean, I know that you said already that he was drunk, but the other three?

A   He had his prescription medications that he was on.  Even when he was in the place that he came out of, he had medications.

Q   Okay.  But I thought that you said that he didn't -- was off his meds when this happened?

A   When he got out, he was trying to get them filled -- his insurance -- but he was on his medication while he was there. He just got out before this happened.

Q   Okay, when did he get out?

A   I think it was like six or seven days prior, maybe five. I'm not too sure, but I know it was a week or so.

Q   Okay.  So did he come out with his prescriptions or are you saying he took his prescriptions in the facility?

A   They gave him what he had there to bring home to last him until he could get his filled.

Q   Okay.  So what --

A   It was like a couple of days' worth.

Q   So he had been off for four or five days before?

A   Yeah, because he was trying to get them filled and his insurance wasn't covering one of them.

Q   Do you know what medications he was prescribed?  I might have already asked that and apologize if I did.

A   I don't.

Q   Okay.  But you're, you did mention earlier that he also had a substance abuse problem with methamphetamines; correct?

A   Yes.

Q   Did you have any idea that he was using a methamphetamine that day?

A    No.

Q    You did say that he was -- had been drinking.  What about cannabis?  Did you have any knowledge that he had used cannabis that day?

A    No.

Q    Okay.  And then the benzos, he possibly could have been prescribed.  You're not sure if he was taking those or not?

A    I'm pretty sure that was from the doctors.

Q    Okay.  And that was at Pinnacle?

A    Rivendell.

Q    Rivendell.  Okay.  Sorry, I didn't mean to speak over you. Rivendell.  And I can use -- I'm going to -- I can attach this as an exhibit as well to the deposition.

**(WHEREUPON, Exhibit 5 was marked for identification and is attached hereto.)**

MR. OGLES:  I can make you a page.  You want to just copy that one page?

MS. LEWIS:  Yeah.

MR. OGLES:  Okay.  We'll do it in a minute.

MS. LEWIS:  But you can go ahead and stick it on there.

MR. OGLES:  You can go ahead and label it.

Q    (Ms. Lewis continuing)  So I'm going to move on to the video that you took on your cell phone after Officer McInturff arrived.  You said that he walked up and kind of power walked

up, and then your brother was kicking rocks and walking around the yard; correct?

A    Yeah.   Where he parked, where McInturff parked, my brother had kicked rocks onto his truck.   And then McInturff got out and he was mad, and he automatically started yelling at my brother and told him to get down and put his hands up and shot him with a Taser.

Q    You yelled at your brother, calm down and please stop during the encounter with Officer McInturff.

A    He didn't do anything wrong.   I was trying to get him to hear my voice so he wouldn't do anything.

Q    Well, and that's not the question I asked.   You said, calm down and please stop; is that correct?

A    Yeah.

Q    Okay.   What were you asking him to stop?

A    Nothing, really.   Just from speaking, like, calm down.

Q    Okay.   Did you ever hear Officer McInturff tell your brother -- you said already that you told -- he told him to get on his knees and put his hands behind his head.   Did you ever hear him say, back up and turn around so he could handcuff him?

A    No.

Q    Okay.   If the video shows that he did say that, did your brother ever comply with that?   Did he ever turn around or back up or let Officer McInturff handcuff him?

A    No.

Q    So in Paragraph 11 of your complaint, you allege Officer McInturff never issued any verbal commands or warnings to your brother, but you've stated previously that he did tell him to get down and put his heads behind his head.

A    So he told him to get down.  My brother didn't even do anything wrong, really, besides kicking rocks.

Q    But you're -- and you called 911 for terroristic threatening; correct?

A    No.

Q    You called 911 and you told 911 --

A    I was trying to explain to them --

Q    Can I finish my question, please?

A    Yes, ma'am.

Q    You called 911 and you told them that he was throwing rocks.  And you're saying now that this was not true.  But do you dispute that you told 911 that he was throwing rocks at your vehicle?

            MR. OGLES:  Now, you can say what she cut you off to say.  You were trying to explain?

A    I was trying to explain what I'm explaining now, but I can't -- I couldn't get it out right.  Like, I don't, like, whenever I may have said that my brother was throwing rocks, he wasn't.  He never threw rocks, not at me.

Q    I understand.

            MR. OGLES:  Let her finish, please.

Q    (Ms. Lewis continuing)  I understand.  But in your 911 call and the information that the 911 dispatcher had and that Officer McInturff had, you said, He's throwing rocks, he's going to break -- he started throwing rocks, he's going to break out my windows; is that correct?

A    That's what I said, but it wasn't what I was meaning.

Q    But that's what you told 911 dispatcher?

A    I mean, yeah, obviously, but it's not what I was meaning.

Q    And then that is the only information that they had was your 911 call, to your knowledge?

A    To my knowledge, yeah.

Q    Okay.  So Officer McInturff arrives and he tells your brother to get down and put his head behind his head.  Did your brother comply with that command?

A    No, my brother told him to call somebody else out there, to dismiss himself cause he knew that he wasn't going help him, cause he already started yelling back and forth with my brother.

Q    Was your brother yelling as well?

A    Yeah, my brother was yelling.

Q    Well, do you know what he was yelling?

A    Just cussing.

Q    Do you remember any specific things that he said?

A    To get the F on, get off our property, that it was private property and to call somebody else.  Dismiss yourself and call

somebody else out here.

Q    Okay.

A    That I didn't do anything.  He said -- pretty much cursing back and forth and Officer McInturff yelling back and forth.

Q    Okay.  And then they get on the porch of your property and Officer McInturff pulls his handcuffs out of his pouch and his bag.  And at that time, did you see your brother grab McInturff's arm and twist it?

A    No.

Q    Okay.  You stated on your second 911 call that he had gone inside the house, but you were not afraid for him to be inside the house.  Is that what you said?

A    Yeah.  I mean, I'm not --

Q    You just didn't want him to be there when your kids got home?

A    No.  I had mentioned that he had went inside my property, inside the house where my mom was.  I was trying to figure out what time the cop was going to get here.

Q    Okay.  When did he come back out?

A    Way before the officer got there.  My brother was already at the end of the yard, like, where my storage buildings were.  My front door was open.

Q    At the moment that Officer McInturff pulled out his handcuffs, you yelled, please, Jeremy, let him help you.

A    Yeah.  So he could calm himself down and talk.

Q    Okay.

A    I was trying to get Officer McInturff to calm himself down too, like, from yelling back and forth.

Q    Okay.

A    Like, if he would have just stepped back, then it would, I mean, my brother had already calmed himself down.

Q    And then did you see Officer McInturff punch or not Officer McInturff, sorry.  Strike that.  Did you see your brother punch Officer McInturff in the head?

A    No, I seen him swing his arm from falling.

Q    Okay, but you never saw him land contact with Officer McInturff?

A    No.  Not as aggressive physically, no.  He was stumbling from a fall that he didn't hit the ground the second time.

Q    Okay.  Did you ever see your brother have -- in the video that you took of him, while you're taking the video, balled up fist?  No attempts to strike McInturff or actually strike him?

A    No.

Q    Have you re-watched the video since the incident happened?

A    I don't have to watch them.  I see it playing in my head every day.

Q    Did you re-watch it though?

A    No.

Q    When you did your --

A    I have the videos.  I just -- why watch them?  I was

there.

Q   I watched an interview with you on YouTube for Too Hot for TV, I believe, is the name of the news agency that posted that. Did you watch your video in preparation for that interview?

A   No.

Q   So you did not see your brother strike McInturff before the gun was discharged?

A   No.  I seen him trying to stumble from a fall and him telling McInturff to keep his hands off of him, that he didn't do anything wrong.  McInturff was being aggressive.  My mom, with my front door being open, said, Son, come put mama in her wheelchair and put me on the front porch and we'll smoke a cigarette and we'll be alright.  We'll calm down together.  My brother was calm.  My brother went to go turn around to walk in the house, put my mom in a wheelchair like she asked to calm himself down.

And McInturff runs up on my front porch and pulls my brother's hair and makes him bust his head on the brick piers. My brother got up first time and said, "Don't put your hands on me.  I didn't do anything.  Don't put your hands on me."  So I'm trying to tell my brother, just calm down, let it go.  And my brother calmed himself.  He had his hands in front of him.

Q   And I forgot to ask earlier, when your brother was tased, where in the yard was he tased?

A   By my storage building.

Q    Okay.  So --

A    Where McInturff's truck was.

Q    Okay.  And the Taser didn't do anything to him at that point; correct?

A    It didn't stick because my brother had a baggy shirt on.

Q    Okay, so you think it just hit the shirt?

A    And my brother had told him, dismiss yourself.  Call somebody else out here.  But he just didn't.  And he -- go ahead.

Q    So at that point, you hear the gun discharge.  How many times did you hear the gun discharge?

A    Three.

Q    Okay.  And then how long after the gun discharged did other officers arrive?

A    A long time.  My brother died before my face.

Q    Okay, so you -- if it was a couple of minutes on the video, you don't --

A    Like, he drifted away in my face.  Several times that I wanted to get down there and help him, but he still had his gun drawn.  And I had to think about my mom and the situation that I was in at that time.  What if I would have went down there to help my brother and he would have said I was trying to attack him?  I mean, you know.

MR. OGLES:  Wait till she asks you a question.

Q    (Ms. Lewis continuing)  Do you want to take a break?

A    Huh-uh.

MR. OGLES:  If you do, we can.

MS. LEWIS:  Yeah, we can take a break if you need to.

MR. OGLES:  You're doing good.  Just answer your question.  Listen and answer.

THE WITNESS:  You can go ahead.  It's fine.

MS. LEWIS:  No, I -- let's just, for a second, go off the record for a second.

**(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)**

Q    (Ms. Lewis continuing)  You stated earlier, before we took a break, that he drifted before your eyes.  In your interview with Too Hot for TV video you stated that you didn't know what happened and that he spoke to you, your brother did.

A    Huh?

Q    In your interview with Too Hot for TV, you said --

A    What's that?

Q    That was the YouTube video that you did.  We talked about it previously.

A    Yeah.

Q    You did and interview with a news anchor and I asked you if you watched the video in preparation for that.

A    Oh, no, I didn't.

Q    In that interview you stated that you didn't know if he

had died or lived and that your brother spoke to you and told you to go to UAMS?

A    Yeah.

Q    Okay.

A    Yeah, my brother, you could see it in my brother's eyes when he was laying there that he was fighting to stay here, you know.  Like, he didn't want to give up.  And then I was pulled away when everybody else showed up.  And I was trying to see if my brother was still breathing.  But when I seen him breathing getting inside the fire truck ambulance, it made me feel a little bit better that my brother was still breathing.  By the time that the yellow tape was cut around my premises, I jumped in my truck and something just told me just go to UAMS.

And when I did, I didn't go to the emergency room. Something just told me to go up on the fourth floor.  So I did and I told them that the emergency room had sent me up here. My brother was airlifted, and he was a gunshot victim.  And they asked me did he have any scars or markings.  Then they pulled me and my dad to the door and the doctor tells us what happened, that my brother wasn't -- that my brother had passed away.

Q    Okay.  And you said he was airlifted to UAMS?

A    Yeah.

Q    Okay.  Did you recall -- you said in your complaint -- and I'm going to ask this one more time.

MR. OGLES: What paragraph?

MS. LEWIS: Paragraph 11, I believe.

MR. OGLES: Okay.

Q    (Ms. Lewis continuing)  That he, Officer McInturff, never issued any verbal commands or warnings to your brother prior to the use of his firearm.  If the video that you took says something different, I mean, do you disagree with that statement?

A    Like, what do you mean?

Q    Well, if the video says, you know, you say it yourself that he told him to get down, put his hands behind his knees and the video says, shows McInturff telling your brother, I said back up and turn around so he can handcuff him.  That is a verbal command; correct?

A    I'm not understanding.

Q    Okay.

MR. OGLES: She may not understand.

MS. LEWIS: Hold on.  Let me finish.

Q    (Ms. Lewis continuing)  If McInturff advised your brother and told Jeremy to back up and turn around so he could handcuff him, is that a verbal command?

MR. OGLES: Explain to her what a verbal command is.

Q    (Ms. Lewis continuing)  Is that an officer telling him to do something so he could handcuff him?

A    I guess, yeah.

Q    Okay.  Did your brother ever comply with that command?

A    No.

MS. LEWIS: I want to take a break for a second and just review my notes.

**(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)**

Q    (Ms. Lewis continuing)  I just have a few more questions for you and then we'll finish up.  We talked previously about your cleaning company.  Did you have any contracts or anything with any of your clients that were signed?

A    No, ma'am.

Q    Okay.  Have you ever been convicted of a crime?

A    Yes.

Q    What crimes have you been convicted of?

A    Methamphetamines.

Q    Okay.  Was that in Pulaski County?  Saline County?

A    Fort Smith.

Q    What year was that?

A    2003, or 4.  I don't remember.

Q    Did you serve any time for that?

A    Yes.  That was my first time ever being in trouble.

Q    Okay.  How long did you -- did you go to prison?

A    Yes.

Q    How long were you in prison?

A     Three years.

Q     Have you been convicted of anything since you were released?

A     No.

          MR. OGLES:  Hold on a second.  Can you restate that question?

Q     (Ms. Lewis continuing.)  Have you been convicted of anything since you've been released?  Like, since you said that was probably in 2007, have you been convicted of anything else?

          MR. OGLES:  Tell her all the convictions you've been convicted of.  All the times you've been arrested.

A     I've been in trouble for driving with no license.

Q     Okay.  Were you arrested or just get a ticket?

A     I don't, I mean, I know I probably went to jail for a ticket.

Q     Okay.  What -- you don't remember what year that was?

A     (Shakes head side to side.)

Q     Okay.  Any others?

A     Back in 20 -- can't remember the year.  It's like 2012 or 14.  I don't remember.  I got indicted.

Q     For what?

A     For just knowing somebody.

Q     Okay.  So that wasn't a charge against you?

A     I mean, I got charged with it.

Q    Do you know what the charge was?

A    I don't remember what it exactly it was.

Q    Do you know what court or county?

A    It was federal court.

Q    Okay.  Where did you live at the time?

A    At Gibbons Loop.

Q    So in Saline County?

A    Yeah.

Q    Okay.  Any other charges or convictions?

A    Not that I remember, no.

Q    Have you ever been sued before outside of -- not a criminal, but like civilly?

A    No.

Q    Have you ever -- do you take drugs recreationally?

A    No.

Q    Are you on drugs today?

A    No.

Q    Are you prescribed any medication that would alter your ability to give an accurate and truthful testimony today?

A    No.

Q    And you're not on any medication right now currently?

A    I am on my medication.

Q    But the medication that you're on would not alter your mental state?

A    No.

Q    Okay.

          MS. LEWIS:  I don't think I have any other questions right now.

**EXAMINATION**

BY MR. OGLES:

Q    What are your diagnosis, health wise?

A    Depression, ADHD, and speech impediment.

Q    You said something earlier today about comprehension.

A    Yeah.

Q    What are you talking about?

A    Comprehension.  Like, I have a hard time remembering, like, how to say things.

Q    Okay.  And you have medication you take.

A    Yes.

Q    What medication do you take?

A    I take Adderall.

Q    What'd you take today?

A    I had my Adderall.  I have pills at nighttime that I have to take.

Q    Do you know the name of them?

A    No, but I have a list of them.

Q    Okay.  Any other medication?

A    No.

Q    She had asked you about your felony convictions and I'm just going to make sure we get it right the best you can.

You're not denying you've been convicted of felonies; correct?

A    No.

Q    Were you convicted in Pulaski County of a felony?

A    (Nonverbal response).

Q    What's your middle initial?

A    D.

Q    Were you convicted of burglary in Pulaski County in 2014 or a theft of property?

A    I think it was theft of property.

Q    Okay.

A    It was for a washer, I think.

Q    Okay.  Were you -- I'm just looking here on Court Connect. Do you remember any other felony convictions other than the one in federal court?

A    No.

Q    But you're not denying you've been convicted; correct?

A    Correct, no.

Q    I only see two felonies.  Do you know if there are any more felonies other than -- you have a felony conviction in federal court; right?

A    Yes.

Q    You think you have two felony convictions in state court in Pulaski County?

A    I believe so.  I really don't remember.

Q    That's fine, that's fine.  I'm not going to hold you to

it.

MR. OGLES: That's all I have.

MS. LEWIS: I believe we're done.

**(WHEREUPON, the proceedings were concluded in the matter at 3:07 p.m. on November 4th, 2025.)**

**(WITNESS EXCUSED)**

C E R T I F I C A T E

STATE OF ARKANSAS    )

                     )ss

COUNTY OF PULASKI    )


     I, NATOSHA WILLINGHAM, Certified Court Reporter #894 and Notary Public, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

     I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

C E R T I F I C A T E

(Continued)

I FURTHER CERTIFY that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter.  This transcript is prepared at request of Counsel for Defendant and all fees are billed directly to Counsel for Defendant in compliance with Arkansas Board of Court Reporter Examiners Regulations Section 19.

WITNESS MY HAND AND SEAL this 11th day of November, 2025.

_____

NATOSHA WILLINGHAM, CCR

Certified Court Reporter #894

My Commission Expires:  01/09/2033





ERRATA SHEET

Page _____ Line _____ Change: _____

To: _____

Reason: _____

Page ____ Line ____ Change: _____

To: _____

Reason: _____

Page ____ Line ____ Change: _____

To: _____

Reason: _____

Page ____ Line ____ Change: _____

To: _____

Reason: _____

Page ____ Line ____ Change: _____

To: _____

Reason: _____

Page ____ Line ____ Change: _____

To: _____

Reason: _____

_____    _____    Page ___ of ___

     MITZI PADILLA                 DATE

SIGNATURE PAGE

I, Mitza Padilla, do hereby certify that I have read the foregoing 96 pages of typewritten transcript of my testimony, after necessary translation, given under oath on the 4th day of November, 2025, and that the said transcript and corrections, if any, that appear on the attached errata sheet(s), are true and correct to the best of my memory and belief. Further, that I have signed my name to this signature page and authorize that the same be attached to the original transcript.


_____        _____

          DATE                        MITZI PADILLA



*****************************************************************

STATE OF _____ )

COUNTY OF _____ )

    SUBSCRIBED AND SWORN to before me, a Notary Public in and for the aforesaid county and state on this the _____ day of _____, 2025.


                              _____
                                      NOTARY PUBLIC

**ARKANSAS DIAMOND COURT REPORTING - 501.319.4807**
*www.arkansasdiamondcourtreporting.com*