**In The Matter Of:**

*MITZI PADILLA, ET. AL v.*
*DWIGHMCINTURFF, ET AL.*

*DWIGHT MCINTURFF*
*November 6, 2025*

*SKYE'S THE LIMIT COURT REPORTING*

Original File Deposition Transcript Dwight McInturff.prn

**Min-U-Script® with Word Index**

IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


MITZI PADILLA, personally and as the
special administrator of the estate of
Jeremy Dale Adams                                      PLAINTIFF


VS.                          CASE NO. 2:24-cv-0071-BSM


DWIGHT MCINTURFF
and SHERIFF RODNEY WRIGHT                               DEFENDANT



ORAL DEPOSITION

OF

DWIGHT MCINTURFF

TAKEN NOVEMBER 6, 2025, AT 9:02 A.M.



SKYE'S THE LIMIT COURT REPORTING, LLC

SKYE R. WRIGHT, CCR

844 Bee Branch Road

Quitman, Arkansas  72131


Phone: 501-206-8336


skyesreporting@gmail.com

# A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

MR. JOHN OGLES
OGLES LAW FIRM, P.A.
P.O. BOX 891
JACKSONVILLE, ARKANSAS  72078
jogles@aolcom


ON BEHALF OF THE DEFENDANTS:

MS. KAYLEN LEWIS
OWENS & PARKER LAW FIRM, P.A.
1160 MARKHAM ST., SUITE 2
CONWAY, ARKANSAS  72032
lewis@jowenslawfirm.com

MR. CHRIS MADISON
MADISON LAW FIRM
501 WOODLANE STREET, STE. 122 SOUTH
LITTLE ROCK, ARKANSAS  72201
rcmlaw@livecom

I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . . . 2

CAPTION PAGE . . . . . . . . . . . . . . . . . . . . . . . 4

WITNESS:  DWIGHT MCINTURFF

     Examination by Mr. Ogles . . . . . . . . . . . . . . . 5

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . . . 123

E X H I B I T S

EXHIBITS:                                    IDENTIFIED:

1.  Training History Report . . . . . . . . . . . . . . . 13

2.  State Police Recording. . . . . . . . . . . . . . . . 20

3.  Twitter Profile. . . . . . . . . . . . . . . . . . . 34

4.  Video . . . . . . . . . . . . . . . . . . . . . . . 113

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF DWIGHT MCINTURFF, a witness produced at the request of the Plaintiff, taken in the above-styled and numbered cause on the 6th day of November, 2025, at 9:02 a.m., at the offices of Owens & Parker Law Firm, P.A., Conway, Arkansas, pursuant to the Federal Rules of Civil Procedure.

P R O C E E D I N G S

THEREUPON,

DWIGHT MCINTURFF,

THE WITNESS HEREINBEFORE NAMED,

having been first duly cautioned and

sworn by me to testify to the truth,

the whole truth, and nothing but the

truth, testified on his oath as

follows, to-wit:

EXAMINATION

BY MR. OGLES:

Q   Sir, I'm John Ogles I represent Ms. Mitzi Padilla in the Adams Estate and I'm going to ask you some questions.  If you don't understand them just tell me and I'll re-ask them because sometimes I don't ask good questions.  State your name.

A   Dwight McInturff.

Q   At the time this happened you were 75 years of age, correct?

A   I believe -- yes, sir.

Q   November 16, 2023?

A   Yes, sir.

Q   And the only reason I'm saying that, because I know when I got all your personnel files your age was blacked out, your birthday was -- I don't need -- go ahead.

(TELEPHONE RINGS)

Q   And I don't care what your birth date is.  At the time this happened, November of '23, you were 75.  And your address was blacked out too, and I don't care about your address, but it's on arcounty.gov, just so you know.  But you have to say yes or no, okay, when I ask you questions, or answer the question.  Nod your head, that doesn't really work.  But you are a resident of Saline County, correct?

A   Yes, sir.

Q   How long have you been a resident of Saline County?

A   Since 1989.

Q   And are you married?

A   Yes, sir.

Q   And what is your wife's name?  The only reason I care is because the jury pool, I want to make sure you don't have any relatives on the jury pool.

A   Her name is Geri, G-e-r-i.

Q   Do you have any other relatives in this area, Central Arkansas?

A   My son.

Q   What's his name?

A   Tyler.

Q   And where does he live?

A   With us.

Q    Anybody else?

A    No, sir.  We have kind of an adopted granddaughter, but she's not ours, but we helped raise her.

Q    How old is she?

A    Marley is 17.

Q    Okay.  Well, she won't be on the jury pool if she's 17.

A    No.

Q    You live in Saline County.  Do you belong to any organizations?

A    No, sir.

Q    Do you go to church?

A    Kind of.

Q    If you do go to church, where do you go to church?

A    Geyer Springs.

Q    Do you live close to Geyer Springs?

A    Yes.

Q    I didn't GPS your address, I just found it.  And the reason I'm asking you these background questions is for the jury pool.  I want to make sure that you don't have anybody on it that knows you personally.  If they don't say they know you personally on the jury, I'm just trying to get some names.  So you told me about your family.  You don't belong to any organizations, Rotary or anything like that?

A    No, sir.

Q    And what do you do for a living?

A    I'm retired now.

Q    When did you retire?

A    This past year.

Q    Was that from Dwight McInturff and Associates?

A    Yes, sir.  I closed the business.

Q    And what is that?

A    We publish phone books for a living.

Q    Really?

A    Yes.  Business kind of died.

Q    Actually, I had no idea what it was, I couldn't figure it out on the internet.  So how long has that business gone?

A    We started it in 2022.

Q    And before that, what did you do?

A    Worked for AT&T in directory.  I've done directory sales since 1980.

Q    And have you been in Saline County since '89?

A    Yes, sir.

Q    And have you been working for AT&T since '89?

A    From '89 til '92, while I was in Saline County I worked for AT&T.

Q    After that where did you work?

A    Worked for a telephone company in Illinois doing

the same thing, doing directory.

Q     From Saline County where did you move?

A     Moved to Illinois for a little while and then we were right back.  Didn't like it.

Q     Then what did you do?  I'm just getting your work history.

A     Worked for CCD from '94 to about 2001.

Q     What is that?  What did you say?

A     It's another company that printed phone books.  And then in 2002, started this business.

Q     McInturff and Associates?

A     Yes.

Q     You were incorporated I saw.  Is it still an ongoing corporation, or are you closing it down?

A     We're closing it down now.  We haven't done business since June.

Q     All right.  And have you ever worked full-time for law enforcement?

A     Oh, full-time?  No, sir.

Q     When did you start working as a reserve deputy for Saline County?

A     Let's see, I believe that was in 2014, maybe 2013.

Q     That's fine.  I have your personnel file.  I don't care about looking at it, it doesn't really matter.  So if you started working in 2014, did you have any

training?

A    Yes, sir.

Q    Where did you have the training?

A    In Saline County.

Q    Did you ever go to law enforcement academy or anything like that?

A    The State of Arkansas has an academy for reserves, and I went to their academy.

Q    Where is that?

A    In Saline County.

Q    What's the name of it?

A    I don't know.

Q    You don't get paid as a reserve deputy, do you?

A    No, sir.

Q    Have you ever been paid as a reserve deputy?

A    No, sir.

Q    Why did you become a reserve deputy?

A    The County needed help and I was able and I was willing.

Q    How do you know they needed help?

A    The County always needs help.

Q    Well, did anybody tell you they needed help?

A    Yes.

Q    Who?

A    I don't remember, just conversation that I had with

someone.

Q    And how long were you a reserve deputy?

A    Still am.

Q    Well, didn't you take off some time and then came back?

A    I left the sheriff's office, don't remember the year, and then came back, but while I was off I was a reserve for Shannon Hills and then Haskell Police Department.  So I stayed as a reserve.

Q    How long were you a reserve for Shannon Hills and Haskell?

A    During that time that I was off.

Q    And I think the Sheriff asked you to come back in January of '23; is that right?

A    I'm not sure of the date, but --

Q    Was the year '23?

A    I believe it was.

Q    And why did he ask you to come back?

A    He liked me.

Q    Did he say he wanted you to work schools?

A    When you come back as a reserve there's things you like to do, but you also do things you're asked to do. So didn't just ask me to work the schools.

Q    He didn't?

A    No.  You come back as a reserve to follow his

instructions.

Q   So he didn't ask you to come back and tell you that he just wanted you to work the schools, the sheriff?

A   No.

Q   And when I say work the schools, what does that mean; is that security or is that something else?

A   Yes, sir.

Q   Okay.  And you actually didn't come back until July of '23; is that correct?

A   I don't know the day.

Q   That's fine.  Was it the summer of '23?

A   I'm not sure, but it could be.

Q   But you didn't come back in January when he first asked you to come back, did you?

A   When he first asked me to come back I may not have, but I was still a reserve for Haskell and Shannon Hills.

Q   Did you receive any training in '23 when you came back as a reserve deputy?

A   There's mandatory training as a reserve deputy every year.  I did that, whatever mandatory training there was, plus other training as it comes up.

Q   Okay.  Did you receive training at Shannon Hills, also?

A   I took online classes.  Now, whether I was at Shannon Hills at that time I'm not sure.

Q   All right.  I'm just asking you, if your personnel file reflects that you received training from Saline County in July of '23, would you agree with that?  This will be our Exhibit 1.

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

A   Let's see, in-service training 2023, yes, must have.  I'll accept that if it says it.

Q   Yes.  Well, that's all I have too.

A   Yes.

Q   So the way I look at it here, Exhibit 1, you received in-service training on July 27, '23, is that right, and then handgun training in June of '23; do you agree with me on that?

A   And where did this come from?

Q   Your personnel file.

A   Okay.  Yes, if that came from the personnel file.  Yes, we qualify every year.

Q   Okay.  I know you received training in '24, but I'm asking you about '23.  And then you received some training in '22, that's when you were at Shannon Hills, is that correct, in '22?

A   I don't remember.  I don't know.

Q   Okay.  Do you remember when you came back and started working in Saline County?

A   The exact date?

Q    No.  You remember it's in '23, though, we can agree on that, right?  You came back in '23 and you started working for Saline County?

A    I believe that's possible, yes.

Q    I'm just asking you, I don't want to put words in your mouth.

A    And that's okay.  You're just trying to remember dates, but --

Q    You don't have to remember them specifically, the year is good enough for me because I have your personnel file.

A    Okay.

Q    So after you came back in '23 for reserve deputy of Saline County, what kind of stuff did you do?

A    As a reserve?

Q    That's right.

A    The same thing I'd done since 2013.

Q    Okay.  Tell me some of the things you did, if you can remember, from July of '23, or June of '23, whenever you think you came back in '23.

A    It would be consistent with any year.  You do special events, we do special events, Amplify, the fair, we would help at the schools, we help patrol.  Just whatever you're asked to do.  What's your asked to do.

Q    Did you ever do any calls by yourself for violent

cases or felony cases?

MS. LEWIS: Object to form. You can answer.

Q    You can answer the question.

A    Say that again.

Q    Did you ever do any calls as reserve deputy in Saline County in '23 for violent cases or felony cases?

A    I did calls for Saline County in 2023. Any call could have the potential to be violent or dangerous, but I don't remember any.

Q    Did you ever go by yourself other than this incident?

A    Yes.

Q    How about for felony cases; did you ever go by yourself?

A    You don't know if it's a felony until you go.

Q    Okay. Give me some examples, then, of what you went to. I know we've got some dog cases, you went and helped people find dogs, I'm not talking about that.

A    Automobile accidents, welfare checks, things like that.

Q    All right. Did you ever do any domestic cases in 2023 by yourself?

A    Don't remember.

Q    This is after you came back. All my questions are

related to after you came back to Saline County as a reserve deputy. So you don't remember any domestic cases?

A   Not right offhand.

Q   How would you describe this incident, November 16, '23? Would that be a domestic case to you?

A   It was terrorist threatening and I believe that --

Q   That's how you'd describe it?

A   That's what the call was.

Q   Okay. And before November 16, '23, had you done any other terroristic threatening cases?

A   I don't remember.

Q   Did you ever go on any terroristic threatening cases by yourself in November of '23?

A   Couldn't remember that.

Q   Okay.

A   Couldn't remember that.

Q   This is November '25, so you don't remember going on any from July of '23 until November 16, '23?

A   Say that again.

Q   You don't remember going on any terroristic threatening cases from July of '23 to November of '23 --

A   No.

            MS. LEWIS:  Object to form.

Q   -- other than this one, this case we're here for

Q today?

A Don't remember any others.

Q In November 16, 2023, before you got this call, what were you doing, before the Jeremy Adams, what were you doing?

A Before this call?

Q That's right.

A On that day.

Q On that day.

A I was assisting patrol.

Q And who was the patrolman? Who was the patrolman you were assisting?

A I don't remember his name. I was on patrol that day and another deputy got a call. We do try to back each other up.

Q Who was the other deputy that got a call?

A I can't remember his name. Sorry.

Q That's fine.

A I know it was on Terrace, off of Chicot, so I was with him when the call came out.

Q And what kind of case was it? I mean, you got a call on Terrace, off of Chicot; what kind of call was it?

A That he was on?

Q Yes.

A    I believe that he was on -- it was minor.  It was dealing with, I think, DHS, some issue with family.  It wasn't a dispute, it was just some issue with a family.

Q    Okay.  How did you find out about the Jeremy Adams call?

A    When I was with him, the call came out on the radio.  My handheld radio didn't pick up the call.  Now, that doesn't mean it's a bad radio.  It's like a cell phone, sometimes you get a signal, sometimes you don't.  I heard it on his radio, but it was to me.

Q    Okay.  And what did it say?

A    It said that it was terroristic, a brother was threatening to throw rocks at his sister and her car.  That's what it was.  Now, I don't know if that's the words that came out over the radio, but that's the gist of it.

Q    Why was it sent to you and not the other patrolman on another radio?  You said you heard the call on the other officer's radio.

A    Yes.

Q    Why was it not sent on your radio?

A    My radio didn't pick up.  I didn't get a signal, I didn't pick up the call.

Q    Do you know why they sent it to you and not the other patrolman?

A    Whose the other patrolman?

Q    You said you were assisting a patrolman.

A    Oh, he was on a call.  He was already assigned a call.

Q    Were you with him?

A    Yes.

Q    Okay.  And what kind of vehicle were you driving?

A    County truck.

Q    Okay.  And it had a radio in it?

A    Yes, sir.

Q    And you also had a radio on you; is that correct?

A    Yes.

Q    Did you have a body cam on you?

A    No, sir.

Q    Is there a reason why you didn't have a body cam?

A    I don't know.

Q    That's fine.  If you don't know, you don't know.

A    No, I --

Q    That's a question for somebody else.  But you had a radio in your pocket; is that right?

A    Yes, sir.

Q    Did you have a mic where you could punch a button and talk into?

A    I don't believe I did.  I believe it was just the radio on the belt or in my hand.

Q    And so you got the call.  What did you do next?

A    I went.

Q    Did you tell anybody that you were going?

A    Yes.

Q    Who did you tell?

A    Dispatch and obviously the deputy I was with.

Q    Okay.  I have the recording and I'm going to play it.  Your Internal Affairs recording.  There's no since in me asking you what you already said, and then I'm going to ask you some questions about it.

A    Okay.

MR. OGLES:  And this will be our Exhibit 2. I'll email it to you.

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

MS. LEWIS:  Is this the State Police recording?

MR. OGLES:  I think so.  He was there.

MS. LEWIS:  I just wanted to make sure that I knew what we were playing.

MR. OGLES:  I'm not the worlds smartest on this stuff, okay, so just bare with me.  But I'm going to let it play and then I'm going to ask you if it's your voice.  It's like 38 minutes, and then I'm going to ask you some questions about it, okay?  And if you can't

hear it, then you tell me, because I don't hear very well either so we may be in trouble. All right. Here we go, Exhibit 2.

(RECORDING STARTS)

SPECIAL AGENT TRAVIS MAY: It is November 20, 2023, at 2:07 p.m. We're at the State Police Headquarters in Company A conference room. Special Agent Travis May, with me is Sergeant Jason Martin, Deputy Dwight McInturff and his PBA Representative, Mr. Chris Madison. Mr. McInturff, we're going to talk about the events that transpired last week in Saline County, okay? So just in generality, starting off, I'll just ask you to tell me what happened and I want you to tell me what happened. You don't have to start at the beginning of your shift or anything crazy like that, but centered around that call, okay? And then I'll go back and we'll ask some clarifying questions after that, okay. All right.

DWIGHT MCINTURFF: Well, first of all, I'm a reserve deputy, not a full-time deputy. You guys don't get paid much. I don't take money, but I do that because I love the community and I help do as much as I can. Usually I work at

the schools.  That's usually where they'll have me at the schools.  I'm 75 years old, I'm great with the kids.  The shift was short and then you can --

Q     (By Mr. Ogles)  Let me stop you right there.  That is your voice, correct?

A     Yes, sir.

Q     What is, shift is short?  What does that mean?

A     A shift at the sheriff's office consists of six people; a lieutenant, a sergeant and four deputies. They always want at least four deputies on the street at all times.

Q     In Saline County?

A     In Saline County.  Now, I don't know if that's minimum standards or not, but that's the goal.  That day they only had three.  They were short.

Q     Okay.  Do you know how many reserve deputies there were for Saline County?

A     No, sir.  I mean, I can guess, but I don't know.

Q     More than one, though?

A     Yes, sir.

Q     I'm going to turn it back on.

DWIGHT MCINTURFF:  -- they needed help.  I said I would help.  I was out on Terrace Road. When the call came out I was on Terrace with

another deposition on another call and my radio wasn't working, my handheld wasn't working, it was on --

Q   (By Mr. Ogles)  So which radio wasn't working?

A   The handheld.  The one I had in my hand.

Q   Oh, I thought it was working.  I thought you didn't have a mic.  Was the radio in your pocket working?

A   Yes.  I had it in my hand when the call came out. I picked it up, but I just didn't get a signal.

Q   Oh, so it wasn't working because of the signal, not because it wasn't working.

A   Right.

Q   I had to ask.

A   It worked later.

Q   I got you.

DWIGHT MCINTURFF:  -- and I showed it to him, and I said, I'm not getting this call. But he got it and I kind of listened and didn't know what was going on.  And he told me about it and I said, well, you're on this call, this doesn't look like a major deal, you know, it's a -- it's a -- it's a verbal disturbance, you know, between I thought was two brothers, that's what I thought.

Q   (By Mr. Ogles)  So was the call to you or to the

other patrolman?

A    Me.

Q    I thought you said here it was to the other officer.

A    No, it wasn't on his radio -- it went to his radio, but it was to me.

Q    That's fine.  And you thought it was a disturbance between two brothers?

A    At first, yes.

Q    At the point where we are now.

A    (Witness nods head.)

Q    That's a yes?

A    Yes, sir.

DWIGHT MCINTURFF:  -- I'm not sure.  So I turned my radio off and turned it back on, and that will become important in a minute.  I turned and I told Central, I said, I'm going to divert from this call over to Washington Road where this disturbance was either ongoing, happening or already had happened, you don't know.  So I started going that way.  And when I went that way, as I started going that way, this right here is -- let me see here now, this right here -- this is everything I had.  That's the call.  That's everything I had.  It just

says, you know, where I'm going, the call, and what's going on.  So I drove over there.  I didn't run coded because this was not physical.  So I get --

Q    (By Mr. Ogles)  And what were you looking at that told you where you were going?

A    Back then, when you got a call, they would send it to my phone.

Q    Your phone?  Your cell phone?

A    Yes.  So I could look at the phone, verify the address and kind of -- sometimes you can't remember all that on the radio and you're trying to plug it in.

Q    I understand.

A    And so it came to my phone.

Q    Okay.

DWIGHT MCINTURFF:  -- over there.  I turn on Wasson Road and this house is right at the corner at Heinke and Wasson Road.  So when you're coming down Heinke comes -- like comes to Little Rock, I turn right on Wasson and there sits the house.  I saw nothing.  I didn't see a disturbance.  There was no one outside, there was no cars there.  The place looked quiet.  So I slowly drove by the house.  I was going to drive down to the next driveway and

turn around and leave and call the complainant to see what's going on because I don't see anything.  As I started slowly driving forward I saw this man come out of this house.  He came out of this house.  And so when I saw him I stopped.  And I started slowly backing up.  And all of a sudden I heard this.  And I jumped.  I thought I hit somebody.  I thought I'd backed into someone.  And I was looking in my mirror and it shocked me.  And I thought, what the heck, have I run over somebody, because I didn't see anybody behind me.  And then I heard it again.  And I got out of my truck.  That man had come out of that house and had ran -- run towards me.  He run towards me.  And he was beating on the side of the truck --

Q   (By Mr. Ogles)  Let me ask you, did you ever consider calling for backup then when he started beating on the side of your truck, Mr. Adams?

A    No.

Q    You didn't?

A    One, there was no backup.  Two, you can de-escalate it, you can talk to people.

Q    Okay.  I understand that.  You talk about that and we'll get there in a minute.  But at this point of the

interview, when you first got there and he banged on your truck, you never thought about -- you didn't call for backup, correct?

A     No, sir.

Q     Okay.

DWIGHT MCINTURFF:   -- telling me to get the fuck off of his property.  I wasn't on his property, on the roadway.  And I walked around to the back of the truck and I said, calm down. He came at me.  He came at me.  This was not a normal man coming --

Q     (By Mr. Ogles)  Did you think about calling for backup then when he came at you?

A     It's happening pretty fast.

Q     I understand.

A     No.

Q     Did you think about getting back in your car and de-escalating at that point when he came at you?

A     What do you mean de-escalating?

Q     Well, get away from him.

A     Run from him?

Q     Well, get back in your car and call for backup. Did you think about doing that?

A     At that moment?  Yes.

DWIGHT MCINTURFF:   -- at you.  And I've

been around people that can talk to you
normally, and I'm good at talking to people.  I
can talk to people in a normal voice.  I can
talk to people that are mad.  You know, we all
do.  A lot of citizens are mad when they're
talking to you.  I can deal with a mad person.
This person was not normal, he --

Q    (By Mr. Ogles)  What do you mean by that, Mr. Adams
wasn't normal?

A    He was so upset.  He wasn't acting in any way that
he was trying to calm down or that he wanted to calm
down.  The man came out of that house to fight.  I
realized that later, not at the moment.

Q    Did you ever consider calling for backup when he
started doing all that, coming out of the house wanting
to fight?

A    Well, I didn't know it at the time.

Q    Okay.  At the time you knew it did you consider
calling for backup?

        MS. LEWIS:  Object to form.  You can
answer.

A    Say that again.

Q    At the time you knew he came out of the house
wanting to fight, did you consider calling for backup?

A    When he came out of the house and I didn't realize

he wanted to fight.

Q     But at some point you realized he wanted to fight.

A     Later on.

Q     Did you consider calling for backup then, on your radio?

A     You're in the middle of it.

Q     Okay.  This is your answer, just tell me your answer.

A     You're in the middle of it.  You're just reacting to what's going on?

Q     Did you consider backing up and getting back in your car when you were in the middle of it and calling for backup?

A     You mean running?

Q     You can call it running, you can call it backing up, getting back in your car.

A     Leaving, is that what you're asking?

Q     And just sitting in your car and calling for backup.

A     The man was violent.  The man was too violent at that moment.

Q     Okay.  I'll turn it back on.

                DWIGHT MCINTURFF:  -- was not mad, he had
           rage in his eyes.  It was rage and it was f
           this, f that, I'll kick your ass.  And I said,

whoa, whoa, whoa, whoa, I'm just here to talk, you know, calm down.  And he came at me.  And I'll tell you, I got scared.  I did all I knew how to do.  I pulled my taser, not to hurt him but to protect me.  And it was f you this, and f you that.  And finally he turned and started walking off.  I said, wait a minute.  I said, wait a minute, I said, you're detained.

Q   (By Mr. Ogles)  At some point you say he was walking off; is that correct?

A    (Witness nods head.)

Q    Is that a yes?

A    Yes.  Sorry.

Q    Did you consider calling for backup then when he was walking off?

A    No, you're in the middle of it.  You're still trying -- remember --

Q    Well, we've got the video, I understand.

A    Right.  Right.  You have to remember, the shift was short.  The other deputy had already told me that when he cleared over there he was headed my way, so I knew backup was coming when it was available.  There was only three deputies on the street.

Q    So that's why you didn't call for backup?

A    I knew backup was coming when it was available.

Q     But that's why you didn't call for backup then when he turned around and walked away.

A     Right.  I knew backup was coming.

Q     Okay.

                    DWIGHT MCINTURFF:  I said, I'm not putting up with this.  And he was walking away, and he's walking towards his house, which is real close, right there, and I'm following him.  And he said this, he said, I'm going in my house to get something.  I said, you're not going in that house.  I'm by myself.  And I said, you're not going in that house.  I said, you are with me right now and we've got work this out.  F you.  And that body language, like when you could --

Q     (By Mr. Ogles)  Stop right there.  Same question, you didn't consider calling for backup then when he said he was going in the house?

A     I knew backup was coming.

Q     Okay.  I understand, sir.  I'm just asking you questions, okay?

A     Right.  In my mind backup was coming.  There's no need to call for something that's on its way as soon as it's available.

Q     Okay.  And you didn't consider going back to your

car and waiting on backup?

A    No.

Q    Okay.  What did you think he was going to get in his house?

A    I did not think he was going in there to get me a donut.  There are weapons in that home?

Q    How do you know that?

A    Every home has them.

Q    That's how you know?

A    I didn't say a gun.  I said there are weapons in that home.

Q    Okay.

A    There are knives, hammers, screw drivers, maybe a baseball bat.  But he was not going in that home because he was detained.

Q    Okay.  And why was he detained?

A    I knew I had probable cause to make an arrest.  I could arrest him for criminal mischief just hitting my truck.  It would escalate to a felony once I realized it was rocks.  I could arrest him for terrorist threatening against a police officer.  That's a felony.  I could arrest him for disturbing the peace, disorderly conduct because people had come out of their homes, they were watching this.  I had plenty of reason to arrest him, but I was still trying to work it out.

Q    What is your educational background?

A    High school education, little bit of college.

Q    Have you ever had probable cause training at the Saline County Sheriff's Office?

A    Yes.

Q    Did you know his sister was videoing you?

A    Yes.

Q    Okay.  Going back on.

DWIGHT MCINTURFF:  -- you're getting ready to be jumped.  And I'm sitting here going, what the heck have I gotten into.  And he walked up on his porch.  He said I'm going in my house, fuck you.  He turned to go into his house.  I had the taser in my hand.  I reached out and got him by the back of the hair because that's all I could get.  He was bigger than me, he was younger than me and he was insane.  I got him by the back --

Q    (By Mr. Ogles)  What do you mean he was insane?

A    Acting, in a violent --

Q    Crazy?

A    Yes.  Acting in a violent nature.  That does not mean he is insane, but I've learned in life that sane people can do insane things.  It's a fact.

Q    Okay.  And when you made the decision that he was

acting insane, you still didn't consider calling for backup because you knew it was coming, correct?

A    (Witness nods head.)

Q    Is that a yes?

A    Yes.

DWIGHT MCINTURFF:  And then I said, you're not going in that house.  In my mind there's a gun in that house and I was scared, I'm sorry. I was scared.  I got him by the --

Q    (By Mr. Ogles)  Why did you think there was a gun in the house?

A    You could say gun, weapon.

Q    Well, you said gun.

A    Right.

Q    That's what I'm asking you.  So why did you think there was a gun in that house?

A    Most houses have them.  That's not uncommon.

Q    In fact, you have guns in your house, correct?

A    And a gun safe.

Q    And you have a Twitter profile.  Do you still use your Twitter profile?

A    Don't think I have one.

Q    I'm going to show you Exhibit 3.  Are you a member of NRA?

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

A    I don't know if I still am or not.

Q    Okay.  Are you a right wing conservative?

          MS. LEWIS:  Object.

A    Define right wing conservative.

Q    I'm going to show you Exhibit 3.  Is that your Twitter profile?

A    Let's see here now --

Q    I just want to know if that's your Twitter profile?

A    Never seen this before in my life.

Q    Do you have a Twitter account?

A    No.  No, sir.  Joined 2012.

Q    All I'm asking if that's your account.

A    If you say so.

Q    No, I'm not saying anything.

A    I don't recognize it.

Q    Okay.

A    I bet if you -- there's no history on that account.

Q    My question is --

A    I'm not a Twitter guy.

Q    Okay.  Are you opposed to abortion?

A    I am opposed to abortion.

Q    Are you opposed to same sex marriage?

A    No.

          MS. LEWIS:  I'm going to object to relevance.

MR. OGLES: Relevance doesn't matter.

MS. LEWIS: I know, but I'm just going to put it on the record.

MR. OGLES: It doesn't matter. You can't object to it. You can object to the form of the question.

Q    How about are you a Christian Republican?

MS. LEWIS: Well, and I'm also objecting because he said this is not his Twitter account.

MR. OGLES: Well, I'm not sure he said --

Q    Are you saying under oath this is not your Twitter account?

A    I have never seen that before in my life.

Q    Do you have a Twitter account?

A    Not that I know of.

Q    Okay. This is Exhibit 3. Go back to the recording.

DWIGHT MCINTURFF: -- back of his hair, I pulled him back. I put him on the ground, which infuriated him that much more. This guy was out of control. I put him on the ground and I said, you're under arrest. And I said, I'm not doing this. He got up, he pushed past me, he said, I'm --

Q    (By Mr. Ogles)  When you pushed him on the ground, did you consider putting handcuffs on him?

A    I placed him on the ground.

Q    Well, you pulled him down on the ground, didn't you, by his hair?

A    I placed him on the ground.  I did not push him, did not try to hurt him.  I placed him on the ground. And I did consider handcuffing him.

Q    Okay.  Why did you consider it and not do it?

A    I knew I would have to put that taser up, and I'm not getting in hand-to-hand combat with a person.

Q    You have a bad shoulder too; is that correct?

A    What's a bad shoulder?

Q    I thought you had a shoulder replacement.

A    That doesn't make it bad.

Q    Okay.  So it's a good shoulder?

A    It's a good shoulder.

Q    It doesn't affect your strength or anything like that?

A    Both shoulders are in pretty good shape.

Q    Okay.

                DWIGHT MCINTURFF:  -- going in the house.
           I reached up, I got him by the back of the
           hair, I pulled him back again.  He didn't go
           down the second time, he didn't go down.  And

Q    he was in a rage.  He was in a -- I've still got the taser, I haven't deployed it.  And I wish I wasn't there, but I was.

Q    (By Mr. Ogles)  Why do you wish you weren't there?

A    Who would want to be?

Q    At any point during this time period did you think about -- consider calling for backup?

A    I knew backup was coming.

Q    Did you consider getting on your radio and calling for backup?

A    I knew backup was coming.

Q    That's your answer?

A    Yes.

Q    Okay.

        DWIGHT MCINTURFF:  I couldn't run.  I couldn't just walk away.  This was insane.  He turned around and he came towards me.  I fired the taser.  And I believed in my mind -- first time I've ever used that taser as a reserve in ten years, I fired the taser.  I thought the taser was supposed to put him on the ground.  I thought that was supposed to solve all my problems.  But I was too close to him.  I was as close as me and you when I fired that taser.  And it didn't affect him.  He grabbed his shirt

like a mad man, and he yanked that shirt up, and thought, holy crap, I'm with a maniac.

Q   (By Mr. Ogles)  So when he yanked the taser out, at any point during that time period did you think about calling for backup?

A   I knew backup was coming.

Q   And that's your answer?

A   Yes.

DWIGHT MCINTURFF:  And I'm alone.  And I threw the taser on the ground.  The taser was nothing to him.  I threw the taser on the ground and I drew my gun.  I drew my gun and I stepped back.  I didn't shoot him.  I didn't draw my gun to shoot him.  I drawed my gun because I wanted t protect myself.  And I didn't think that was unreasonable.  You may think it is, but I didn't think it was.  I didn't pull the trigger.  I didn't shoot him. And I told him, I said, I've got a gun.  I said, stop.  And he looked at me and he said, go ahead and shoot me.  And I don't know the timeline.  My mind was a blur.  And all of a sudden he stepped across and he had a weapon, he had a weapon, it was his fist.  That is a weapon in that guy's hand.

Q    (By Mr. Ogles)  When he had the weapon, his fist, at that point did you think about calling for backup?

A    I knew backup was coming.

Q    And that's your answer, you didn't think it was -- if there had been two people there do you think this would have happened?

A    I don't know.

Q    Did you think about backing up and getting in your car and waiting for backup to come?

A    Running?

Q    That's not my question.  My question is, did you think about getting back in your car and waiting for backup to come and asking for help?

A    No.

Q    Okay.  Why not?

A    Why didn't I consider getting back in my car and leaving this --

Q    I didn't say leaving.

A    -- violent person there?

Q    Listen to my question.  Did you consider getting back in your car and calling for help, for backup?

A    After I'm holding him at gunpoint?

Q    Yes.  At this point in the conversation that you're talking about.

A    No.

Q    And you never -- you say at this point you're holding your gun, but you never considered that.  We've established that, correct, number one, calling for backup, and number two, getting in your car and waiting for backup.

MS. LEWIS:  I'm going to object to form.

Q    You never considered that?

A    Say that again.

Q    Well, I've been asking you over and over the same question, but at different points of the incident.  But you never considered backing up, getting in your car and calling for backup to come now, did you?

A    No.

Q    Okay.  And why is that?

A    Because it was happening too fast.

Q    And you couldn't slow it down?

A    Tried.

Q    How did you try?

A    By talking to him.

Q    But didn't you pull his hair and throw him on the ground?

MS. LEWIS:  Object to form.

A    I did not throw him on the ground.

Q    Well, what do you call it when he went on the ground?

A    I placed him on the ground.

Q    What's the difference in throwing him on the ground and placing him on the ground?

A    Hurting him.

            MS. LEWIS:  Can we take a break for just a
            second?

                      (BREAK TAKEN)

Q    (By Mr. Ogles)  I'm ready when you are.

                      (RECORDING CONTINUED)

            DWIGHT MCINTURFF:  -- in that guy's hand.
            And he stepped across, grabbed me and he hit me
            right there.  He hit me so hard that I saw
            stars.  I could barely stay on my feet.  The
            doctor said later, at 75 years old, I can't
            imagine a 75-year-old man standing through
            that.  When he charged me, and he hit me right
            here, I knew at that moment that if my gun was
            still in my holster and I hadn't pulled it, I
            was a dead man, because I was not going to
            sustain another blow like that.  And he had the
            look of rage in his eyes.  He was going to kill
            me.  There is no doubt in my mind, guys, he was
            going to kill me.  And when he hit me my vision
            left, I had a hard time thinking.  But when he
            hit me, I fired the gun.  I fired the gun.  And

I was -- I was a lot closer than any of you because he was on top of me.

Q   (By Mr. Ogles)  How close were you to Mr. Adams at the time you fired the gun?

A    We were touching.

Q    Pretty close.

A    Yes, he had already grabbed me.  Yes, I fired the weapon after he hit me in the head.

DWIGHT MCINTURFF:  I mean, I fired the gun. I went, pow, pow.  And I don't know why I fired twice, it was just like, pow, pow.  And then -- and then he went down.  I -- there's a lot of that that gets blurry because I couldn't get my vision right.  I got down -- I got on my radio and I called out, shots fired.  I didn't even ask for an ambulance.

Q   (By Mr. Ogles)  So at that point after you shot him you got on the radio and yelled out, shots fired; is that correct?

A    Yes, sir.

Q    Okay.

DWIGHT MCINTURFF:  I didn't even say I'd shot somebody.  My mind had quit working.  I was just trying to stay conscious.  I got that out and then I sat beside him and tried to do

something, I don't know what I did.  And then other deputies showed up.  I did not pull my gun to shoot him, I pulled my gun to defend myself because --

Q    (By Mr. Ogles)  At that point, before you pulled your gun, is there anything else you could have done different?

A    Anything I could have done different?

Q    That's right, before you pulled your gun.

A    Before I pulled that weapon could I have done anything different?  Lord, I cannot think of a think.

Q    I've already asked you why you didn't back up. You've already told me your answer on that; is that correct?

A    Yes, sir.

Q    It hasn't changed, is that right, before you pulled your gun?

A    Say that again.

Q    Before you pulled your gun, I've asked you if you could back up and you've already told me why you didn't back up; is that correct?

A    That I told you why I didn't back up?

Q    Right.

A    I --

Q    Just tell me why you didn't back up then.

A    Because it's happening too fast.

Q    Okay.  When I say the word, de-escalate, do you know what that means?

A    Yes.

Q    To calm things down.

A    Yes.

Q    Did you think about trying to back up to de-escalate it, to calm things down?

A    I had already de-escalated and tried to calm things down.

Q    How did you do that?

A    How did I de-escalate?

Q    Yes.

A    De-escalation starts with a frame of mind.  You start de-escalating from the moment you get the call.  That's why I said I was only going to go over there and make sure she was okay.  You de-escalate by not running lights and siren over there and scaring people.  I de-escalated when I stopped in front of his home and did not see a crime.  I de-escalated when I did not trespass on his property, I respected that.  I could have gotten out of that truck and went and beat on that door, try to enter his home, make him talk to me.  I de-escalated by respecting his constitutional rights of being secure in his home, and he has a Fifth Amendment right to not even

have to talk to me. All that was de-escalation. That was the only thought on my mind.

I de-escalated when I drove away. I didn't even contact the man. Wasson is a dead end street. I de-escalated when I would not even turn around in his driveway because I thought that could escalate something. I de-escalated after he started hitting my truck and I just got out and walked to the back of the truck. When he came at me, I de-escalated when I asked him to calm down. I told him, I'm standing in the street. You came out of your house, what do you want to talk about? I de-escalated when I did not Tase him.

I de-escalated when I told him he was detained. I de-escalated when I did not Tase him when he went in that home, when he tried to, and just brought him back. I de-escalated when he was on the ground, I didn't kick him in the head and hurt him. That's de-escalation, it's doing just the opposite of escalating something. I de-escalated when he came at me and I only fired the taser. I de-escalated when I was holding him at gunpoint, telling him, I don't want to do this.

If I'd pulled that weapon and just fired it, I'm guilty. When I pulled that weapon I de-escalated by keeping my finger off of that trigger. You can pull that trigger accidentally. No, everything I did there,

from the time the call came out, until he tried to kill me, I de-escalated.  You can de-escalate until you can't anymore.  Everything --

Q    Okay.  Go ahead.

A    Everything I did was trying to de-escalate.

Q    When did you decide you couldn't de-escalate anymore?

A    When he beat me in the head.

Q    How close were you to him when you pulled the gun? Pretty close?

A    Pretty close.

Q    Okay.  If you had backed up, would that have been de-escalation?

A    No, I don't think so.

Q    If you had gotten in the car, backed up and walked into your car and sat there and called for backup, would that have been de-escalation?

A    That didn't happen.

Q    I know it didn't.  I'm asking you if you had, would that have been de-escalation?

A    You could argue it.

Q    Okay.

DWIGHT MCINTURFF:  -- at that moment I wanted to go home to my grandkids.  I do this for free.  I wasn't out there to hurt him.  I

wasn't out here to cause that. But from the -- as a matter of fact, if he had not come out of the house, I wasn't even going to knock on his door because I didn't see anything. Well, hey, brothers fighting, stuff like that, that happens, my brothers and I would fight as kids, and stuff like that, and you get over it. I was going to turn around and leave. He charged me. He never gave me a break. He never let up. Words did not impact him. Hands on didn't impact him, putting him down. Tasing him didn't bother him. And he got up and he was determined that he was going to take my life. And when he hit me, God help me, I pulled the trigger. But I didn't pull the trigger even to hurt him. I regret one thing. I regret, and I'm sorry, that he made the decision to do that. I do not regret defending myself, and I won't apologize for that. I don't regret defending myself because I wanted to go home. If that makes me a bad person, I'm sorry, but I wanted to go back to my grandkids, I wanted to go back to the schools. And I want to tell you something about that house. When that call came out, that's all I had, that's all I had.

That's my granddaughter.  That's all I had right there.  That's all I had.  You could ask, well, why didn't you call for backup?  That radio was on my belt.  I didn't have a mic up here.  That radio clips on my belt in such a way it takes two hands to get it off.  I had a taser in my hand.  I didn't have the luxury of putting the taser --

Q   (By Mr. Ogles)  Did you consider backing up and calling for help?  You just heard your testimony here from your interview.

A   Where in the process is that?

Q   My question is, did you consider backing up?

A   At what time?

Q   Right then.

A   What was going on at that moment?

Q   Well, this is what your testimony is.

DWIGHT MCINTURFF:  -- in my armpit and trying to get the radio out.  I was in the middle of it and I couldn't get out of it.  I couldn't get out of it.  I couldn't get --

Q   (By Mr. Ogles)  Now.

A   So when I'm holding him at gunpoint; is that your question?

Q   My question is, did you consider backing up?

A    When I was holding him at gunpoint?

Q    That's right.

A    Did I consider backing up?  I was only thinking about survival because he was coming at me.  If I'd backed up -- since we're doing hypotheticals, if I had backed up he would have kept coming.

Q    That's your answer?

A    It's hypothetical.

Q    It's not hypothetical.  Did you consider backing up at this point?  That's not a hypothetical.

A    Didn't have time to consider anything.

Q    Okay.

            DWIGHT MCINTURFF:  -- him to calm down, I couldn't extradite myself from it, I couldn't leave.  I didn't want to stay, but I couldn't leave.  But that house right there, if you do the research on that house, I didn't know it at the time, but that is a violent house.

Q    (By Mr. Ogles)  What do you mean by that is a violent house?

A    That's really a misstatement, because as we know a house cannot be violent, it's just a building.

Q    I just want you to tell me what you meant by that statement.

A    There was a violent history of that man.

Q    What is the history?

A    Well, I didn't know it at the time.

Q    Well, you do now.

A    Little bit, not much.

Q    I mean, you brought it up.  I didn't bring it up.

A    Right.

Q    So what did you know at the time you said that?

A    That there was a violent -- well, afterwards I found out that police officers had been there multiple times before, that he has thrown rocks through a police officer's car window before, that he had been held at gunpoint before, that he'd been tased before, that he had knocked a female deputy down before.  This person had a history, but I didn't know.

Q    Well, why didn't you know it?

A    I can't tell you why I didn't know, I just didn't know.

Q    Was there not anything in your vehicle that would -- a computer in your vehicle that would tell you?

A    No, sir.

Q    How come?

A    Well, I can't answer that.  There's not one.

Q    Do some police officers have a computer in their car?  It's called a CAD.

A    Some do, yes.

Q    What does CAD stand for?

A    The CAD?

Q    Yes.

A    I believe it's the system they use to communicate back and forth and also check driver's license or license plates, you know, stuff like that, do police work on.

Q    And believe me, some of these questions I ask you I know the answer to.

A    It's okay, John.

Q    We're just making sure we're on the same page here. But you did not have a CAD in your truck; is that correct?

A    No computer.

Q    And do you know, do any of the reserve deputies have CAD's in their trucks or vehicles?

A    I don't think so.

Q    Okay.

              DWIGHT MCINTURFF:  There's been violence there before.  I was not aware of that or I wouldn't have gone by myself.  I was too old to go there by myself --

Q    (By Mr. Ogles)  What do you mean when you say you were too old to go there by yourself if there had been violence before?

A    For a dangerous situation.  I would say that I was too old to go there by myself.  But I'll say this, in that situation, if I were 20 years old, I'd had said I was too young to go by myself.  If I was a female, I'd have said a female shouldn't be by herself.  That was a reference to how dangerous it was.

Q    These are your words.

A    Yes.

            DWIGHT MCINTURFF:  -- alone.  They've been there before, they've tased that guy before.

            Pulaski was there, I heard, not too long ago.

Q    (By Mr. Ogles)  Have you ever been there before, to that house?

A    You know, I have thought about that and it seems like that when I first pulled up, like I recognized the house, but I did not remember ever being there before, certainly for nothing that was violent.

Q    I understand.

A    You'd remember that.  Trust me, if it had been a fight I'd remembered it.  But I do remember that house.

Q    We have a picture that was introduced in the last deposition where he was being loaded -- Mr. Adams was being loaded into an ambulance and you're in the background; does that ring a bell?

A    It does not ring a bell.  I'm sorry.

Q    That's fine.

A    If it's a picture, I was there, but it could not have been for violence because you'd remember that.  If I was in a fight I'd remember that.

DWIGHT MCINTURFF:  Three deputies, all of them pulled guns on him, and he complied.  And I'll tell you something about him.  Before he hit me, before he hit me in those just moments, I -- he looked around for a second.  He just kind of looked and he saw that I was by myself, and he saw an old man.  Oh, if there was three of us there, that wouldn't have happened.  I'm sorry.  And I believe that.  If there were four of us --

Q    (By Mr. Ogles)  So you just said that if there were three of you-all there, three deputies, you don't think this would have happened; is that correct?

A    I don't think he would have looked around.

Q    Okay.  What do you think would have happened?

A    If there was three of us there?

Q    Yes.

A    If there was three deputies there, first of all, I wouldn't be in charge --

Q    Right.

A    -- because there would be another deputy leading

everything.

Q    Because you're a reserve deputy, volunteer.

A    Right.  If there was three deputies there I would only be assisting.

Q    Would the answer be the same for two deputies?

A    Yes.

DWIGHT MCINTURFF:  -- there, we could have contained him.  He saw an old man standing there with a taser and he knew -- I could see it in his eyes, he calculated it.  And he was right, I could not whip him in a fight.  I could not whip this guy in a fight.

Q    (By Mr. Ogles)  Why could you not whip him in a fight?

A    If I'm going to get in a fight with someone, I've got to have a one hundred percent guarantee I'm going to win.  I did not have that.

Q    Was it because of your age?

A    A combination of a lot of things.  If I were 20 years old, I'm not going to get into a fight with someone.  Hand-to-hand combat is a terrible thing to get into.

Q    Well my question is -- you're the one that said that so I'm asking questions about it.

A    That's fair.

Q    If there had been two deputies there do you think there'd have been a fight?

A    It's hard to guess.  There were two deputies there once before and there was a fight.

Q    Okay.  And you know that from looking at reports or somebody telling you?

A    Somebody telling me.

Q    Okay.  Do you think he was mentally ill, Mr. Adams?

A    No.

Q    You don't?

A    No, I do not.

Q    I mean, you said he was insane in your interview.

A    Sane people can do insane things.

Q    I understand.  But you don't think he was mentally ill?

A    Not for a second.

Q    Did you think he was drunk?

A    Gave no indications.  The man ran across his grass, threw rocks and hit my truck down the street.

Q    I know.  To me that's --

A    He did not have -- he did not slur his words,  he did not have bloodshot eyes.

Q    Okay.

A    He gave me no indicators.

DWIGHT MCINTURFF:  And I tried everything

in the world. And other people have tased him and fought with him and beat on him. He saw me alone. But if I had known that house was as dangerous as it was -- and I don't blame anybody for that. See, I don't have CAD in my truck. And I'll compliment the Sheriff. The Sheriff, this week, is putting CAD in my truck. If I had CAD I would have looked at the history for the address. We do stuff like that. You look --

Q    (By Mr. Ogles)  What would you have done different if you'd had the CAD and looked at the history?

A    If I'd looked at the history -- you've got to go back that the shift was short and there was no help. I would have had to make a choice. I would have had to have made a choice.

Q    Do you still stand by your statement?

A    Yes, yes.

DWIGHT MCINTURFF:  -- where you're going. I didn't get that luxury. No one called out and said, this is a dangerous house. So I was kind of -- I was blind sided when I got there. But it was never my intent to harm him. It was never my intent to shoot him. I just -- I wanted to protect myself. Everything I did was

trying to protect myself and get him to calm down.  That's -- and I know that's terrible, and I'm sorry, but that's what it was.

SPECIAL AGENT TRAVIS MAY:  Well, I appreciate you retelling us that.  I'm sure it's difficult to relive many of those moments.

DWIGHT MCINTURFF:  It is.

SPECIAL AGENT TRAVIS MAY:  I've got just a few follow-up.  How long have you been a reserve deputy at Saline County?

DWIGHT MCINTURFF:  Ten years, but about three years ago -- I started in 2013.  But about three years ago I got hurt real bad at the Sheriff's Office, I got hurt real bad.  I went through three surgeries.

Q    (By Mr. Ogles)  How did you get hurt?

A    A father called in from Oklahoma, asked us to find his daughter and help her.  He told us where she was at. So I drove up to Lake Norrell and I drove down this old dirt road, way back in the woods to an old meth house. And the door was opened and I went up this long flight of stairs and I looked in and I saw her.  I know I can't enter that home.

So I looked in and I saw her and I told her, I said, are you Linda, or whatever her name was.  And she

said, yes.  And I said, your daddy called, he sent me to get you to take you to the hospital.  And I said, I'm not here to hurt you, I'm not here to arrest you, I'm not here to put you in handcuffs.  I said, kiddo, this is a decision you have to make.  And we talked for a minute and she told me she'd go with me.

We walked out of that old meth house, we're on the front porch, and the whole porch collapses.  What are the odds I'm standing there?  It's Murphy's Law.  If it can go wrong, it will.

Q    So the porch collapsed and you fell?

A    The whole porch fell away from the house, and we fell about 20 feet.  And when we started falling I reached out and grabbed her, she didn't weigh 90 pounds, and I put her on top of me to protect her, and we landed on a pile of rocks and I broke five ribs in this side of my chest, damaged my lung, cracked my wrist and broke my shoulder all to pieces.  And she started helping me.  I was in the hospital for a while, went through the surgeries.

Q    And you weren't getting paid.  Did you file workers comp?

A    That's what my wife told me.  But I never got paid, but workers comp did -- State of Arkansas did take care of my medical.

Q     Did you consider suing the owner of the house for a defective porch?

A     Would not have considered it.  You should have seen the place.

Q     All right.  That's the trial lawyer in me.  All right.  Here we go.

DWIGHT MCINTURFF:  I was helping a dad find his daughter.  I found her at an old meth house up at Lake Norrell.  I told her, I said, your daddy is in Oklahoma and he wants you to go to the hospital.  I'm not here to arrest you or hurt you, but your daddy wants you to go to the hospital.  She agreed to go with me.  We walked out of that meth house, the dang front porch fell off the house.  What are the odds I'm standing there?  We fell about 20 feet.  I broke five ribs, cracked my wrist and broke my shoulder.  Then she helped me.  And I was in the hospital.  And three surgeries later, a year and a half later I now have a prosthetic shoulder.  It actually works amazingly well.  And I went back.  So there was a time there I was hurt pretty bad.  And let me tell you something, I admire what you guys do.  I was glad to help.  You can get hurt doing this.

You can get hurt doing this, but I knew that was a possibility, but I still wanted to help. I still wanted to help. But so other than those three years, you know. And I just came back in July of this year. About a year ago --

Q    (By Mr. Ogles)  And we're talking about July of '23, right?  I think this interview is, like, four or five days after November 16th.  So that's a yes, correct?

A    Yes.

DWIGHT MCINTURFF:  -- I knew I was going to retire.  You know, I was getting older and I thought I'd just stay home and mow the grass, but Captain Shamlin called me in January, we're short, and he said, will you just come back and just help the schools.  Just help us.

Q    (By Mr. Ogles)  Was does he mean help the schools? What did you understand that to mean, to come back?  He called you in January, that's --

A    His SRO was sick.  She was very sick, and they had nobody and he said, would you go help at the school.

Q    Like school security?

A    Yes, SRO.  And I enjoy doing that, I really do.

Q    When did it transition from school security to being a reserve deputy on violent calls and domestic

disturbances?

MS. LEWIS: Object to form.

A   There is not transition.  You do whatever they ask you to do.

Q   I understand.  But you wanted to work schools, correct?

A   You always don't get to do what you want to do.

Q   I understand.  My question is, that's what you wanted to do though.

A   It was my preference, but I was willing to do anything.

Q   I understand.

DWIGHT MCINTURFF:  And I thought about it and then it took me from January to July to do it, so in July I had to go through some training again, I had to go through a psych eval again, you know, all that stuff you go through.  And I came back to help the schools.  But when the shift was short, when they call you for help, and I've never been one to say no.  I've always tried to help as much as I could.  I'm -- at the schools -- can I tell them that?  At the schools, if you go to Harmony Grove School, Bauxite School or East End Schools, the kids at those schools don't

call me Deputy McInturff, they don't call me Deputy Mac. All the kids and all the parents call me Mac-N-Cheese. So if you go out there, I am Deputy Mac -- that's what they call me, Mac-N-Cheese. And the parents know I love the kids and they know I'll take care of them, and I take care of them. So my relationship is good. I'm not a violent man. I'm not a violent man.

SPECIAL AGENT TRAVIS MAY: When was the last time you qualified with your firearm?

DWIGHT MCINTURFF: When I came back, I had to go qualify then.

SPECIAL AGENT TRAVIS MAY: So July?

DWIGHT MCINTURFF: So that would be -- yes, July or August, yes.

SPECIAL AGENT TRAVIS MAY: July of this year -- June or July --

DWIGHT MCINTURFF: Yes, it had to be July. Yes, yes, they qualified me in July.

MALE'S VOICE: Sheriff's office would have the records of that. It was the sheriff's office.

DWIGHT MCINTURFF: Well, the Chaplain took me out there and qualified me.

SPECIAL AGENT TRAVIS MAY:  Did you know the gentleman at that residence?  Have you had any prior dealings with him?

DWIGHT MCINTURFF:  You know, it's weird. When I pulled up, I thought I recognized the house, but not from anything evil.  I just thought -- I pulled up and I thought, have I ever been here before?  I knew I hadn't, but maybe I'd been there with another deputy, backed him on something.  But I just had -- I didn't have that thought -- the history may show it, but I may have been there once, but it was nothing that happened that would make you go, whoa, this house.  No, it wasn't nothing like that, so.  But I did think I recognized that house, but not in a bad way or I would have left.

SPECIAL AGENT TRAVIS MAY:  Okay.  I understand.  We'll kind of go back and summarize and make sure I have your statement correct in my mind, okay?  So you were assisting a deputy at a different location, heard another call come out, and with the information that you had you said, hey, I'll go take that one, I'll run over to that house,

right?  Okay.  So you --

Q    (By Mr. Ogles)  Is that what happened, you volunteered to do it, the call to Mr. Adams' house?

A    Volunteered?

Q    Did you volunteer to take that call to Mr. Adams house?

MS. LEWIS:  Will you go back and just replay that?

DWIGHT MCINTURFF:  But not in a bad way or I would have left.

SPECIAL AGENT TRAVIS MAY:  Okay.  I understand.  We'll kind of go back and summarize and make sure I have your statement correct in my mind, okay?  So you were assisting a deputy at a different location, heard another call come out, and with the information that you had you said, hey, I'll go take that one, I'll run over to that house, right?  Okay.

Q    (By Mr. Ogles)  So my question is, did you volunteer to take that call to Mr. Adams' house?

A    When you are a reserve deputy, there is no volunteer or not volunteer.  If you're assigned a call, you go.

Q    Well, were you assigned or did you just say you

would do it?

A     The call came out to me.

Q     Okay.

SPECIAL AGENT TRAVIS MAY:  So you go to Wasson Lane, initially don't see any type of disturbance going on so your intent was to drive down, turn around, come back and say, hey, they squashed it or, you know, whatever. Didn't even see anything going on.  Okay.  The gentleman comes out of the house, starts beating on your issued patrol vehicle; is that right?  Okay.  That's not -- it's a Saline County truck?  (Inaudible)

DWIGHT MCINTURFF:  Yes.  Fully marked unit.

SPECIAL AGENT TRAVIS MAY:  Okay.

DWIGHT MCINTURFF:  And my intention that I was going to arrest him for that, that was terroristic threatening.

SPECIAL AGENT TRAVIS MAY:  Okay.  And so --

DWIGHT MCINTURFF:  (Inaudible) -- it was all kinds of stuff.

SPECIAL AGENT TRAVIS MAY:  And so he's yelling, being argumentative with you, you get out of your truck, initially try to de-escalate it verbally; is that right?

DWIGHT MCINTURFF:  Yes.

SPECIAL AGENT TRAVIS MAY:  Okay.  And he -- you said, I'm going to -- or he told you he was going to get something before he --

DWIGHT MCINTURFF:  He said, I'm going in my house, I'm going to get something.

SPECIAL AGENT TRAVIS MAY:  Okay.

DWIGHT MCINTURFF:  And I said, you're detained.

SPECIAL AGENT TRAVIS MAY:  Okay.

DWIGHT MCINTURFF:  You are not going back in that house.

SPECIAL AGENT TRAVIS MAY:  All right.  And so at that point you-all had made it up to the front porch area, right?

DWIGHT MCINTURFF:  Yes.

SPECIAL AGENT TRAVIS MAY:  Okay.

Q    (By Mr. Ogles)  Why was he not going back in the house?  Why did you not want him to go back in the house?

A    Because he was detained.

Q    I understand, that's the reason?

A    Yes.

Q    Okay.  No other reason?

A    It's a legal detainment.

SPECIAL AGENT TRAVIS MAY:  And he attempted to go into the residence twice you said?

DWIGHT MCINTURFF:  Yes.

SPECIAL AGENT TRAVIS MAY:  Okay.  And you pulled him out and --

DWIGHT MCINTURFF:  I put him on the ground the first time.

SPECIAL AGENT TRAVIS MAY:  Okay.

DWIGHT MCINTURFF:  And then I pulled him back the second time and that's when he took the rage -- if zero is asleep, and ten is stark raising mad, he was a ten.

SPECIAL AGENT TRAVIS MAY:  Okay.  So after you prevented him from entering the residence the second time, you fired your taser -- you tased him.

DWIGHT MCINTURFF:  When he came towards me.

SPECIAL AGENT TRAVIS MAY:  Okay.

DWIGHT MCINTURFF:  I showed him the taser -- I never put the taser down from the time I had it at my truck, I always kept it in my hand.  And I thought that would work, I -- I'm sorry, I really did.  I thought it was a magic tool.

SPECIAL AGENT TRAVIS MAY:  Right.

DWIGHT MCINTURFF:  But it's not.

SPECIAL AGENT TRAVIS MAY:  And so the taser was ineffective on this gentleman.

DWIGHT MCINTURFF:  Totally.

SPECIAL AGENT TRAVIS MAY:  Did he --

Q    (By Mr. Ogles)  Why was it ineffective?

A    I believe that we were too close.

Q    Okay.  That's what you said.

A    Yes.  I believe we were too -- as you are -- if I'm five feet away from you I can get a much better spread. And I've been tased before, trust me, and a good spread you will go down.  But that's what I believe he just -- I wish I could have gotten him to step back about four feet.

Q    Did you consider stepping back four feet and tasing him?

A    No.

SPECIAL AGENT TRAVIS MAY:  -- pull wires out or --

DWIGHT MCINTURFF:  Yes.  Pulled his shirt up --

SPECIAL AGENT TRAVIS MAY:  -- pulled his shirt up.

DWIGHT MCINTURFF:  -- and brought the wires out.  I was so close to him they told me that

it might have been a real small spread and, you know, it didn't have a chance to open to really get a good body and -- but, no, sorry.

SPECIAL AGENT TRAVIS MAY: Okay. With -- and so after that he came toward you, struck you on your left ear?

DWIGHT MCINTURFF: You can see --

SPECIAL AGENT TRAVIS MAY: Yes. And that's when you fired -- fired your pistol.

DWIGHT MCINTURFF: When he hit me -- I never fired that gun until he hit me. After he hit me I knew -- I'm telling you guys, if my gun had been in my -- if I hadn't had my gun out, I wouldn't be here today. And they would have gone and told my wife and grandkids, your grandfather is dead, but don't worry, he's in jail. And that wasn't going to solve anything. But some deputies may not have pulled their gun. I pulled my gun, not to harm him, but to protect myself.

Q   (By Mr. Ogles)  Why did you say some deputies may not have pulled their gun?

A   Scared.

Q   Deputies were scared?

A   I'm just -- hypothetical.  I'm just guessing.

Q    Well, you said that some deputies may not even pull their guns.  Why did you make that statement?

A    A young deputy there -- what I was thinking at the time that if it was a real young deputy and they're uncertain or just out of the academy, they may have paused long enough to get killed.  That was my thought process.

Q    Did you ever go through the academy?

A    Yes.

Q    You went to the Saline County Academy, correct?

A    Yes.

Q    Not the ALETA, Arkansas Law Enforcement Academy, did you?

A    I don't know about that one.

Q    Okay.

DWIGHT MCINTURFF:  I pulled my gun.  I didn't shoot when I pulled that gun.  I didn't pull that gun and fire.  And I told him I had the gun.  And he told me go ahead and shoot, or something to that affect.  And it was -- it was the worse day of my life.

SPECIAL AGENT TRAVIS MAY:  Deputy, when you pulled him and threw him on the ground, do you think it would have been possible for you to jump on him and (inaudible) handcuff.

DWIGHT MCINTURFF:  Not possible.

SPECIAL AGENT TRAVIS MAY:  Why not?

DWIGHT MCINTURFF:  Guys, I am not strong enough, and I was alone and he was in a state. When you get in that state you have power that other people don't have.

Q    (By Mr. Ogles)  So you admit you weren't strong enough to put handcuffs on him when he was on the ground?

MS. LEWIS:  Object to form.

Q    Is that what you mean by your statement?

MS. LEWIS:  Object to form.

A    That, and the fact that I am not putting that taser up and getting into a fist fight.  Don't have to.

Q    Okay.

DWIGHT MCINTURFF:  When you're so drugged up, intoxicated, you -- no, if I tried to get on him he would have killed me quickly.  I let him get up.  I told him, you're under arrest, you're under arrest.  But nothing would enter his mind except that hate he had towards law enforcement.  And it was there.  I didn't know it at the time.  I didn't know he had hate towards law enforcement.  I didn't know about the history of the darn place.  But, no, I

couldn't fight him.  I wish somebody was with
me.  I'm sorry, but I wish we could have solved
that.

Q    (By Mr. Ogles)  Why do you wish somebody was with
you?  Is it funny?

A    No, it's a strange question.  Who wouldn't --

Q    You said that.

A    -- who wouldn't want someone with them?

Q    Well, I'm asking you.  Are you talking about
another patrolman?

A    Yes, yes.

Q    Why did you want another patrolman there?

A    One, I wouldn't have been in charge.

Q    Okay.

A    Two, I believe two people would have been better
than one.

Q    All right.  Is that your answer?

A    (Witness nods head.)

Q    That's a yes?

A    Yes, sir.

Q    Okay.  Did you not want to be in charge?

A    When I was there by myself I was in charge.

Q    I understand.  Did you not want to be in charge?

A    When I was there -- I was in charge.

Q    Were you qualified to be in charge?

A    Yes.

Q    But if another deputy was there you wouldn't be in charge; is what you're saying.

A    By policy.

DWIGHT MCINTURFF:  But I was alone and I couldn't fight him.

SPECIAL AGENT TRAVIS MAY:  So you had talked to him, told him he was detained and under arrest.

DWIGHT MCINTURFF:  Yes.

SPECIAL AGENT TRAVIS MAY:  You had used physical restraint by preventing him physically from going in the house --

DWIGHT MCINTURFF:  Yes.

SPECIAL AGENT TRAVIS MAY:  -- do I understand that right?

DWIGHT MCINTURFF:  Yes.

SPECIAL AGENT TRAVIS MAY:  You had fired your taser; is that correct?

DWIGHT MCINTURFF:  Yes.

SPECIAL AGENT TRAVIS MAY:  And then when he hit you is when you fired your pistol.

DWIGHT MCINTURFF:  When he hit me -- I didn't shoot him until after he hit me.

SPECIAL AGENT TRAVIS MAY:   At that time,

because there again, when you're standing there and he's hit you, do you have any other option to take him into custody?

DWIGHT MCINTURFF:  If I -- I tried to get my handcuffs out, but -- but -- and this happens fast.  It happens -- you look at a video and think, that's slow, but in your mind this is going fast.  And I knew, I knew.  I could read in his eyes when he projected the punch, but I had no time to duck.  I had no time to move.  It's instant, like, it's -- you know, when they look at you, size you up real quick and look around, and he knew, I can take this guy, I can kill this guy.  If I can't kill a 76-year-old man, what good am I.  So I knew at that moment I was -- I was out of -- I was out of all options.  It wasn't what I wanted to do.

SPECIAL AGENT TRAVIS MAY:  I don't have anything else.

SERGEANT JASON MARTIN:  Yes, I've got some things I want to ask you, okay?  I just want to clarify some stuff, okay?  Because you have to understand, right now we're on audio, we're not on a video --

DWIGHT MCINTURFF:  Right.  Okay.

SERGEANT JASON MARTIN:  -- so I want to clarify some things you've done that you need to clarify.

DWIGHT MCINTURFF:  Sure.

SERGEANT JASON MARTIN:  You said that he -- you thought he -- was on top of you, you said?

DWIGHT MCINTURFF:  No.

SERGEANT JASON MARTIN:  Okay.  He was never on top of you?

DWIGHT MCINTURFF:  No.

SERGEANT JASON MARTIN:  Okay.  He just swung from standing up?

DWIGHT MCINTURFF:  Yes.

SERGEANT JASON MARTIN:  Okay.  So he swung standing up.  And so you guys -- he was in your space.

DWIGHT MCINTURFF:  Oh my gosh, he was so close.  He was so close.  And maybe if I was younger I'd see the blow coming.  But in the blink of an eye it just --

Q    (By Mr. Ogles)  Do you think you were too close to him during all this?

A    Small porch.  The space you had.

Q    Were you on the porch?

A     (Witness nods head.)

Q     That's a yes?

A     Yes.

Q     Okay.  Have you seen --

A     I think it's a porch.

Q     Have you seen the video?

A     No, sir.

Q     Never seen the video?

A     No, sir.

Q     Well, we'll show it in a minute.

          DWIGHT MCINTURFF:  I'm not sure, but I
     think he grabbed me.  It's kind of vague.  But
     all of a sudden he moved towards me and the
     blow landed.  And I'm holding a gun on him.

          SERGEANT JASON MARTIN:  Okay.

          DWIGHT MCINTURFF:  And I told him I was
     holding a gun on him and he told me he didn't
     care.

          SERGEANT JASON MARTIN:  Okay.

          DWIGHT MCINTURFF:  This guy was in a state
     of mind that you could not control --

          SERGEANT JASON MARTIN:  Okay.

          DWIGHT MCINTURFF:  -- unless there was four
     of us there.

          SERGEANT JASON MARTIN:  And just to clarify

some more things, like, this agent said and I just want to clarify.  You were just driving there, and when you were driving there he approached you, he came out and slammed into your truck.

DWIGHT MCINTURFF:  Yes.

SERGEANT JASON MARTIN:  You didn't approach him?

DWIGHT MCINTURFF:  No.  I never went on his property.

SERGEANT JASON MARTIN:  You never had no intentions to approach him?

DWIGHT MCINTURFF:  No.

SERGEANT JASON MARTIN:  Okay.  I just wanted to clarify that.  So he approached you hitting your patrol unit.

DWIGHT MCINTURFF:  And then charging at me.

SERGEANT JASON MARTIN:  And then charging at you.  To your window?

DWIGHT MCINTURFF:  No.  I had gotten out. I thought I'd hit somebody.  I didn't think it was him until I got out and he's beating on the truck saying, get the fuck off my property.  I was in the road.

SERGEANT JASON MARTIN:  Okay.

DWIGHT MCINTURFF:  And when he came around, that -- that freaked me out a little bit.

SERGEANT JASON MARTIN:  Absolutely.  And then he said he was going in the house to get something.

DWIGHT MCINTURFF:  Yes.

SERGEANT JASON MARTIN:  And you would not let him in that house to get something because you didn't know what he was going to get -- come out with.

DWIGHT MCINTURFF:  He was -- his state of mind was -- he could not go in that house.  I don't think a reasonable person would let him go in that house.  And I just --

SERGEANT JASON MARTIN:  And just to clarify this, and I want to say this on the record, you are going off this by not looking at no videos, no radio traffic, you're doing this off fresh mind; is that correct?  I just want to clarify.

DWIGHT MCINTURFF:  Yes, yes.  I have not eaten in four days.

SERGEANT JASON MARTIN:  Okay.

DWIGHT MCINTURFF:  I've been just so --

SERGEANT JASON MARTIN:  So you have not seen nothing about this incident, but you're

just recalling what you know what happened.

DWIGHT MCINTURFF: I'm recalling what I know what happened. And I may have missed some stuff. I'm sorry.

SERGEANT JASON MARTIN: No, it's fair. It's fine.

DWIGHT MCINTURFF: But that's as best as I can. This was a scary moment. You remember scary moments.

SERGEANT JASON MARTIN: Absolutely.

DWIGHT MCINTURFF: I was in Vietnam when I was a kid. War is different than this. With war if you see someone with a gun you don't talk to them, you kill them.

SERGEANT JASON MARTIN: Right.

DWIGHT MCINTURFF: But in police work you talk to people, and you try to reason with people. And I understand that, and --

SERGEANT JASON MARTIN: And so out of the -- how many years do you have, ten years?

DWIGHT MCINTURFF: Ten, yes.

SERGEANT JASON MARTIN: Out of the ten years, I'm going to ask you, have you ever seen a man in this capability do something like that? Have you ever seen anybody in this

manner before --

DWIGHT MCINTURFF: No.

SERGEANT JASON MARTIN: -- in your career?

DWIGHT MCINTURFF: Never.

SERGEANT JASON MARTIN: Never?

DWIGHT MCINTURFF: Never have I seen --
I've seen people mad.

SERGEANT JASON MARTIN: Right.

DWIGHT MCINTURFF: I can deal with people
mad. I met a person up at Lake Norrell that
wanted to commit suicide, and I just talked to
him --

SERGEANT JASON MARTIN: Right.

DWIGHT MCINTURFF: -- and we talked him
down and everything was fine. I'm good at
talking to people. And the reason I pursue
him, I -- I -- I believed I could talk him
down, that we could reason with each other.
And when I'm up there in that situation, I
realized at the end, I can't.

SERGEANT JASON MARTIN: Okay.

DWIGHT MCINTURFF: I can't reason with him.

SERGEANT JASON MARTIN: All right. And
when you got hit that night did you see any
medical that night?

DWIGHT MCINTURFF:  Yes, they diagnosed me with a concussion.

SERGEANT JASON MARTIN:  They diagnosed you with a concussion.

DWIGHT MCINTURFF:  Yes, and I can't drive for two weeks, they won't let me do anything.

SERGEANT JASON MARTIN:  So following the impact of this man, you got a concussion and you can't drive and there's other things that's happened.

DWIGHT MCINTURFF:  Yes, they want me to do a CT scan.

SERGEANT JASON MARTIN:  Okay.

DWIGHT MCINTURFF:  They think there may be some head trauma.  And, guys, it was a vicious blow.

SERGEANT JASON MARTIN:  You don't have to explain it, I understand it.

DWIGHT MCINTURFF:  Can you see?

SERGEANT JASON MARTIN:  Listen, you don't have to explain nothing to me.

DWIGHT MCINTURFF:  Okay.

SERGEANT JASON MARTIN:   This is you -- you don't have to explain nothing to me, sir, okay?

DWIGHT MCINTURFF:  Okay.

SERGEANT JASON MARTIN:  This is your story. This is your story, this is what your happened, this is what you're telling us.  And you need to tell us everything about that night that you remember.

DWIGHT MCINTURFF:  Yes.

SERGEANT JASON MARTIN:  And if this is how it happened, then that's how it happened.

DWIGHT MCINTURFF:  Okay.

SERGEANT JASON MARTIN:  So you don't have to apologize to us or anything, okay?

DWIGHT MCINTURFF:  Okay.

SERGEANT JASON MARTIN:  You're the one there, we're not there, okay?

DWIGHT MCINTURFF:  Okay.

SERGEANT JASON MARTIN:  So is there anything else that you think of that -- and that's why I'm going to bring this up.  Is there anything else that you can think of, because I'm not there, he wasn't there, none of us are there, that happened that you think that we should know, or anybody out there, or if whoever has to listen to this that you want -- anything about you, how you felt, anything? Because you'll get --

DWIGHT MCINTURFF: I was scared --

SERGEANT JASON MARTIN: Okay.

DWIGHT MCINTURFF: -- but I wouldn't leave. You can be scared and stay. I told the Sheriff, I said, maybe I should have just got in my truck and drove it away. And the Sheriff said, and if he'd killed somebody after you left, you'd be at fault for that.

SERGEANT JASON MARTIN: Yes.

DWIGHT MCINTURFF: He said, you could not leave.

SERGEANT JASON MARTIN: You told him he was detained and under arrest? He was under arrest?

DWIGHT MCINTURFF: Yes. I told him he was detained, I told him he was under arrest. And he was --

SERGEANT JASON MARTIN: He refused.

DWIGHT MCINTURFF: He was insane. I have never seen someone -- I mean, can you imagine being out there on the street and someone running up and just beating on your unit and you think you ran over somebody because you're backing up and old? I just -- I couldn't -- it just wasn't what I thought was going to happen.

When he walked out I just thought we were going to talk and we'd have a conversation and leave. The man was --

SERGEANT JASON MARTIN:  I think your word was rage.

DWIGHT MCINTURFF:  The look in his face was rage.  The look in his face was rage.  Not a normal person, not even an upset person.  It was way beyond that.  It was way beyond that. And I couldn't -- I couldn't get out of it. And I couldn't fight him.  I couldn't -- I couldn't jump on him when he was on the ground.

SERGEANT JASON MARTIN:  That's what I'm asking.  When he was on the ground, what happened when he was on the ground?  What were you doing?

DWIGHT MCINTURFF:  I let him get up.

SERGEANT JASON MARTIN:  So you let him get up?

DWIGHT MCINTURFF:  Yes.  And I told him, I said, you can't go in that house.  I told you, you cannot go in that house.

SERGEANT JASON MARTIN:  Okay.

DWIGHT MCINTURFF:  And just f you this, f you that, and he tried to do it again.

SERGEANT JASON MARTIN: Tried to go in the house again.

DWIGHT MCINTURFF: Yes, yes.

SERGEANT JASON MARTIN: I just want to clarify what you're saying.

DWIGHT MCINTURFF: Yes. And then I stopped again. And then when he turned around, he no longer wanted to go in that house. I could sense the change.

SERGEANT JASON MARTIN: Okay.

DWIGHT MCINTURFF: He wanted me.

SERGEANT JASON MARTIN: Okay.

DWIGHT MCINTURFF: And from that moment on that was his plan. He never once ever wanted to go in that house again. He looked around and saw I was alone and he came after me. And I -- I hate that it happened. I don't hate that I defended myself, I just hate that it happened. But it was his actions and his results as what he did, and -- it's been -- it's been horrific.

SERGEANT JASON MARTIN: Horrific on you?

DWIGHT MCINTURFF: Yes. And my granddaughter, yesterday, sat me down at the kitchen table, fixed me a bowl of oatmeal and

she said, Papaw, you cannot get up until you eat. And I ate that bowl of oatmeal. But I just couldn't -- I couldn't function. Not from guilt. Two families are suffering here, his and mine. Both families are suffering, but this was his actions. This -- everything he did would never go back, would never calm down. It kept escalating the whole way through. The rage never left him. And there's a history of that rage there, I found out later. There's a history of that rage. And I tell you, if I'd known it, if that message on that phone said anything different, I would have had three deputies there. To me it was a minor, you know, two brothers fighting --

SERGEANT JASON MARTIN: Right.

DWIGHT MCINTURFF: -- arguing. It wasn't even physical --

SERGEANT JASON MARTIN: right.

DWIGHT MCINTURFF: -- just arguing. I would have talked to him, say go home.

SERGEANT JASON MARTIN: Right.

DWIGHT MCINTURFF: You know, everybody calm down, go home. Listen, you've drank too much, go inside and get over it. We've done that

before.

SERGEANT JASON MARTIN: Right.

DWIGHT MCINTURFF: This man wouldn't do that.

SERGEANT JASON MARTIN: Okay.

DWIGHT MCINTURFF: This man wanted to fight. From the time he came out of that house he was in a rage and it could not be controlled.

SERGEANT JASON MARTIN: My last question is this, based on what you just said. You've been doing this for ten years, correct? And I'm not trying to get you to give me an exact number, because there's no way -- I've been doing this for, like, 22 years, there's no way I could give you an exact number. How many calls have you got like this that did not turn out like this though?

DWIGHT MCINTURFF: Oh --

SERGEANT JASON MARTIN: How many have been --

DWIGHT MCINTURFF: -- domestics?

SERGEANT JASON MARTIN: Yes. Just any service.

DWIGHT MCINTURFF: I work a lot of hours

when I worked. I worked more hours than any reserve there. Lots of them.

SERGEANT JASON MARTIN: Lots?

DWIGHT MCINTURFF: Lots.

SERGEANT JASON MARTIN: Okay. I just wanted to clarify that.

DWIGHT MCINTURFF: And I have never not been able to talk people down.

SERGEANT JASON MARTIN: I wanted to clarify that.

DWIGHT MCINTURFF: Just because that's -- that's what I do.

SERGEANT JASON MARTIN: Lots meaning more than ten?

DWIGHT MCINTURFF: I would say more than a hundred.

SERGEANT JASON MARTIN: More than a hundred. Fair enough. That's all I needed to know.

DWIGHT MCINTURFF: And I've never pulled my gun on someone.

SPECIAL AGENT TRAVIS MAY: That's all I needed to know.

SERGEANT JASON MARTIN: One thing I do want to add. When he was talking earlier, when you

were talking about closing on you and grabbing a hold of you, you have a -- what kind of, like, vest, shirt do you have?

DWIGHT MCINTURFF:  It's an outer vest.

SERGEANT JASON MARTIN:  Okay.  That's what I was going to ask you.

DWIGHT MCINTURFF:  Pretty easy to grab -- pretty easy to get your hands -- you can't -- that's hard to get -- someone grab me there.

SERGEANT JASON MARTIN:  You had an outer vest on.

DWIGHT MCINTURFF:  Yes.

SERGEANT JASON MARTIN:  And you had no lapel mic you said.

DWIGHT MCINTURFF:  Yes.

SERGEANT JASON MARTIN:  You had no lapel mic to be able to talk to nobody.

DWIGHT MCINTURFF:  Oh, it'd have been nice if I'd have had one here.

SERGEANT JASON MARTIN:  Right, right.

DWIGHT MCINTURFF:  But it wasn't issued, and you didn't think about it.  And I -- I -- I couldn't get it off my belt.

SERGEANT JASON MARTIN:  Right.

DWIGHT MCINTURFF:  Because the issue was

ongoing and I needed to keep my eyes on him and keep that taser, so --

SPECIAL AGENT TRAVIS MAY: And I don't know if you covered this or not. When you-all -- at the back of the truck, did he approach you, get close to you, lay hands on you; do you recall?

DWIGHT MCINTURFF: You know something, I don't recall. I wish I did, but I don't recall that. But I remember the rage when someone charges you. You know, they don't have to put hands on you to threaten you. When they charge up to you and you back up. I was concerned enough to pull that taser. And I've never done that on another person in ten years.

SPECIAL AGENT TRAVIS MAY: So this is the first time you've pulled your taser?

DWIGHT MCINTURFF: Yes. First time ever.

SERGEANT JASON MARTIN: First time you've pulled your taser then too.

DWIGHT MCINTURFF: And the thing didn't work, you know.

SERGEANT JASON MARTIN: That makes sense.

DWIGHT MCINTURFF: And it didn't work. I had high hopes for that taser.

SERGEANT JASON MARTIN: Right. Is there

anything you need to add?

SPECIAL AGENT TRAVIS MAY: I know we've been through this and you've described it some about his rage in his eyes, but was there anything about his body language or his movements or anything like that that you recall?

DWIGHT MCINTURFF: He was -- he was -- his body language talked of aggression and bullying and fighting, and you add that with his words, it's not just one thing, it's a culmination of all of it. And this was a madman. This was a -- this was a bad -- and you don't just walk out and get out of the truck and say, oh, madman. You don't recognize that right away.

SPECIAL AGENT TRAVIS MAY: Right.

DWIGHT MCINTURFF: You grow into that.

SPECIAL AGENT TRAVIS MAY: Right.

DWIGHT MCINTURFF: As the event goes on you realize how bad it's getting. It got to the point that with these bruises and this stuff and -- guys, I'll tell you, I don't know how I stayed on my feet when he hit me. My eyes went to a pin point. And I just tried to -- you need that couple of seconds to say, don't fall,

don't fall, don't fall. And then he fell and then I was trying to recover, but I -- I tried everything. I tried every tool that I had. I tried all the training I've had. And it came down to this, it came down to one thing. I knew that my life was going to end there. I'm sorry.

SERGEANT JASON MARTIN: You don't have to apologize to us.

DWIGHT MCINTURFF: Okay. But I -- if he had hit me twice, at my age, it was not sustainable.

SERGEANT JASON MARTIN: I understand.

DWIGHT MCINTURFF: And he was coming on through me. He wasn't just going to hit and back up, he was coming through me. And that's the horror of it.

SPECIAL AGENT TRAVIS MAY: Do you have anything else?

SERGEANT JASON MARTIN: I don't have anything else. That will conclude the interview at 2:45 p.m.

Q (By Mr. Ogles) So that will be our exhibit. Have you ever heard that tape before?

A Yes. Yes.

Q   Is there anything you'd have done different after listening to that tape, in the completion?  I know I asked you that question earlier before it was over.

MS. LEWIS:  I'm going to object to form because are you -- about the interview or about the incident itself?

Q   After listening to the interview, is there anything you would have done different with the incident?

A   Would have done different.

Q   Yes.

A   No.

Q   Okay.  Do you believe that you were in over your head going there by yourself as a reserve deputy?

A   Nope.

Q   You don't?

A   No.

Q   Do you blame Saline County for not giving you enough information, Saline County deputy, Sheriff's Office?

A   No.

Q   For not having a CAD in your car?

A   No.

Q   Because you got a text message, I guess --

A   (Witness nods head.)

Q   That's a yes, right?

A    Yes, sir.

Q    Do you remember what the text message said?

A    It was very simple.  It just gave the address, said a brother -- terroristic threatening, an address, brother was threatening to throw stones at his sister and her car.

Q    Do you believe you should have been given more information in the text message?

A    I was given what I was given.

Q    I understand.  That's not my question.  My question is do you believe they should have given you more information?

A    I believe they gave me what they had.

Q    Okay.  Who gave it to you?

A    Dispatch.

Q    911?

A    Yes, sir.

Q    Are you still a reserve deputy?

A    Yes, sir.

MS. LEWIS:  Can we take a break for a second?

MR. OGLES:  Sure.

(BREAK TAKEN)

Q    (By Mr. Ogles)  And so you didn't have a body cam on; is that correct?

A   No, sir, I did not.

Q   And you've heard your transcript today, and you made a comment about your mic, and you made a decision not to use your mic when you were confronting Mr. Adams; is that correct?

A   The handheld?

Q   Yes.  Well, let me rephrase the question.  You did not have a mic; is that correct?

A   I had the handheld.

Q   Had the handheld.

A   Right.  No chest mic.

Q   And you made the decision not to call for backup while you had the handheld on your belt; is that correct?

A   Didn't feel like I needed to.

Q   You didn't feel like you needed to?

A   No, not -- not at -- depending on where you were in this sequence.

Q   But I thought you said in your testimony here with your Internal Affairs, that you had the taser in your hand.

A   I did.

Q   Is that one of the reasons you didn't use your handheld?

A   Very possible, yes.  Good point.

Q    But also you didn't think you needed to.

A    Didn't have time.  It was happening too fast.

Q    All right.  And you never shot your gun before this time with Mr. Adams.  Is that the first time you shot your gun at someone?

A    First time I've ever fired that weapon --

Q    Yes.

A    -- in --

Q    Yes, not in target practice.

A    Oh, okay.  Yes.

Q    Is that your first time?

A    Yes.

Q    Had you ever used a taser before?

A    No, sir.

Q    Had you ever been trained on tasers?

A    Yes, sir.

Q    Okay.  I'm going to show you the video and we're probably going to have to watch it twice since you've never seen it before.  And I don't know if I can make it too big, but I'm just going to let you watch it.  And you knew she was following you -- I mean, she was videoing you, right, the sister?

A    Not at this moment, but later on I did.

                    (VIDEO IS PLAYED)

A    Oh, she's driving here.  Okay.  I couldn't figure

out what was going on.

Q    Can you see it okay?

A    Yes, sir.

FEMALE VOICE:  Damn.  Brother, please calm down.

JEREMY ADAMS:  I don't give a fuck.

FEMALE VOICE:  Please.  Jeremy, stop.

DWIGHT MCINTURFF:  Back up.

FEMALE VOICE:  Brother, please.

DWIGHT MCINTURFF:  (Inaudible)  Right now.

JEREMY ADAMS:  (Inaudible).

DWIGHT MCINTURFF:  Do you want to die here today?

JEREMY ADAMS:  Yes, I do.

DWIGHT MCINTURFF:  I'll make it happen.

JEREMY ADAMS:  (Inaudible).

FEMALE VOICE:  Jeremy, please stop.

JEREMY ADAMS:  I don't give a fuck.  I don't give a fuck.

FEMALE VOICE:  Jeremy, please.

DWIGHT MCINTURFF:  I asked you what was going on.

JEREMY ADAMS:  Get the fuck -- get the fuck from around me.

FEMALE VOICE:  No, no, no, no, no, no,

no, no, no, no, please.

JEREMY ADAMS:  If you ever grab me by the goddamn hair again --

DWIGHT MCINTURFF:  I said back up and turn around.

JEREMY ADAMS:  No, I ain't.  You're not going to (inaudible).

DWIGHT MCINTURFF:  It's jail or the morgue.  It's jail or the morgue.  Come on.

A    There is where I reach for my handcuffs.

FEMALE VOICE:  Please, Jeremy, let him help you.  Please

Q    (By Mr. Ogles)  So what did you say?

A    I just saw myself reach for the handcuffs.

Q    And the video shows you're pretty close; is that correct?

A    Yes.

Q    And I know we talked about this a minute ago, but you never considered putting some distance between you and Mr. Adams, did you?

A    He wasn't allowing it.

Q    He wouldn't allow any?

A    No.

Q    When he went inside the house, or tried to go inside the house, he wouldn't allow any?

A    He wasn't going in that house.

Q    Okay.

JEREMY ADAMS:  I don't give a fuck.  Let's do that then.  I don't give a fuck.

DWIGHT MCINTURFF:  I came out here to (inaudible).

JEREMY ADAMS:  I'm not (inaudible).

FEMALE VOICE:  Brother just  let him help you, please.

Q    (By Mr. Ogles)  Do you know what he's telling you?

MR. OGLES:  I don't know where to start.

MS. LEWIS:  I'm going to go back a little bit because I noticed that you had your gun down when we stopped it, and your gun is up, but you're about to put it down.

MR. OGLES:  We'll watch it again.

(VIDEO IS PLAYED)

JEREMY ADAMS:  I don't give a fuck.

DWIGHT MCINTURFF:  I came out here to (inaudible).

JEREMY ADAMS:  I'm not (inaudible).

FEMALE VOICE:  Brother, just let him help you, please.

JEREMY ADAMS:  I can't (inaudible).  I'm (inaudible) --

DWIGHT MCINTURFF:  You came out and beat on my truck.

JEREMY ADAMS:  No, I --

DWIGHT MCINTURFF:  Then you threatened me.

JEREMY ADAMS:  No, I --

DWIGHT MCINTURFF:  I said you're not going in --

FEMALE VOICE:  Jeremy, Jeremy.

JEREMY ADAMS:  (Inaudible).

FEMALE VOICE:  Jeremy.  No, no.  Please stop.  No, no.  Jeremy.  Call 911, please.  Please.  (Inaudible).  Help.  Brother.

A    That's when I'm on the radio.

FEMALE VOICE:  Jeremy.  Call 911.  Call 911.

(VIDEO ENDS)

Q    (By Mr. Ogles)  We'll watch it again because that's the first time you've seen it, correct?

A    Yes.

Q    So I notice you have the radio in your left hand; is that correct?

A    It looks like it, yes.

Q    It looks like to me you called on the radio in your left hand.

A    Uh-huh.

MS. LEWIS: Object to form just because at one -- at different points in the video -- earlier in the video he had handcuffs in his hand.

MR. OGLES: I'm going to ask him.

MS. LEWIS: Okay.

Q   I'm talking about at this point you had the radio in your left hand.

A   It looks like it.

Q   Well, we're going to go back and look at it again. Is there any reason why -- you had the taser in your right hand earlier; is that correct?

A   Yes.

Q   Are you right handed?

A   Right handed.

Q   Okay.

A   That video did not show when I tased him, did it?

Q   Hang on a second, we're going to watch it again.

MR. OGLES: I hate to ask you to do this, can you start it over?

MS. LEWIS: Yes. And then this time when we go through and you ask questions can we do the times, just because I know he switches --

MR. OGLES: You do it.

MS. LEWIS: You want me to do it? Okay.

Just say the time stamps on it?

MR. OGLES:  Uh-huh.

MS. LEWIS:  Okay.  Because, you know, sometimes he has a gun, sometimes he has handcuffs.  I don't think he ever has a taser in his hands during the video.

MR. OGLES:  That's fine, we'll watch it.

MS. LEWIS:  Okay.

MR. OGLES:  I'm going to email it to everybody.

(VIDEO IS PLAYED)

FEMALE VOICE:  Damn.  Brother, please calm down.

JEREMY ADAMS:  I don't give a fuck.

FEMALE VOICE:  Please.  Jeremy, stop.

MR. OGLES:  So you do whatever you want to do on the times.

MS. LEWIS:  When we want to stop I'll pause it.

DWIGHT MCINTURFF:  Back up.

FEMALE VOICE:  Brother, please.

DWIGHT MCINTURFF:  (Inaudible)  Right now.

JEREMY ADAMS:  (Inaudible).

DWIGHT MCINTURFF:  Do you want to die here today?

JEREMY ADAMS:  Yes, I do.

MR. OGLES:  I want to stop right now.

MS. LEWIS:  So at approximatly 2:17 on the video.

Q    (By Mr. Ogles)  Is this after you tased him?

A    Because we don't see the taser.

Q    No, I'm just asking you, do you think is -- it has to be after you tased him, this video; is that correct?

A    I think so, because it doesn't show me tasing him, does it.  This video doesn't show me tasing him.

Q    Well, we're going to watch it in its entirety, so it's not a trick.  I'm just trying to make sure we all get it correct.  And you're pretty close to him; is that correct?

A    Yes.

Q    And I know we've already talked about it, if you could back up.  You just made a decision not to back up; is that correct?

MS. LEWIS:  Object to form.

A    He wouldn't let me back up.

Q    How does he not let you back up?

A    His aggressive stance.

Q    Okay.  So --

A    The violent nature of the call.

Q    -- this video right here that's showing would not

let you back up; is that correct?

A    It's not, not letting you.

Q    That's what you said.

A    No.  It's not -- he would not let me.

Q    That's what I was asking you.

A    I was not, not letting me.

Q    Right.

A    Yes.

Q    Okay.

DWIGHT MCINTURFF:  I'll make it happen.

JEREMY ADAMS:  (Inaudible).

FEMALE VOICE:  Jeremy, please stop.

JEREMY ADAMS:  I don't give a fuck.  I
don't give a fuck.

FEMALE VOICE:  Jeremy, please.

Q    (By Ms. Ogles)  What's he saying to you?

MS. LEWIS:  Let me do the time stamp.

A    I don't remember.

MS. LEWIS:  That was at 55 seconds.

A    But you can see his violent nature, his violent
stance.

Q    Okay.

A    You can see that.

Q    What do you have in your right hand right there?

A    I don't know.

Q    Okay.  Is it your pistol?

A    I can't tell.

Q    Is your radio in your left hand?

A    I can't tell.  I'm sorry.

Q    Do you normally carry the radio on your left side?

A    Yes.  Yes, I normally do, I think.  Yes.

Q    I'm not trying to trick you, I'm just asking you.

A    I know, and I'm trying my best, John.  I'm trying.

Q    But there's nothing here -- because from listening to your statement to Internal Affairs, it seemed like to me that you couldn't get your radio, but there's nothing here stopping you from getting your radio, is it?

A    It doesn't appear to be anything.

Q    Okay.

DWIGHT MCINTURFF:  I asked you what was going on.

JEREMY ADAMS:  Get the fuck -- get the fuck from around me.

FEMALE VOICE:  No, no, no, no, no, no, no, no, no, no, no, please.

MR. OGLES:  What time is that?

MS. LEWIS:  1:56.

Q    (By Mr. Ogles)  And why did you pull him down by his hair?

A    He wasn't going in that house.

Q    Okay.  And you've already talked about why he wasn't going in that house.

A    Right.

MS. LEWIS:  I think it's a little bit zoomed in.  Let me see, there.

MR. OGLES:  Well, you zoomed it in.  All right, I'm turning it back on.

JEREMY ADAMS:  If you ever grab me by the goddamn hair again --

DWIGHT MCINTURFF:  I said back up and turn around.

JEREMY ADAMS:  No, I ain't.  You're not going to (inaudible).

DWIGHT MCINTURFF:  It's jail or the morgue.  It's jail or the morgue.  Come on.

A    There I get the handcuffs.

FEMALE VOICE:  Please, Jeremy, let him help you.

A    And tried to reach him.

MS. LEWIS:  Time stamp 1:39.

Q    (By Mr. Ogles)  So you had your gun, I think, right before in your left hand, and then you switched it over, am I correct, and got the handcuffs?

A    You said I had the gun in the left hand?

Q    Do you have the gun?  At this point you didn't have

the gun; is that correct?

A    I don't think I -- are you saying did I have the gun in my hand?

Q    Yes.

A    Well, you can see it.

Q    I know, and you have the handcuffs in your left hand.

A    Yes.

Q    Did you originally have the gun in your left hand?

A    No.

Q    It was always in your right hand?

A    Yes.

Q    Okay.  So what were you going to do with the handcuffs?

A    Handcuff him, take him -- arrest him.

Q    Okay.

                 FEMALE VOICE:  Please

                 JEREMY ADAMS:  I don't give a fuck.  Let's do that then.  I don't give a fuck.

                 DWIGHT MCINTURFF:  I came out here to (inaudible).

A    And see there, I put the gun down.  I'm not wanting to shoot the man.

                 JEREMY ADAMS:  I'm not (inaudible).

                 FEMALE VOICE:  Brother just  let him help

you, please.

A    This is a de-escalate right there.

        MR. OGLES:  Turn it off.

        MS. LEWIS:  1:19 time stamp.

Q    (By Mr. Ogles)  Do you know what he was telling you?  Do you remember?

A    I can't remember.

Q    Did you hear his sister?

A    No.  It's funny, you can hear it here because she must have the camera --

Q    I understand.

A    -- to her, but I never heard his sister say calm down.

Q    Okay.

A    If I'd realized that, I probably would have called her over there with me, but I didn't hear that.

Q    Did you see her?

A    No.

Q    So you didn't know she was there?

A    No, not at this time.

Q    At what time did you know she was there?

A    After the shooting.

Q    Okay.

A    When she screamed.

Q    I got you.

JEREMY ADAMS:  I don't give a fuck.

DWIGHT MCINTURFF:  I came out here to (inaudible).

JEREMY ADAMS:  I'm not (inaudible).

FEMALE VOICE:  Brother, just let him help you, please.

JEREMY ADAMS:  I can't (inaudible).  I'm (inaudible) --

DWIGHT MCINTURFF:  You came out and beat on my truck.

JEREMY ADAMS:  No, I --

DWIGHT MCINTURFF:  Then you threatened me.

JEREMY ADAMS:  No, I --

DWIGHT MCINTURFF:  I said you're not going in --

FEMALE VOICE:  Jeremy, Jeremy.

JEREMY ADAMS:  (Inaudible).

FEMALE VOICE:  Jeremy.  No, no.  Please stop.  No, no.

MR. OGLES:  Stop it.

MS. LEWIS:  Do you want me to rewind it a little bit?

MR. OGLES:  No, it's fine.  You saw it.

THE WITNESS:  Yes.

Q    (By Mr. Ogles)  So why did you pull his hair the

second time?

A    He wasn't going in that house.

Q    Okay.  We've already talked about the reasons --

A    Yes.

Q    -- in your mind why he wasn't going in that house.

A    Right.

FEMALE VOICE:  Jeremy.  Call 911, please.

Q    (By Mr. Ogles)  So I'm trying to figure out when you got on the radio.  What's in your hand right there?

A    There's the handcuffs.  It's the handcuffs still.

Q    Okay.  I think it was handcuffs.

A    Yes, there, you can see them.  Those are the handcuffs.

Q    Okay.

A    And radio is in my hand too.

MS. LEWIS:  And we're at time stamp around :48.  And the time stamps are counting down. Like, it started at three minutes and it goes backwards, just so everyone is clear.

Q    So you had your radio in your hand, but you don't call until you shoot him; is that correct?

A    I think that's -- I don't call until after the shots are fired.

Q    Right.

A    Yes.

Q   That's what you said in your statement.

A   Yes.

Q   You don't call before?

A   No.

Q   Okay.

FEMALE VOICE:  Please.  (Inaudible).

Q   (By Mr. Ogles)  So is this where you call right here?

A   Apparently it was.

MR. OGLES:  What time is that?

MS. LEWIS:  30 seconds remaining.

Q   (By Mr. Ogles)  So is this when you call?

A   It looks like it, yes.

FEMALE VOICE:  Help.  Brother.

Q   (By Mr. Ogles)  Did you have a vest on?

A   Did I have a vest on?  Yes, you can see it.

Q   I thought you did.

FEMALE VOICE:  Jeremy.  Call 911.  Call 911.

(VIDEO ENDS)

Q   (By Mr. Ogles)  Did you ever go inside the house?

A   Never.

THE COURT REPORTER:  And just for the record, that's going to be Exhibit 4, the video.

(EXHIBIT 4 MARKED FOR IDENTIFICATION)

MR. OGLES:  Okay.  I will email it to you in just a second.

Q   After looking at this video is there anything you would have done different?  You've seen it twice.

A   I've seen it twice.  I can't think of anything I would have done different.

Q   You shot two shots; is that correct?

A   Yes, sir.

Q   Do you remember how close you were to him when you shot him?

A   Well, you can see --

Q   Well, I've got the video, but do you know?

A   Yes.  A foot.  Well, he was already hitting me, so he was closer than a foot.  I mean, his arm was already connecting with my head.

Q   And what were you aiming at?

A   I thought -- I tried -- I thought I'd shoot him in the arm.  But when he's on top of me -- when he swung and hit me, your whole body shifts.  When he hit me, I fired.

Q   So before he hit you, you were going to shoot him in the arm?

A   I had no thoughts before he hit me.  I hadn't planned on shooting him at all.

Q    Well, but you made a comment you were going to shoot him in the arm.  What was that about?

A    That was after he hit me.

Q    Okay.

A    Yes.  Before he hit me I had no intention of shooting the man.

Q    So after he hit you, you intended to shoot him in the arm.

A    That's the thought.  And that happens in the blink of an eye, because, remember, that's kind of boom, boom. You don't have a lot of time to process.

Q    But you didn't shoot him in the arm.

A    No, no.

Q    And you knew he was unarmed.

A    The man was armed.

Q    With his fist?

A    With his fist.

Q    Anything else?  Any knife or --

A    The first was enough.

Q    But my question --

A    The fist was deadly.

Q    -- is, did you see a knife or a rock or anything else in his hand?

A    Didn't see anything.

Q    And what verbal warnings did you give before you

fired the gun?

A    What verbal warnings did I give?

Q    Yes.

A    Other than the de-escalate tactics.  The weapon itself is a verbal warning.  And I told him -- I told him that -- I didn't hear it on that video, you don't hear stuff like that.  I told him that this either ends in the morgue or jail.  I told him that.  Now -- no, go ahead.

Q    I don't want to cut you off.

A    No, I'll just wait on a question.

Q    After you pulled your gun, pointed it at him, what verbal warnings did you give then?  Is that when you said the morgue or jail?

A    Told him to stop.  Tried to get him to calm down. You could see me moving around a little bit.  I actually put my gun at my side to try to de-escalate it so the gun wouldn't fire accidentally.  I'm doing everything I can not to shoot the man.  I'm doing everything I can not to shoot the man.

Q    Did you say morgue or jail after you pulled your gun or before?

A    Can't remember.

Q    What did you shoot him twice for, instead of once?

A    Instinct.  It's just to stop the threat.

Q    And this is the first time you've ever shot anyone in your life, correct?

A    As a deputy.

Q    So you've shot someone not as a deputy?

A    I'm was in Vietnam.

Q    Oh, okay.  Well, I'm talking about as a reserve -- Saline County Reserve Deputy.  Who was the backup that came first?

A    I think, and I'm not sure.  I don't -- tell you the truth, I don't remember.  I'd only be guessing.  I know a bunch of people came.

Q    Do you know what the written policy is for Saline County on using violent force, deadly force?

A    I can't quote it, but I know it.  I've studied it.

Q    Pardon me?

A    I've looked at it, yes.

Q    What is your understanding?

A    That in order to use violent force it's got to be the end of the story.  You can't pull up to someone's house -- if I'd have pulled up to his house, got out of my car when he's in the yard and shot him, that's excessive.  If I had -- when he tried to walk away from me, if I'd have shot him in the back, that's wrong.  If when he tried to go in his house I just pulled the gun and shot him, that's wrong.  If I -- if when he attacked

me, when he came at me after I tased him, if I'd pulled my gun and shot him, that was wrong.  So I didn't shoot him.  It's to do anything you can not to fire that gun.

But when that man grabbed me, he hit me in the head.  You have little pressure points on your body.  The most sensitive place on your body is your temple.  That's the most sensitive place on your body.  A blow there can kill you.  And that's where he hit me.  The man knew that if he did it again I was done for it.

Q     And you told him that?

A     Told him.

Q     Is that when you said the morgue or jail?

A     Yes.  I wanted him to know -- saying this either ends in the morgue or jail, I wanted him to know, John, how dangerous this situation had gotten and I didn't want to do it.  And then I told him, I don't want to shoot you.  I don't want to do this.  All you have to do is stop.  But he kept attacking.  The morgue or -- I would not -- if I came to your home I would not tell you, if I came up to your place, this either ends in the morgue or jail.  I wouldn't do someone like you that way, a normal person.

But this person had already attacked me three times, rocks in the street and at that house.  We were at the end of the story.  I wanted him to clearly  know

how dangerous this was and I didn't want to do it.

Q    And the three times before you shot him, you never called for backup; is that correct?

A    I knew backup was coming.

Q    I understand that's your answer.

A    It's the only answer I've got, buddy.

Q    Okay.  And you believe you exhausted all other means before shooting him?

A    Including leaving the man in peace, without even making contact with him.

Q    Is it your testimony he was attacking you when you shot him?

A    Yes.  I think the blow to the head is a pretty clear indication of an attack.

Q    That was before you shot him though, right, the blow to the head?

A    The blow to the head, yes.  I wouldn't have shot him if he hadn't hit me in the head.

Q    We just saw the videos.

A    Yes.

Q    Was he swinging at you when you shot him?

A    No, he hit me.

Q    Pardon?

A    You can slow the video down, but the blow was landing.

Q    Did you write a written report?

A    No.

Q    How come?

A    I wasn't asked to.

Q    Were you suspended from Internal Affairs?

A    Suspended?

Q    Well, you gave your statement to Internal Affairs, State Police, and your lawyer was there.

A    Right.

Q    Did you get disciplined in any way?

A    None.

Q    Did you get any special training in any way?

A    No.

Q    And I've already asked you, you don't remember meeting Mr. Adams before this incident.

A    No.  You say there's a photo, but I'm sorry, I just don't -- it had to be such a minor call I don't remember it.

Q    I understand.

A    I'm sorry.

Q    But you are aware now that there were other incidents at that house, but you were not told when you showed up; is that correct?

A    Totally aware.

Q    And you don't blame that on the Saline County

Sheriff's Office?

A    No.  They didn't know.

Q    Have you made any statements on social media about this case?

A    No, no.  Didn't even know I had a Twitter account.

Q    Well, you have a Facebook account though.

A    Yes, I've got six friends.  Don't like three of them.

Q    But you haven't made any comments on social media about this case?

A    No.  It was too horrific.

Q    Did you ever tell anyone you were scared for your life?  Have you told anyone else you were scared for your life when this happened?

A    I don't know who anyone else -- what you mean by that.

Q    Well, have you told -- let me rephrase the question.  Have you ever made the statement you were scared for your life when this happened with Ms. Adams?

A    Well, I did in that -- when I was talking to them.

Q    I understand that.  Any other times?

A    Probably when I was talking to someone at the sheriff's office, you know.  But as far as --

Q    Who would that have been at the sheriff's office?

A    They assigned a deputy to me.

Q    What was his name?

A    Admunson.  Did I say that right?  A detective.  And he's the one that took me in.

Q    So at what point were you scared for your life with Mr. Adams?

A    When he came at me and started beating me in the head.

Q    So you weren't scared or concerned until then?

A    Not for my life.  But there was fear.

Q    Okay.  And I know I've already asked you this, but you never considered waiting, backing up and calling backup to help you, correct, after you had the fear?

A    I knew backup was coming.

Q    Okay.  And that's your answer?

A    Yes.  Do you think it's wrong?

Q    I'm asking the questions.

A    Okay.  I'm sorry.

Q    We're not in a social context.  And you never gave an official written report of what happened?

A    State Police.

Q    That's the only time?

A    That's all they asked me to do.

Q    Okay.  Did Mr. Adams lunge at you?

A    I think the video kind of shows that.  Yes.

Q    And I've already asked you this, just making sure.

But until today, you've never seen this video before.

A     No, sir, that was the first.  I never wanted to.

Q     Okay.  Have you been offered to see it?

A     Yes, I guess, but I lived it.  I didn't need to see it.

Q     I understand.

MR. OGLES:  That's all I have.  Thank you very much.  Your lawyer may have some questions.

MS. LEWIS:  I don't have any questions.

(WHEREUPON, the proceedings were concluded in the matter at 11:15 a.m.)

(WITNESS EXCUSED)

* * * * * * *

REPORTER'S CERTIFICATE

I, Skye Wright, Certified Court Reporter in and for the State of Arkansas, do hereby certify as follows:

(1) that on November 6, 2025, Dwight McInturff was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein;

(2) that the foregoing pages contain and are a true and correct transcript of the proceedings as reported verbatim by me via the voice-writing method to the best of my ability and transcribed and reduced to typewritten form by myself or under my direction and supervision;

(3) that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and that I am not a relative or employee of any attorney employed by the parties hereto;

(4) that I am not financially or otherwise interested in the outcome of this action that affects or has a substantial tendency to affect impartiality or requires me to relinquish control of an original or copies of a deposition transcript before it is certified, or that requires me to provide any service not made available to all parties to the action; and

(5) that I have no contract with the parties, attorneys, or persons with an interest in the action; and that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter.

This transcript is prepared at the request of Plaintiff's counsel and all fees are billed in compliance with the Arkansas Board of Court Reporter Examiners Regulations Section 19.

WITNESS MY HAND AND SEAL this 24th day of November, 2025.

_____
SKYE WRIGHT, CCR 686
My Commission Expires:  2/21/2026



SKYE RENAE WRIGHT
MY COMMISSION # 12347124
EXPIRES: February 21, 2026
Cleburne County

## A

**able (3)**
10:18;89:8;90:17
**abortion (2)**
35:20,21
**Absolutely (2)**
79:3;80:10
**academy (7)**
10:5,7,8;71:5,8,10,
12
**accept (1)**
13:7
**accidentally (2)**
46:25;115:18
**accidents (1)**
15:20
**account (8)**
35:10,12,17;36:10,
13,15;120:5,6
**across (3)**
39:23;42:11;56:18
**acting (4)**
28:10;33:20,22;
34:1
**actions (2)**
86:19;87:6
**Actually (4)**
8:12;12:8;60:21;
115:16
**Adams (48)**
5:13;17:4;18:4;
26:19;28:8;43:3;
53:22;56:8;65:5;96:4;
97:4;98:6,11,14,16,
18,23;99:2,6,20;
100:3,7,18,21,24;
101:3,5,9;103:14,23;
104:1;105:11,13;
106:17;107:8,12;
108:18,24;110:1,4,7,
11,13,17;119:15;
120:19;121:5,23
**Adams' (2)**
65:3,21
**add (3)**
89:25;92:1,10
**address (7)**
6:4,5;7:18;25:11;
57:9;95:3,4
**admire (1)**
60:24
**admit (1)**
72:7
**Admunson (1)**
121:2
**adopted (1)**
7:2
**Affairs (5)**
20:8;96:20;106:10;
119:5,7
**affect (3)**

37:18;38:25;71:20
**afterwards (1)**
51:8
**again (21)**
15:5;16:20;26:13;
28:22;37:24;41:8;
44:18;62:16,17;75:1;
85:25;86:2,7,15;99:3;
100:16;101:17;
102:10,18;107:9;
117:9
**against (1)**
32:21
**age (4)**
5:18,24;55:18;
93:11
**AGENT (48)**
21:5,8;58:4,8;
63:10,14,17;64:1,18;
65:11;66:4,15,19,22;
67:2,7,10,13,17;68:1,
4,8,13,18,25;69:2,5,
18,22;70:4,8;71:22;
72:2;74:7,11,15,18,
21,25;75:19;78:1;
89:22;91:3,15;92:2,
16,18;93:18
**aggression (1)**
92:9
**aggressive (1)**
104:22
**ago (5)**
53:11;58:12,13;
61:5;99:18
**agree (3)**
13:3,13;14:1
**agreed (1)**
60:13
**ahead (5)**
5:25;39:21;47:4;
71:19;115:9
**aiming (1)**
113:17
**ain't (2)**
99:6;107:12
**ALETA (1)**
71:12
**allow (2)**
99:22,25
**allowing (1)**
99:21
**alone (6)**
39:9;53:9;57:3;
72:4;74:5;86:16
**always (6)**
10:21;22:11;62:7,
21;68:21;108:11
**amazingly (1)**
60:21
**ambulance (2)**
43:16;53:23
**Amendment (1)**
45:25

**Amplify (1)**
14:22
**anymore (2)**
47:3,7
**apologize (3)**
48:19;83:11;93:9
**Apparently (1)**
112:9
**appear (1)**
106:13
**appreciate (1)**
58:5
**approach (3)**
78:7,12;91:5
**approached (2)**
78:4,15
**approximatly (1)**
104:3
**arcountygov (1)**
6:5
**area (2)**
6:19;67:15
**argue (1)**
47:21
**arguing (2)**
87:17,20
**argumentative (1)**
66:23
**Arkansas (4)**
6:20;10:7;59:24;
71:12
**arm (6)**
113:15,19,23;
114:2,8,12
**armed (1)**
114:15
**armpit (1)**
49:18
**around (21)**
21:18;26:1;27:8;
28:1;31:2;38:17;46:5;
48:8;54:9,18;66:7;
75:13;79:1;86:7,15;
98:24;99:5;106:18;
107:11;111:16;
115:16
**arrest (16)**
32:17,18,20,22,24;
36:23;59:3;60:11;
66:17;72:19,20;74:9;
84:13,14,16;108:15
**asleep (1)**
68:11
**ass (1)**
29:25
**assigned (4)**
19:3;65:23,25;
120:25
**assisting (6)**
17:10,12;19:2;55:4;
64:22;65:15
**Associates (2)**
8:6;9:11

**AT&T (3)**
8:17,21,23
**ate (1)**
87:2
**attack (1)**
118:14
**attacked (2)**
116:25;117:23
**attacking (2)**
117:18;118:11
**attempted (1)**
68:1
**audio (1)**
75:24
**August (1)**
63:16
**Automobile (1)**
15:20
**available (3)**
30:22,25;31:24
**aware (3)**
52:20;119:21,24
**away (10)**
27:20;31:2,6;38:16;
46:3;59:12;69:10;
84:6;92:15;116:22

## B

**back (89)**
9:4;11:5,7,13,18,21,
25;12:2,8,13,14,15,
18;13:23;14:2,13,20;
15:25;16:1;17:14;
21:18;22:22;24:15;
25:7;27:9,17,22;
29:11,16,22;31:25;
33:8,15,18;36:17,19,
20;37:23,24;39:13;
40:12,16,21;44:12,20,
21,22,25;45:7;46:8,
15;48:22,23;52:5;
57:14;58:20;60:22;
61:5,15,18;62:18;
63:12;64:19;65:7,12;
66:7;67:11,18,19;
68:10;69:13,15;87:7;
91:5,12;93:16;98:8;
99:4;100:12;102:10;
103:20;104:17,17,20,
21;105:1;107:7,10;
116:23
**backed (6)**
26:8;47:12,15;50:5,
6;64:10
**background (3)**
7:19;33:1;53:24
**backing (12)**
26:6;29:11,15;40:8;
41:11;49:9,13,25;
50:3,9;84:24;121:11
**backup (44)**
26:18,22;27:3,13,

22;28:14,19,24;29:4,
13,19;30:14,22,24,25;
31:1,3,17,19,22;32:1;
34:2;38:7,8,10,11;
39:5,6;40:2,3,9,13,21;
41:4,5,12;47:16;49:3;
96:12;116:7;118:3,4;
121:12,13
**backwards (1)**
111:19
**bad (12)**
18:8;37:12,13,15;
48:21;58:13,14;
60:23;64:16;65:9;
92:13,20
**banged (1)**
27:1
**bare (1)**
20:21
**barely (1)**
42:13
**baseball (1)**
32:14
**based (1)**
88:11
**bat (1)**
32:14
**Bauxite (1)**
62:24
**beat (5)**
45:22;47:8;57:2;
101:1;110:9
**beating (6)**
26:16,18;66:11;
78:22;84:22;121:6
**become (2)**
10:17;24:16
**beginning (1)**
21:16
**behind (1)**
26:12
**bell (2)**
53:24,25
**belong (2)**
7:9,24
**belt (5)**
19:25;49:4,5;90:23;
96:13
**beside (1)**
43:25
**best (2)**
80:7;106:8
**bet (1)**
35:17
**better (2)**
69:10;73:15
**beyond (2)**
85:9,9
**big (1)**
97:20
**bigger (1)**
33:16
**birth (1)**

6:2
**birthday (1)**
5:25
**bit (7)**
33:2;51:4;79:2;
100:13;107:4;110:22;
115:16
**blacked (2)**
5:24;6:4
**blame (3)**
57:4;94:17;119:25
**blind (1)**
57:22
**blink (2)**
76:21;114:9
**bloodshot (1)**
56:22
**blow (9)**
42:20;76:20;77:14;
82:16;117:7;118:13,
16,17,24
**blur (1)**
39:22
**blurry (1)**
43:13
**body (11)**
19:13,15;31:14;
70:3;92:5,9;95:24;
113:20;117:5,6,7
**books (2)**
8:9;9:9
**boom (2)**
114:10,10
**Both (2)**
37:20;87:5
**bother (1)**
48:12
**bowl (2)**
86:25;87:2
**break (5)**
42:5,7;48:9;95:20,
23
**bring (2)**
51:5;83:18
**broke (4)**
59:16,17;60:17,17
**brother (13)**
18:12;95:4,5;98:4,
9;100:8,22;101:12;
103:12,21;108:25;
110:5;112:14
**brothers (5)**
23:23;24:8;48:5,6;
87:15
**brought (3)**
46:15;51:5;69:24
**bruises (1)**
92:21
**buddy (1)**
118:6
**building (1)**
50:22
**bullying (1)**

92:9
**bunch (1)**
116:11
**business (5)**
8:7,11,14;9:10,16
**button (1)**
19:22

## C

**CAD (9)**
51:24;52:1,2,12;
57:5,7,8,12;94:21
**CAD's (1)**
52:16
**calculated (1)**
55:10
**call (67)**
15:8;16:9;17:3,6,
14,16,20,22,22;18:5,
6,7,18,23;19:3,4;20:1;
21:18;22:25;23:1,8,
17,20,25;24:18,25;
25:1,7;26:1;27:2,22;
29:15,15;30:24;31:1,
23;41:24;45:15;47:1;
48:24;49:3;62:19;
63:1,1,3,4;64:23;65:3,
5,16,21,23;66:2;
96:12;101:11,14,14;
104:24;111:7,21,22;
112:3,7,12,18,18;
119:17
**called (11)**
43:15;47:16;51:24;
57:20;58:17;59:1;
61:14,19;101:23;
109:15;118:3
**calling (20)**
26:18;27:12;28:14,
19,24;29:4,12,18;
30:14;31:17;34:1;
38:7,9;39:5;40:2,21;
41:3,12;49:10;121:11
**calls (5)**
14:25;15:6,8;61:25;
88:16
**calm (16)**
27:9;28:11,11;30:2;
45:5,8,9;46:10;50:13;
58:1;87:7,23;98:4;
103:12;109:12;
115:15
**cam (3)**
19:13,15;95:24
**came (55)**
11:4,7;12:17;13:16,
23;14:2,13,20;15:25;
16:1;17:20;18:6,15;
22:25;23:8;25:14;
26:4;27:10,10,13,18;
28:12,23,25;30:2;
38:17;46:9,11,19;

47:1;48:25;61:4;
62:18;63:12;66:2;
68:17;70:5;78:4;79:1;
86:16;88:7;93:4,5;
100:5,19;101:1;
108:20;110:2,9;
116:8,11;117:1,19,20;
121:6
**camera (1)**
109:10
**can (53)**
14:1,19;15:2,4;
21:25;22:4,19;26:22,
23;28:1,3,3,6,20;
29:15,15;33:24;36:5;
42:5;46:24;47:2;
56:13;59:10;60:25;
61:1;62:22;69:10;
70:7;75:13,14;80:8;
81:9;82:19;83:19;
84:4,20;95:20;97:19;
98:2;102:20,22;
105:20,23;108:5;
109:9;111:12;112:16;
113:12;115:19,19;
117:3,8;118:24
**capability (1)**
80:24
**Captain (1)**
61:14
**car (20)**
18:13;27:17,22;
29:12,16,18;32:1;
40:9,12,16,21;41:4,
11;47:15,16;51:11,
24;94:21;95:6;116:21
**care (8)**
6:2,4,16;9:24;
59:24;63:6,7;77:18
**career (1)**
81:3
**carry (1)**
106:5
**cars (1)**
25:23
**case (5)**
16:6,25;17:21;
120:4,10
**cases (11)**
15:1,1,7,7,14,18,22;
16:3,11,14,22
**cause (3)**
32:17;33:3;48:1
**cautioned (1)**
5:5
**CCD (1)**
9:7
**cell (2)**
18:8;25:9
**centered (1)**
21:17
**Central (2)**
6:20;24:17

**certainly (1)**
53:17
**chance (1)**
70:2
**change (1)**
86:9
**changed (1)**
44:16
**Chaplain (1)**
63:24
**charge (9)**
54:23;73:13,21,22,
23,24,25;74:3;91:11
**charged (2)**
42:16;48:8
**charges (1)**
91:10
**charging (2)**
78:17,18
**check (1)**
52:5
**checks (1)**
15:20
**chest (2)**
59:17;96:11
**Chicot (2)**
17:19,22
**choice (2)**
57:15,16
**Chris (1)**
21:10
**Christian (1)**
36:7
**church (3)**
7:12,14,14
**citizens (1)**
28:5
**clarify (11)**
75:23;76:3,4;77:25;
78:2,15;79:15,19;
86:5;89:6,9
**clarifying (1)**
21:19
**classes (1)**
12:24
**clear (2)**
111:19;118:14
**cleared (1)**
30:21
**clearly (1)**
117:25
**clips (1)**
49:5
**close (18)**
7:16;31:8;38:23,24;
43:3,6;47:9,10,11;
69:7,25;76:19,19,22;
91:6;99:15;104:13;
113:10
**closed (1)**
8:7
**closer (2)**
43:1;113:15

**closing (3)**
9:14,15;90:1
**coded (1)**
25:3
**collapsed (1)**
59:11
**collapses (1)**
59:8
**college (1)**
33:2
**combat (2)**
37:11;55:21
**combination (1)**
55:19
**coming (20)**
25:19;27:11;28:15;
30:22,25;31:3,19,22;
34:2;38:8,11;39:6;
40:3;50:4,6;76:20;
93:14,16;118:4;
121:13
**comment (2)**
96:3;114:1
**comments (1)**
120:9
**commit (1)**
81:11
**communicate (1)**
52:4
**community (1)**
21:24
**comp (2)**
59:22,24
**company (3)**
8:25;9:9;21:7
**complainant (1)**
26:1
**completion (1)**
94:2
**complied (1)**
54:6
**compliment (1)**
57:6
**computer (3)**
51:19,23;52:14
**concerned (2)**
91:12;121:8
**conclude (1)**
93:21
**concluded (1)**
122:11
**concussion (3)**
82:2,4,8
**conduct (1)**
32:22
**conference (1)**
21:7
**confronting (1)**
96:4
**connecting (1)**
113:16
**conscious (1)**
43:24

**conservative (2)**
35:2,4
**consider (25)**
26:18;28:14,18,24;
29:4,11;30:14;31:17,
25;34:1;37:2,8,9;
38:7,9;40:16,20;49:9,
13,25;50:3,9,11;60:1;
69:15
**considered (6)**
41:2,7,11;60:3;
99:19;121:11
**consistent (1)**
14:21
**consists (1)**
22:9
**constitutional (1)**
45:24
**contact (2)**
46:4;118:10
**contained (1)**
55:8
**context (1)**
121:18
**CONTINUED (1)**
42:9
**control (2)**
36:22;77:21
**controlled (1)**
88:9
**conversation (3)**
10:25;40:23;85:2
**corner (1)**
25:18
**corporation (1)**
9:14
**counting (1)**
111:17
**County (32)**
6:9,11;7:9;8:19,22;
9:2,21;10:4,10,18,21;
13:3,24;14:3,14;15:7,
8;16:1;19:8;21:13;
22:13,14,18;33:4;
58:10;66:13;71:10;
94:17,18;116:7,13;
119:25
**couple (1)**
92:25
**COURT (1)**
112:23
**covered (1)**
91:4
**cracked (2)**
59:17;60:17
**crap (1)**
39:2
**crazy (2)**
21:17;33:21
**crime (1)**
45:20
**criminal (1)**
32:18

**CT (1)**
82:12
**culmination (1)**
92:11
**custody (1)**
75:3
**cut (1)**
115:10

**D**

**dad (1)**
60:7
**daddy (3)**
59:1;60:10,12
**damaged (1)**
59:17
**Damn (2)**
98:4;103:12
**dang (1)**
60:14
**dangerous (7)**
15:9;53:1,6;57:4,
21;117:15;118:1
**darn (1)**
72:25
**date (3)**
6:2;11:15;13:25
**dates (1)**
14:8
**daughter (2)**
58:18;60:8
**day (6)**
12:10;17:8,9,14;
22:15;71:21
**days (2)**
61:8;79:21
**de- (3)**
45:7,18;46:4
**dead (3)**
42:19;46:4;70:16
**deadly (2)**
114:21;116:13
**deal (3)**
23:21;28:6;81:9
**dealing (1)**
18:2
**dealings (1)**
64:3
**decide (1)**
47:6
**decision (6)**
33:25;48:17;59:5;
96:3,12;104:17
**de-escalate (11)**
26:22;45:2,12,17;
47:2,5,6;66:24;109:2;
115:4,17
**de-escalated (14)**
45:9,20,23;46:3,7,9,
12,13,14,16,19,20,23;
47:2
**de-escalating (3)**

27:18,19;45:15
**De-escalation (6)**
45:14;46:1,17;
47:13,17,20
**defective (1)**
60:2
**defend (1)**
44:3
**defended (1)**
86:18
**defending (2)**
48:18,20
**Define (1)**
35:4
**Department (1)**
11:9
**depending (1)**
96:17
**deployed (1)**
38:2
**deposition (1)**
53:22
**deputies (18)**
22:10,11,17;30:23;
44:2;52:15;54:5,16,
22;55:3,5;56:1,3;
70:18,21,24;71:1;
87:14
**deputy (41)**
9:20;10:13,15,17;
11:2;12:18,19;14:13;
15:6;16:2;17:14,16;
20:6;21:9,22,22;23:1;
30:20;51:13;54:25;
55:2;58:10;61:25;
63:1,2,4;64:9,22;
65:15,22;71:3,4,22;
74:2;94:13,18;95:18;
116:3,4,7;120:25
**describe (2)**
16:5,8
**described (1)**
92:3
**detained (9)**
30:8;32:15,16;
46:13;67:9,21;74:8;
84:13,16
**detainment (1)**
67:25
**detective (1)**
121:2
**determined (1)**
48:13
**DHS (1)**
18:2
**diagnosed (2)**
82:1,3
**die (2)**
98:12;103:24
**died (1)**
8:11
**difference (1)**
42:2

**different (15)**
41:10;44:7,8,11;
57:11;64:22;65:15;
80:12;87:13;94:1,8,9;
102:2;113:5,7
**difficult (1)**
58:6
**directory (3)**
8:17,17;9:1
**dirt (1)**
58:20
**disciplined (1)**
119:10
**disorderly (1)**
32:22
**Dispatch (2)**
20:6;95:15
**dispute (1)**
18:3
**distance (1)**
99:19
**disturbance (5)**
23:22;24:7,19;
25:22;66:6
**disturbances (1)**
62:1
**disturbing (1)**
32:22
**divert (1)**
24:18
**doctor (1)**
42:14
**dog (1)**
15:18
**dogs (1)**
15:19
**domestic (4)**
15:22;16:2,6;61:25
**domestics (1)**
88:22
**done (17)**
8:17;9:15;14:17;
16:10;44:6,8,10;
57:11;76:3;87:25;
91:13;94:1,8,9;113:5,
7;117:9
**donut (1)**
32:6
**door (3)**
45:22;48:4;58:21
**doubt (1)**
42:22
**down (45)**
9:14,15;25:19,25;
27:9;28:11,12;30:2;
37:4,25,25;41:16;
43:12,14;45:5,8,10;
46:10;48:11;50:13;
51:13;56:19;58:2,19;
66:7;68:20;69:12;
81:15,18;86:24;87:7,
24;89:8;93:5,5;98:5;
100:14,15;103:13;

106:23;108:22;
109:13;111:17;
115:15;118:24
**drank (1)**
87:24
**draw (1)**
39:14
**drawed (1)**
39:14
**drew (2)**
39:12,12
**drive (4)**
25:25;66:7;82:5,9
**drivers (1)**
32:13
**driver's (1)**
52:5
**driveway (2)**
25:25;46:6
**driving (5)**
19:7;26:3;78:2,3;
97:25
**drove (6)**
25:2,24;46:3;58:19,
19;84:6
**drugged (1)**
72:16
**drunk (1)**
56:17
**duck (1)**
75:10
**duly (1)**
5:5
**During (5)**
11:12;38:6;39:4;
76:23;103:6
**DWIGHT (181)**
5:3,17;8:6;21:9,21;
22:23;23:16;24:14;
25:16;27:6,25;29:23;
31:5;33:9;34:6;36:19;
37:22;38:15;39:9;
42:10;43:9,22;47:23;
49:18;50:13;52:19;
53:9;54:5;55:7;56:25;
57:19;58:7,11;60:7;
61:11;62:13;63:12,
15,19,24;64:4;65:9;
66:14,16,20;67:1,5,8,
11,16;68:3,6,9,17,19;
69:1,4,20,24;70:7,10;
71:16;72:1,3,16;74:5,
10,14,17,20,23;75:4;
76:1,5,8,11,14,18;
77:11,16,20,23;78:6,
9,13,17,20;79:1,6,11,
20,23;80:2,7,11,16,
21;81:2,4,6,9,14,22;
82:1,5,11,14,19,22,
25;83:6,9,12,15;84:1,
3,10,15,19;85:6,17,
20,24;86:3,6,11,13,
23;87:17,20,23;88:3,

SKYE'S THE LIMIT COURT REPORTING

6,19,22,25;89:4,7,11,
15,20;90:4,7,12,15,
18,21,25;91:7,17,20,
23;92:8,17,19;93:10,
14;98:8,10,12,15,21;
99:4,8;100:5,19;
101:1,4,6;103:20,22,
24;105:10;106:15;
107:10,14;108:20;
110:2,9,12,14

**E**

**ear (1)**
70:6
**earlier (4)**
89:25;94:3;102:3,
12
**East (1)**
62:24
**easy (2)**
90:7,8
**eat (1)**
87:2
**eaten (1)**
79:21
**education (1)**
33:2
**educational (1)**
33:1
**either (5)**
21:2;24:19;115:7;
117:13,20
**else (13)**
7:1;12:6;19:19;
44:6;75:20;83:17,19;
93:19,21;114:18,23;
120:13,15
**email (3)**
20:13;103:9;113:2
**end (6)**
46:4;62:25;81:20;
93:6;116:19;117:25
**ENDS (5)**
101:16;112:20;
115:7;117:14,20
**enforcement (5)**
9:18;10:5;71:12;
72:22,24
**enjoy (1)**
61:23
**enough (8)**
14:10;71:6;72:4,8;
89:18;91:13;94:18;
114:19
**enter (3)**
45:23;58:23;72:20
**entering (1)**
68:14
**entirety (1)**
104:11
**escalate (3)**
32:19;45:8;46:6

**escalated (2)**
45:19;46:5
**escalating (2)**
46:18;87:8
**established (1)**
41:3
**Estate (1)**
5:13
**eval (1)**
62:17
**even (13)**
43:15,22;45:25;
46:3,5;48:3,15;66:9;
71:1;85:8;87:18;
118:9;120:5
**event (1)**
92:19
**events (3)**
14:22,22;21:12
**everybody (2)**
87:23;103:10
**everyone (1)**
111:19
**evil (1)**
64:6
**exact (3)**
13:25;88:13,16
**EXAMINATION (1)**
5:10
**examples (1)**
15:17
**except (1)**
72:21
**excessive (1)**
116:22
**EXCUSED (1)**
122:13
**exhausted (1)**
118:7
**Exhibit (13)**
13:4,5,10;20:12,14;
21:3;34:23,25;35:5;
36:17;93:23;112:24;
113:1
**explain (3)**
82:18,21,24
**extradite (1)**
50:14
**eye (2)**
76:21;114:10
**eyes (8)**
29:24;42:21;55:10;
56:22;75:9;91:1;92:4,
23

**F**

**face (2)**
85:6,7
**Facebook (1)**
120:6
**fact (4)**
33:24;34:18;48:2;

72:13
**fair (4)**
14:22;55:25;80:5;
89:18
**fall (3)**
92:25;93:1,1
**falling (1)**
59:13
**families (2)**
87:4,5
**family (3)**
7:24;18:2,3
**far (1)**
120:23
**fast (6)**
27:14;41:15;45:1;
75:6,8;97:2
**father (1)**
58:17
**fault (1)**
84:8
**fear (2)**
121:9,12
**feel (2)**
96:15,16
**feet (7)**
42:13;59:13;60:16;
69:10,14,15;92:23
**fell (6)**
59:11,12,13;60:15,
16;93:1
**felony (6)**
15:1,7,14,16;32:19,
21
**felt (1)**
83:24
**female (31)**
51:13;53:4,5;98:4,
7,9,17,20,25;99:11;
100:8,22;101:8,10,14;
103:12,15,21;105:12,
15;106:19;107:17;
108:17,25;110:5,16,
18;111:7;112:6,14,18
**few (1)**
58:9
**Fifth (1)**
45:25
**fight (20)**
28:12,16,24;29:1,2;
48:6;53:20;54:4;
55:11,12,14,15,20;
56:2,4;72:14;73:1;
74:6;85:11;88:7
**fighting (3)**
48:5;87:15;92:10
**figure (3)**
8:13;97:25;111:8
**file (6)**
9:23;13:2,15,16;
14:11;59:21
**files (1)**
5:24

**finally (1)**
30:6
**find (4)**
15:19;18:4;58:17;
60:7
**fine (10)**
9:23;12:11;17:18;
19:17;24:7;54:1;80:6;
81:15;103:7;110:23
**finger (1)**
46:24
**fire (3)**
71:18;115:18;117:3
**firearm (1)**
63:11
**fired (23)**
38:17,20,24;42:25,
25;43:4,7,9,10,15,18;
46:19,22;68:15;70:9,
9,11;74:18,22;97:6;
111:23;113:21;115:1
**first (21)**
5:5;12:13,15;21:21;
24:9;27:1;38:18;
53:15;54:22;68:7;
91:16,17,18;97:4,6,
11;101:18;114:19;
116:1,8;122:2
**fist (6)**
39:24;40:1;72:14;
114:16,17,21
**five (4)**
59:16;60:17;61:8;
69:10
**fixed (1)**
86:25
**flight (1)**
58:21
**follow (1)**
11:25
**following (3)**
31:8;82:7;97:21
**follows (1)**
5:9
**follow-up (1)**
58:9
**foot (2)**
113:14,15
**force (3)**
116:13,13,18
**form (12)**
15:2;16:24;28:20;
36:5;41:6,22;62:2;
72:10,12;94:4;102:1;
104:19
**forth (1)**
52:5
**forward (1)**
26:3
**fought (1)**
57:2
**found (4)**
7:18;51:9;60:8;

87:10
**four (8)**
22:10,11;54:13;
61:7;69:13,15;77:23;
79:21
**frame (1)**
45:14
**freaked (1)**
79:2
**free (1)**
47:25
**fresh (1)**
79:18
**friends (1)**
120:7
**front (4)**
45:19;59:8;60:14;
67:15
**fuck (19)**
27:7;33:13;78:23;
98:6,18,19,23,23;
100:3,4,18;103:14;
105:13,14;106:17,17;
108:18,19;110:1
**full-time (3)**
9:17,19;21:22
**Fully (1)**
66:14
**function (1)**
87:3
**funny (2)**
73:5;109:9

**G**

**gave (8)**
48:9;56:18,24;95:3,
13,14;119:7;121:18
**generality (1)**
21:13
**gentleman (3)**
64:2;66:10;69:3
**Geri (1)**
6:18
**G-e-r-i (1)**
6:18
**gets (1)**
43:13
**Geyer (2)**
7:15,16
**gist (1)**
18:15
**given (4)**
95:7,9,9,11
**giving (1)**
94:17
**glad (1)**
60:25
**goal (1)**
22:15
**God (1)**
48:14
**goddamn (2)**

99:3;107:9
**goes (2)**
    92:19;111:18
**good (12)**
    5:15;14:10;28:2;
    37:16,17,20;63:8;
    69:11;70:3;75:15;
    81:15;96:25
**gosh (1)**
    76:18
**GPS (1)**
    7:18
**grab (4)**
    90:7,9;99:2;107:8
**grabbed (6)**
    38:25;42:11;43:7;
    59:14;77:12;117:4
**grabbing (1)**
    90:1
**granddaughter (3)**
    7:2;49:1;86:24
**grandfather (1)**
    70:16
**grandkids (3)**
    47:24;48:22;70:15
**grass (2)**
    56:18;61:13
**great (1)**
    22:2
**ground (23)**
    36:20,22;37:1,3,4,6,
    7;38:21;39:10,12;
    41:21,23,25;42:1,2,3;
    46:16;68:6;71:23;
    72:9;85:12,14,15
**Grove (1)**
    62:24
**grow (1)**
    92:17
**guarantee (1)**
    55:16
**guess (4)**
    22:19;56:3;94:23;
    122:4
**guessing (2)**
    70:25;116:10
**guilt (1)**
    87:4
**guilty (1)**
    46:23
**gun (59)**
    32:10;34:8,10,12,
    13,16,19;39:12,12,14,
    14,19;41:2;42:17,25,
    25;43:4,9;44:3,3,6,9,
    17,19;47:9;70:11,13,
    13,19,19,22;71:16,17,
    18,19;77:14,17;
    80:13;89:21;97:3,5;
    100:13,14;103:4;
    107:21,24,25;108:1,3,
    9,22;115:1,12,17,18,
    22;116:24;117:2,3

**gunpoint (5)**
    40:22;46:21;49:23;
    50:1;51:12
**guns (3)**
    34:18;54:6;71:2
**guy (7)**
    35:19;36:21;53:10;
    55:12;75:14,14;77:20
**guys (8)**
    21:23;42:22;60:24;
    70:12;72:3;76:16;
    82:15;92:22
**guy's (2)**
    39:25;42:10

**H**

**hair (9)**
    33:15;36:19;37:5,
    24;41:20;99:3;
    106:24;107:9;110:25
**half (1)**
    60:20
**hammers (1)**
    32:13
**hand (26)**
    19:25;23:5,8;33:14;
    39:25;42:10;49:7;
    68:22;96:21;101:20,
    24;102:4,8,12;
    105:24;106:3;107:22,
    24;108:3,7,9,11;
    111:9,15,20;114:23
**handcuff (2)**
    71:25;108:15
**handcuffing (1)**
    37:8
**handcuffs (16)**
    37:2;59:4;72:8;
    75:5;99:10,14;102:3;
    103:5;107:16,23;
    108:6,14;111:10,10,
    11,13
**handed (2)**
    102:14,15
**handgun (1)**
    13:12
**handheld (8)**
    18:7;23:2,5;96:6,9,
    10,13,24
**Hands (6)**
    48:10;49:6;90:8;
    91:6,11;103:6
**hand-to-hand (2)**
    37:11;55:21
**Hang (1)**
    102:18
**happen (4)**
    47:18;84:25;98:15;
    105:10
**happened (24)**
    5:18;6:3;21:14,15;
    24:20;40:6;54:12,17,

19;64:13;65:2;80:1,3;
    82:10;83:2,8,8,21;
    85:15;86:17,19;
    120:14,19;121:19
**happening (5)**
    24:20;27:14;41:15;
    45:1;97:2
**happens (4)**
    48:6;75:6,6;114:9
**hard (4)**
    42:12,24;56:3;90:9
**harm (2)**
    57:23;70:19
**Harmony (1)**
    62:24
**Haskell (3)**
    11:8,11;12:16
**hate (6)**
    72:21,23;86:17,17,
    18;102:19
**head (19)**
    6:7;24:11;30:11;
    34:3;43:8;46:17;47:8;
    73:18;77:1;82:15;
    94:13,24;113:16;
    117:5;118:13,16,17,
    18;121:7
**headed (1)**
    30:21
**Headquarters (1)**
    21:7
**hear (7)**
    21:1,1;109:8,9,16;
    115:6,7
**heard (11)**
    18:10,18;26:7,12;
    49:10;53:11;64:23;
    65:16;93:24;96:2;
    109:12
**heck (2)**
    26:11;33:11
**Heinke (2)**
    25:18,19
**held (1)**
    51:11
**help (34)**
    10:18,20,21,22;
    14:23,23;21:25;
    22:23,24;40:13,21;
    48:14;49:10;57:14;
    58:18;60:25;61:2,3,
    16,16,17,21;62:18,20,
    21;99:11;100:8,22;
    101:12;107:17;
    108:25;110:5;112:14;
    121:12
**helped (3)**
    7:3;15:19;60:18
**helping (2)**
    59:18;60:7
**HEREINBEFORE (1)**
    5:4
**herself (1)**

53:5
**hey (4)**
    48:4;64:24;65:17;
    66:8
**High (2)**
    33:2;91:24
**Hills (6)**
    11:8,10;12:16,22,
    25;13:20
**history (12)**
    9:6;35:17;50:25;
    51:1,14;57:8,12,13;
    64:11;72:25;87:9,11
**hit (34)**
    26:8;42:11,12,16,
    23,25;43:8;48:14;
    54:8,8;56:19;70:10,
    11,12;74:22,23,24;
    75:2;78:21;81:24;
    92:23;93:11,15;
    113:20,20,22,24;
    114:3,5,7;117:4,8;
    118:18,22
**hitting (4)**
    32:18;46:7;78:16;
    113:14
**hold (1)**
    90:2
**holding (7)**
    40:22;41:2;46:20;
    49:23;50:1;77:14,17
**holster (1)**
    42:18
**holy (1)**
    39:2
**home (15)**
    32:6,8,11,14;45:19,
    23,25;46:15;47:24;
    48:20;58:23;61:13;
    87:21,24;117:19
**homes (1)**
    32:23
**hopes (1)**
    91:24
**horrific (3)**
    86:21,22;120:11
**horror (1)**
    93:17
**hospital (5)**
    59:2,19;60:11,13,
    19
**hours (2)**
    88:25;89:1
**house (81)**
    25:17,21,24;26:4,5,
    14;28:12,15,23,25;
    31:7,9,11,12,18;32:4;
    33:12,13;34:7,8,11,
    16,18;37:22;46:11;
    48:3,24;50:16,17,18,
    20,22;53:13,16,20;
    57:3,21;58:20;59:7,
    12;60:1,8,14,15;64:6,

14,16,25;65:3,6,18,
    21;66:10;67:6,12,19,
    20;74:13;79:4,8,12,
    14;85:21,22;86:2,8,
    15;88:7;99:24,25;
    100:1;106:25;107:2;
    111:2,5;112:21;
    116:20,20,24;117:24;
    119:22
**houses (1)**
    34:17
**hundred (3)**
    55:16;89:16,18
**hurt (13)**
    30:4;37:7;46:17;
    47:25;48:16;58:13,
    14,16;59:3;60:12,23,
    25;61:1
**Hurting (1)**
    42:4
**hypothetical (4)**
    50:8,9,10;70:25
**hypotheticals (1)**
    50:5

**I**

**idea (1)**
    8:12
**IDENTIFICATION (4)**
    13:5;20:14;34:25;
    113:1
**ill (2)**
    56:8,15
**Illinois (2)**
    8:25;9:3
**imagine (2)**
    42:15;84:20
**impact (3)**
    48:10,11;82:8
**important (1)**
    24:16
**Inaudible (27)**
    66:13,20;71:25;
    98:10,11,16;99:7;
    100:6,7,20,21,24,25;
    101:9,12;103:22,23;
    105:11;107:13;
    108:21,24;110:3,4,7,
    8,17;112:6
**incident (7)**
    15:12;16:5;41:10;
    79:25;94:6,8;119:15
**incidents (1)**
    119:22
**Including (1)**
    118:9
**incorporated (1)**
    9:13
**indication (1)**
    118:14
**indications (1)**
    56:18

**indicators (1)**
56:24
**ineffective (2)**
69:3,6
**information (5)**
64:24;65:17;94:18;
95:8,12
**infuriated (1)**
36:21
**initially (2)**
66:5,24
**insane (9)**
33:17,19,23,24;
34:1;38:16;56:12,13;
84:19
**in-service (2)**
13:6,11
**inside (4)**
87:25;99:24,25;
112:21
**instant (1)**
75:11
**instead (1)**
115:24
**Instinct (1)**
115:25
**instructions (1)**
12:1
**intended (1)**
114:7
**intent (3)**
57:23,24;66:6
**intention (2)**
66:16;114:5
**intentions (1)**
78:12
**Internal (5)**
20:8;96:20;106:10;
119:5,7
**internet (1)**
8:13
**interview (7)**
27:1;49:11;56:12;
61:7;93:22;94:5,7
**into (13)**
19:23;26:9;33:11,
13;47:16;53:23;
55:20,22;68:2;72:14;
75:3;78:4;92:17
**intoxicated (1)**
72:17
**introduced (1)**
53:21
**issue (3)**
18:2,3;90:25
**issued (2)**
66:11;90:21

**J**

**jail (11)**
70:17;99:8,9;
107:14,15;115:8,14,

21;117:12,14,21
**January (5)**
11:14;12:13;61:14,
19;62:14
**Jason (82)**
21:9;75:21;76:2,6,
9,12,15;77:15,19,22,
25;78:7,11,14,18,25;
79:3,7,15,22,24;80:5,
10,15,19,22;81:3,5,8,
13,21,23;82:3,7,13,
17,20,23;83:1,7,10,
13,16;84:2,9,12,18;
85:4,13,18,23;86:1,4,
10,12,22;87:16,19,22;
88:2,5,10,20,23;89:3,
5,9,13,17,24;90:5,10,
13,16,20,24;91:18,22,
25;93:8,13,20
**Jeremy (52)**
17:4;18:4;98:6,7,
11,14,16,17,18,20,23;
99:2,6,11;100:3,7,18,
21,24;101:3,5,8,8,9,
10,11,14;103:14,15,
23;104:1;105:11,12,
13,15;106:17;107:8,
12,17;108:18,24;
110:1,4,7,11,13,16,16,
17,18;111:7;112:18
**John (4)**
5:12;52:10;106:8;
117:14
**Joined (1)**
35:11
**July (16)**
12:8;13:3,11;14:19;
16:19,22;61:5,6;
62:14,15;63:14,16,17,
18,19,20
**jump (2)**
71:25;85:12
**jumped (2)**
26:7;33:10
**June (4)**
9:16;13:12;14:19;
63:18
**jury (5)**
6:16,17;7:6,20,22

**K**

**keep (2)**
91:1,2
**keeping (1)**
46:24
**kept (4)**
50:6;68:21;87:8;
117:18
**kick (2)**
29:25;46:16
**kid (1)**
80:12

**kiddo (1)**
59:4
**kids (5)**
22:3;48:6;62:25;
63:2,6
**kill (7)**
42:21,23;47:1;
75:14,14;80:14;117:8
**killed (3)**
71:6;72:18;84:7
**kind (17)**
7:2,13;8:11;14:14;
17:21,22;19:7;23:18;
25:11;54:10;57:22;
64:19;65:12;77:12;
90:2;114:10;121:24
**kinds (1)**
66:21
**kitchen (1)**
86:25
**knew (31)**
20:19;28:18,23;
30:3,21,25;31:3,19;
32:17;34:2;37:10;
38:8,11;39:6;40:3;
42:17;55:9;61:1,11;
64:8;70:12;75:8,8,13,
15;93:6;97:21;
114:14;117:9;118:4;
121:13
**knife (2)**
114:18,22
**knives (1)**
32:13
**knock (1)**
48:3
**knocked (1)**
51:13
**known (2)**
57:3;87:12
**knows (1)**
7:21

**L**

**Lake (3)**
58:19;60:9;81:10
**landed (2)**
59:15;77:14
**landing (1)**
118:25
**Lane (1)**
66:5
**language (3)**
31:14;92:5,9
**lapel (2)**
90:14,16
**last (4)**
21:12;53:21;63:11;
88:10
**later (8)**
23:14;28:13;29:3;
42:14;60:19,20;

87:10;97:23
**law (6)**
9:18;10:5;59:9;
71:12;72:21,24
**lawyer (3)**
60:5;119:8;122:8
**lay (1)**
91:6
**leading (1)**
54:25
**learned (1)**
33:23
**least (1)**
22:11
**leave (7)**
26:1;48:8;50:15,16;
84:3,11;85:2
**Leaving (4)**
29:17;40:17,18;
118:9
**left (16)**
11:6;42:24;64:17;
65:10;70:6;84:8;87:9;
101:20,24;102:8;
106:3,5;107:22,24;
108:6,9
**legal (1)**
67:25
**letting (2)**
105:2,6
**LEWIS (38)**
15:2;16:24;20:15,
18;28:20;35:3,24;
36:2,8;41:6,22;42:5;
62:2;65:7;72:10,12;
94:4;95:20;100:12;
102:1,6,21,25;103:3,
8,18;104:3,19;105:17,
19;106:22;107:4,20;
109:4;110:21;111:16;
112:11;122:10
**license (2)**
52:5,6
**lieutenant (1)**
22:10
**life (12)**
33:23;35:9;36:14;
48:13;71:21;93:6;
116:2;120:13,14,19;
121:4,9
**lights (1)**
45:18
**liked (1)**
11:19
**Linda (1)**
58:25
**Listen (4)**
40:20;82:20;83:23;
87:24
**listened (1)**
23:18
**listening (3)**
94:2,7;106:9

**little (10)**
9:3;25:20;33:2;
51:4;79:2;100:12;
107:4;110:22;115:16;
117:5
**live (3)**
6:24;7:9,16
**lived (1)**
122:4
**living (2)**
8:2,9
**loaded (2)**
53:22,23
**location (2)**
64:22;65:15
**long (8)**
6:11;8:13;11:2,10;
53:11;58:9,21;71:6
**longer (1)**
86:8
**look (11)**
13:10;23:21;25:10;
42:21;57:10;75:6,12,
13;85:6,7;102:10
**looked (12)**
25:23;39:20;54:9,
10,18;57:8,12,13;
58:22,24;86:15;
116:16
**looking (6)**
9:24;25:5;26:9;
56:5;79:17;113:4
**looks (4)**
101:22,23;102:9;
112:13
**Lord (1)**
44:11
**lot (6)**
28:5;43:1,12;55:19;
88:25;114:11
**Lots (4)**
89:2,3,4,13
**love (2)**
21:24;63:5
**lung (1)**
59:17
**lunge (1)**
121:23
**luxury (2)**
49:7;57:20

**M**

**Mac (2)**
63:2,4
**Mac-N-Cheese (2)**
63:3,5
**mad (8)**
28:4,5,6;29:23;
39:1;68:12;81:7,10
**Madison (1)**
21:10
**madman (2)**

92:12,15
**magic (1)**
68:23
**major (1)**
23:21
**makes (2)**
48:21;91:22
**making (3)**
52:11;118:10;
121:25
**MALE'S (1)**
63:21
**man (30)**
26:4,13;27:11;
28:12;29:20,20;39:1;
42:15,19;46:4;50:25;
54:11;55:8;56:18;
63:8,9;75:15;80:24;
82:8;85:3;88:3,6;
108:23;114:6,15;
115:19,20;117:4,9;
118:9
**mandatory (2)**
12:19,20
**maniac (1)**
39:2
**manner (1)**
81:1
**many (5)**
22:17;58:6;80:20;
88:16,20
**MARKED (5)**
13:5;20:14;34:25;
66:14;113:1
**Marley (1)**
7:5
**marriage (1)**
35:22
**married (1)**
6:13
**Martin (82)**
21:9;75:21;76:2,6,
9,12,15;77:15,19,22,
25;78:7,11,14,18,25;
79:3,7,15,22,24;80:5,
10,15,19,22;81:3,5,8,
13,21,23;82:3,7,13,
17,20,23;83:1,7,10,
13,16;84:2,9,12,18;
85:4,13,18,23;86:1,4,
10,12,22;87:16,19,22;
88:2,5,10,20,23;89:3,
5,9,13,17,24;90:5,10,
13,16,20,24;91:18,22,
25;93:8,13,20
**matter (5)**
9:24;36:1,4;48:2;
122:12
**may (59)**
12:15;21:2,5,8;
39:16;58:4,8;63:10,
14,17;64:1,11,12,18;
65:11;66:4,15,19,22;

67:2,7,10,13,17;68:1,
4,8,13,18,25;69:2,5,
18,22;70:4,8,18,21;
71:1,5,22;72:2;74:7,
11,15,18,21,25;75:19;
80:3;82:14;89:22;
91:3,15;92:2,16,18;
93:18;122:8
**maybe (5)**
9:22;32:13;64:9;
76:19;84:5
**MCINTURFF (184)**
5:3,17;8:6;9:11;
21:9,11,21;22:23;
23:16;24:14;25:16;
27:6,25;29:23;31:5;
33:9;34:6;36:19;
37:22;38:15;39:9;
42:10;43:9,22;47:23;
49:18;50:13;52:19;
53:9;54:5;55:7;56:25;
57:19;58:7,11;60:7;
61:11;62:13;63:1,12,
15,19,24;64:4;65:9;
66:14,16,20;67:1,5,8,
11,16;68:3,6,9,17,19;
69:1,4,20,24;70:7,10;
71:16;72:1,3,16;74:5,
10,14,17,20,23;75:4;
76:1,5,8,11,14,18;
77:11,16,20,23;78:6,
9,13,17,20;79:1,6,11,
20,23;80:2,7,11,16,
21;81:2,4,6,9,14,22;
82:1,5,11,14,19,22,
25;83:6,9,12,15;84:1,
3,10,15,19;85:6,17,
20,24;86:3,6,11,13,
23;87:17,20,23;88:3,
6,19,22,25;89:4,7,11,
15,20;90:4,7,12,15,
18,21,25;91:7,17,20,
23;92:8,17,19;93:10,
14;98:8,10,12,15,21;
99:4,8;100:5,19;
101:1,4,6;103:20,22,
24;105:10;106:15;
107:10,14;108:20;
110:2,9,12,14
**mean (22)**
12:6;17:21;18:8;
22:8,19;27:19;28:8;
29:14;33:19,23;43:9;
50:19;51:5;52:23;
56:12;61:17,18;
72:11;84:20;97:21;
113:15;120:15
**meaning (1)**
89:13
**means (2)**
45:3;118:8
**meant (1)**
50:23

**media (2)**
120:3,9
**medical (2)**
59:25;81:25
**meeting (1)**
119:15
**member (1)**
34:23
**mentally (2)**
56:8,14
**message (4)**
87:12;94:23;95:2,8
**met (1)**
81:10
**meth (4)**
58:20;59:7;60:8,14
**mic (9)**
19:22;23:7;49:4;
90:14,17;96:3,4,8,11
**middle (5)**
29:6,9,12;30:16;
49:20
**might (1)**
70:1
**mind (16)**
31:22;34:7;38:18;
39:22;42:22;43:23;
45:14;46:2;64:21;
65:14;72:21;75:7;
77:21;79:12,19;111:5
**mine (1)**
87:5
**minimum (1)**
22:15
**minor (3)**
18:1;87:14;119:17
**minute (7)**
24:16;26:25;30:7,8;
59:6;77:10;99:18
**minutes (2)**
20:24;111:18
**mirror (1)**
26:9
**mischief (1)**
32:18
**missed (1)**
80:3
**misstatement (1)**
50:21
**Mitzi (1)**
5:12
**moment (11)**
27:24;28:13;29:21;
42:17;45:15;47:23;
49:16;75:16;80:8;
86:13;97:23
**moments (3)**
54:8;58:6;80:9
**money (1)**
21:23
**More (9)**
22:20;36:21;78:1;
89:1,13,15,17;95:7,11

**morgue (11)**
99:8,9;107:14,15;
115:8,14,21;117:12,
14,18,21
**Most (3)**
34:17;117:6,7
**mouth (1)**
14:6
**move (2)**
9:2;75:11
**Moved (2)**
9:3;77:13
**movements (1)**
92:6
**moving (1)**
115:16
**mow (1)**
61:13
**much (8)**
21:23,25;36:21;
51:4;62:21;69:10;
87:24;122:8
**multiple (1)**
51:9
**Murphy's (1)**
59:9
**must (2)**
13:6;109:10
**myself (17)**
31:11;39:15;44:4;
48:18,20;50:14;
52:21,22;53:2,4;
54:10;57:25;58:1;
70:20;73:22;86:18;
99:14

**N**

**name (9)**
5:16;6:15,18,22;
10:11;17:13,17;
58:25;121:1
**NAMED (1)**
5:4
**names (1)**
7:23
**nature (3)**
33:22;104:24;
105:20
**need (7)**
5:25;31:23;76:3;
83:3;92:1,25;122:4
**needed (10)**
10:18,20,22;22:23;
89:18,23;91:1;96:15,
16;97:1
**needs (1)**
10:21
**next (2)**
20:1;25:25
**nice (1)**
90:18
**night (3)**

81:24,25;83:4
**nobody (2)**
61:21;90:17
**Nod (1)**
6:7
**nods (6)**
24:11;30:11;34:3;
73:18;77:1;94:24
**none (2)**
83:20;119:11
**Nope (1)**
94:14
**normal (6)**
27:11;28:3,7,9;
85:8;117:22
**normally (3)**
28:2;106:5,6
**Norrell (3)**
58:19;60:9;81:10
**notice (1)**
101:20
**noticed (1)**
100:13
**November (11)**
5:21;6:3;16:5,10,
14,18,19,22;17:3;
21:5;61:8
**NRA (1)**
34:24
**number (4)**
41:3,4;88:13,16

**O**

**oath (2)**
5:8;36:12
**oatmeal (2)**
86:25;87:2
**Object (15)**
15:2;16:24;28:20;
35:3,24;36:5,5;41:6,
22;62:2;72:10,12;
94:4;102:1;104:19
**objecting (1)**
36:8
**obviously (1)**
20:6
**odds (2)**
59:9;60:15
**off (20)**
11:4,7,12;17:19,22;
21:14;24:15;27:7;
30:7,10,15;46:24;
49:6;60:15;78:23;
79:17,18;90:23;
109:3;115:10
**offered (1)**
122:3
**offhand (1)**
16:4
**office (10)**
11:6;22:9;33:4;
58:14;63:21,23;

94:19;120:1,23,24
**officer (2)**
  24:4;32:21
**officers (2)**
  51:9,23
**officer's (2)**
  18:19;51:11
**official (1)**
  121:19
**OGLES (81)**
  5:11,12;20:12,17,
  20;22:5;23:4,25;25:5;
  26:17;27:12;28:8;
  30:9;31:16;33:19;
  34:10;36:1,4,11;37:1;
  38:4;39:3;40:1;42:8;
  43:3,17;44:5;49:9,22;
  50:19;52:23;53:12;
  54:15;55:13;57:11;
  58:16;61:6,17;65:2,
  20;67:18;69:6;70:21;
  72:7;73:4;76:22;
  93:23;95:22,24;
  99:13;100:10,11,16;
  101:17;102:5,19,24;
  103:2,7,9,16;104:2,5;
  105:16;106:21,23;
  107:6,21;109:3,5;
  110:20,23,25;111:8;
  112:7,10,12,15,21;
  113:2;122:7
**Oklahoma (2)**
  58:17;60:10
**old (15)**
  7:4;22:2;42:14;
  52:21,24;53:2,3;
  54:11;55:8,20;58:19,
  20;59:7;60:8;84:24
**older (1)**
  61:12
**once (5)**
  32:19;56:4;64:12;
  86:14;115:24
**one (26)**
  16:25;22:20;23:5;
  25:22;26:22;34:22;
  41:3;48:16;51:22;
  55:16,23;57:20;
  62:20;64:25;65:18;
  71:14;73:13,16;
  83:13;89:24;90:19;
  92:11;93:5;96:23;
  102:2;121:3
**ongoing (3)**
  9:14;24:19;91:1
**online (1)**
  12:24
**only (12)**
  5:23;6:15;22:16;
  30:22;45:16;46:2,19;
  50:3;55:4;116:10;
  118:6;121:21
**open (1)**

70:2
**opened (1)**
  58:21
**opposed (3)**
  35:20,21,22
**opposite (1)**
  46:18
**option (1)**
  75:2
**options (1)**
  75:17
**order (1)**
  116:18
**organizations (2)**
  7:10,24
**originally (1)**
  108:9
**others (1)**
  17:2
**ours (1)**
  7:3
**out (83)**
  5:25;6:4;8:13;
  17:20;18:4,6,15;
  22:24,25;23:8;26:4,5,
  13,14;28:12,15,23,25;
  31:13;32:23,25;
  33:14;36:22;39:3;
  43:15,18,25;45:22;
  46:8,11;47:1,25;48:1,
  2,25;49:19,20,21;
  51:9;57:20;59:7,14;
  60:14;63:3,25;64:23;
  65:16;66:2,10,24;
  68:5;69:19,25;70:14;
  71:5;75:5,16,17;78:4,
  20,22;79:2,10;80:19,
  22;83:22;84:21;85:1,
  10;87:10;88:7,17;
  92:14,14;98:1;100:5,
  19;101:1;108:20;
  110:2,9;111:8;116:20
**outer (2)**
  90:4,10
**outside (1)**
  25:22
**over (20)**
  18:15;24:18;25:2,
  16;26:11;30:21;41:9,
  9;45:16,18;48:7;
  64:25;65:18;84:23;
  87:25;94:3,12;
  102:20;107:22;
  109:16
**owner (1)**
  60:1

**P**

**Padilla (1)**
  5:12
**page (1)**
  52:11

**paid (5)**
  10:13,15;21:23;
  59:21,23
**Papaw (1)**
  87:1
**Pardon (2)**
  116:15;118:23
**parents (2)**
  63:2,5
**past (2)**
  8:5;36:24
**patrol (5)**
  14:23;17:10,13;
  66:11;78:16
**patrolman (9)**
  17:11,11;18:17,25;
  19:1,2;24:1;73:10,12
**pause (1)**
  103:18
**paused (1)**
  71:6
**PBA (1)**
  21:10
**peace (2)**
  32:22;118:9
**people (22)**
  15:19;22:10;26:23;
  28:1,2,3,4;32:23;
  33:24;40:5;45:18;
  56:13;57:1;72:6;
  73:15;80:17,18;81:7,
  9,16;89:8;116:11
**percent (1)**
  55:16
**period (2)**
  38:6;39:4
**person (13)**
  28:6,7;37:11;40:19;
  48:21;51:13;79:13;
  81:10;85:8,8;91:14;
  117:22,23
**personally (2)**
  7:21,22
**personnel (6)**
  5:24;9:23;13:1,15,
  16;14:10
**phone (9)**
  8:9;9:9;18:9;25:8,9,
  9,10,14;87:12
**photo (1)**
  119:16
**physical (3)**
  25:3;74:12;87:18
**physically (1)**
  74:12
**pick (3)**
  18:7,22,23
**picked (1)**
  23:9
**picture (2)**
  53:21;54:2
**pieces (1)**
  59:18

**pile (1)**
  59:16
**pin (1)**
  92:24
**pistol (3)**
  70:9;74:22;106:1
**place (6)**
  25:23;60:4;72:25;
  117:6,7,20
**placed (4)**
  37:3,6,7;42:1
**placing (1)**
  42:3
**plan (1)**
  86:14
**planned (1)**
  113:25
**plates (1)**
  52:6
**play (2)**
  20:7,22
**PLAYED (3)**
  97:24;100:17;
  103:11
**playing (1)**
  20:19
**please (26)**
  98:4,7,9,17,20;99:1,
  11,12;100:9,23;
  101:10,11,12;103:12,
  15,21;105:12,15;
  106:20;107:17;
  108:17;109:1;110:6,
  18;111:7;112:6
**plenty (1)**
  32:24
**plug (1)**
  25:12
**plus (1)**
  12:21
**pm (2)**
  21:6;93:22
**pocket (2)**
  19:20;23:7
**point (20)**
  24:10;26:25;27:18;
  29:2;30:9;38:6;39:4;
  40:2,23;41:1;43:17;
  44:5;50:10;67:14;
  92:21,24;96:25;
  102:7;107:25;121:4
**pointed (1)**
  115:12
**points (3)**
  41:10;102:2;117:5
**Police (11)**
  11:8;20:15;21:7;
  32:21;51:9,10,23;
  52:6;80:16;119:8;
  121:20
**policy (2)**
  74:4;116:12
**pool (4)**

6:16,17;7:6,20
**porch (11)**
  33:12;59:8,8,11,12;
  60:2,14;67:15;76:24,
  25;77:5
**possibility (1)**
  61:2
**possible (4)**
  14:4;71:24;72:1;
  96:25
**potential (1)**
  15:9
**pounds (1)**
  59:14
**pow (4)**
  43:10,10,11,11
**power (1)**
  72:5
**practice (1)**
  97:9
**preference (1)**
  62:10
**pressure (1)**
  117:5
**pretty (11)**
  27:14;37:20;43:6;
  47:10,11;60:23;90:7,
  8;99:15;104:13;
  118:13
**prevented (1)**
  68:14
**preventing (1)**
  74:12
**printed (1)**
  9:9
**prior (1)**
  64:3
**probable (2)**
  32:17;33:3
**probably (3)**
  97:18;109:15;
  120:22
**problems (1)**
  38:23
**proceedings (1)**
  122:11
**process (3)**
  49:12;71:7;114:11
**profile (4)**
  34:20,21;35:6,8
**projected (1)**
  75:9
**property (5)**
  27:7,8;45:21;78:10,
  23
**prosthetic (1)**
  60:20
**protect (6)**
  30:5;39:15;57:25;
  58:1;59:15;70:20
**psych (1)**
  62:16
**publish (1)**

8:9

**Pulaski (1)**
53:11

**pull (12)**
39:18;41:20;44:2;
46:24;48:15;69:18;
71:1,18;91:13;
106:23;110:25;
116:19

**pulled (37)**
30:4;36:20;37:4,24;
42:18;44:3,5,9,10,16,
19;46:22,23;47:9;
48:14;53:15;54:6;
64:5,7;68:5,9;69:20,
22;70:18,19,22;71:16,
17,23;89:20;91:16,
19;115:12,21;116:20,
24;117:1

**punch (2)**
19:22;75:10

**pursue (1)**
81:16

**push (1)**
37:6

**pushed (2)**
36:24;37:1

**put (15)**
14:5;36:3,20,22;
37:10;38:21;59:4,15;
68:6,20;72:8;91:10;
100:15;108:22;
115:17

**putting (7)**
31:5;37:2;48:11;
49:8;57:7;72:13;
99:19

**Q**

**qualified (4)**
63:11,20,25;73:25

**qualify (2)**
13:17;63:13

**quick (1)**
75:13

**quickly (1)**
72:18

**quiet (1)**
25:24

**quit (1)**
43:23

**quote (1)**
116:14

**R**

**radio (39)**
18:7,7,8,10,15,18,
19,21,22;19:9,11,20,
25;23:1,4,7;24:5,5,15;
25:12;29:5;38:9;
43:14,18;49:4,5,19;

79:18;101:13,20,23;
102:7;106:3,5,11,12;
111:9,15,20

**rage (14)**
29:24,24;38:1;
42:21;68:11;85:5,7,7;
87:9,10,11;88:8;91:9;
92:4

**raise (1)**
7:3

**raising (1)**
68:12

**ran (3)**
26:14;56:18;84:23

**reach (3)**
99:10,14;107:19

**reached (3)**
33:14;37:23;59:14

**reacting (1)**
29:9

**read (1)**
75:9

**ready (2)**
33:9;42:8

**real (6)**
31:7;58:13,14;70:1;
71:4;75:12

**realize (2)**
28:25;92:20

**realized (5)**
28:13;29:2;32:19;
81:20;109:15

**really (7)**
6:8;8:10;9:24;
50:21;61:23;68:23;
70:2

**re-ask (1)**
5:15

**reason (12)**
5:23;6:15;7:19;
19:15;32:24;67:22,
24;80:17;81:16,18,
22;102:11

**reasonable (1)**
79:13

**reasons (2)**
96:23;111:3

**recall (4)**
91:6,8,8;92:7

**recalling (2)**
80:1,2

**receive (2)**
12:17,22

**received (4)**
13:2,11,18,19

**recognize (2)**
35:15;92:15

**recognized (3)**
53:15;64:5,15

**record (3)**
36:3;79:16;112:24

**recording (6)**
20:7,8,16;21:4;

36:18;42:9

**records (1)**
63:22

**recover (1)**
93:2

**reference (1)**
53:6

**reflects (1)**
13:2

**refused (1)**
84:18

**regret (4)**
48:16,16,18,19

**related (1)**
16:1

**relationship (1)**
63:7

**relatives (2)**
6:17,19

**relevance (2)**
35:25;36:1

**relive (1)**
58:6

**remaining (1)**
112:11

**remember (40)**
10:25;11:6;13:22,
23;14:1,7,9,19;15:10,
24;16:2,12,15,17,18,
21;17:2,13,17;25:11;
30:17,19;53:16,19,20;
54:3,4;80:8;83:5;
91:9;95:2;105:18;
109:6,7;113:10;
114:10;115:23;
116:10;119:14,17

**remembered (1)**
53:20

**rephrase (2)**
96:7;120:17

**replacement (1)**
37:14

**replay (1)**
65:8

**report (2)**
119:1;121:19

**REPORTER (1)**
112:23

**reports (1)**
56:5

**represent (1)**
5:12

**Representative (1)**
21:10

**Republican (1)**
36:7

**research (1)**
50:17

**reserve (30)**
9:20;10:13,15,17;
11:2,8,9,10,21,25;
12:16,18,19;14:13,15;
15:6;16:2;21:22;

22:17;38:19;52:15;
55:2;58:10;61:25;
65:22;89:2;94:13;
95:18;116:6,7

**reserves (1)**
10:7

**residence (3)**
64:2;68:2,14

**resident (2)**
6:8,11

**respected (1)**
45:21

**respecting (1)**
45:24

**restraint (1)**
74:12

**results (1)**
86:20

**retelling (1)**
58:5

**retire (2)**
8:4;61:12

**retired (1)**
8:3

**rewind (1)**
110:21

**ribs (2)**
59:16;60:17

**right (99)**
9:4,17;11:14;13:1,
12;14:2,16;15:22;
16:4;17:7;19:20;21:3,
20;22:5;23:12;24:23,
24;25:17,20;30:19,
19;31:3,8,13,16,22;
34:14;35:2,4;42:12,
16;43:14;44:9,16,23;
45:25;49:2,15;50:2,
16;51:6;54:24;55:3,
11;60:5,6;61:7;65:1,
19;66:12,25;67:13,
15;68:25;73:17;
74:16;75:24;76:1;
80:15;81:8,13,23;
87:16,19,22;88:2;
90:20,20,24;91:25;
92:15,16,18;94:25;
96:11;97:3,22;98:10;
102:12,14,15;103:22;
104:2,25;105:7,24,24;
107:3,7,21;108:11;
109:2;111:6,9,24;
112:7;118:15;119:9;
121:2

**rights (1)**
45:24

**ring (2)**
53:24,25

**RINGS (1)**
6:1

**Road (6)**
22:24;24:18;25:17,
18;58:20;78:24

**roadway (1)**
27:8

**Rock (2)**
25:20;114:22

**rocks (6)**
18:13;32:20;51:10;
56:19;59:16;117:24

**room (1)**
21:8

**Rotary (1)**
7:24

**run (8)**
25:3;26:11,14,15;
27:21;38:15;64:25;
65:18

**running (5)**
29:14,15;40:10;
45:17;84:22

**S**

**safe (1)**
34:19

**sales (1)**
8:18

**Saline (29)**
6:9,11;7:9;8:19,22;
9:2,21;10:4,10;13:2,
24;14:3,14;15:7,8;
16:1;21:12;22:13,14,
18;33:4;58:10;66:12;
71:10;94:17,18;
116:7,12;119:25

**same (7)**
9:1;14:17;31:16;
35:22;41:9;52:11;
55:5

**sane (2)**
33:23;56:13

**sat (3)**
43:25;47:16;86:24

**saw (15)**
9:13;25:21;26:4,5;
42:12;54:10,11;55:8;
57:2;58:22,24;86:16;
99:14;110:23;118:19

**saying (9)**
5:23;35:14;36:12;
74:3;78:23;86:5;
105:16;108:2;117:13

**scan (1)**
82:12

**scared (12)**
30:3;34:8,9;70:23,
24;84:1,4;120:12,13,
19;121:4,8

**scaring (1)**
45:18

**scary (2)**
80:8,9

**school (6)**
33:2;61:21,22,24;
62:24,24

**schools (16)**
11:20,23;12:3,5;
14:23;22:1,2;48:23;
61:16,17;62:5,18,22,
23,25,25
**screamed (1)**
109:24
**screw (1)**
32:13
**second (10)**
37:25;42:6;54:9;
56:16;68:10,15;
95:21;102:18;111:1;
113:3
**seconds (3)**
92:25;105:19;
112:11
**secure (1)**
45:24
**security (3)**
12:6;61:22,24
**seemed (1)**
106:10
**seems (1)**
53:14
**send (1)**
25:7
**sense (2)**
86:9;91:22
**sensitive (2)**
117:6,7
**sent (4)**
18:17,21,24;59:1
**sequence (1)**
96:18
**Sergeant (83)**
21:9;22:10;75:21;
76:2,6,9,12,15;77:15,
19,22,25;78:7,11,14,
18,25;79:3,7,15,22,
24;80:5,10,15,19,22;
81:3,5,8,13,21,23;
82:3,7,13,17,20,23;
83:1,7,10,13,16;84:2,
9,12,18;85:4,13,18,
23;86:1,4,10,12,22;
87:16,19,22;88:2,5,
10,20,23;89:3,5,9,13,
17,24;90:5,10,13,16,
20,24;91:18,22,25;
93:8,13,20
**service (1)**
88:24
**sex (1)**
35:22
**Shamlin (1)**
61:14
**Shannon (6)**
11:8,10;12:16,22,
25;13:20
**shape (1)**
37:20
**Sheriff (6)**

11:13;12:3;57:6,7;
84:5,6
**sheriff's (10)**
11:6;22:9;33:4;
58:14;63:21,22;
94:18;120:1,23,24
**shift (7)**
21:17;22:3,8,9;
30:19;57:14;62:19
**shifts (1)**
113:20
**shirt (5)**
38:25;39:1;69:20,
23;90:3
**shocked (1)**
26:10
**shoot (21)**
39:13,14,18,21;
44:3;57:24;71:17,19;
74:24;108:23;111:21;
113:18,22;114:2,7,12;
115:19,20,24;117:2,
17
**shooting (4)**
109:22;113:25;
114:6;118:8
**short (7)**
22:3,8,16;30:20;
57:14;61:15;62:19
**shot (17)**
43:17,23;97:3,4;
113:8,11;116:1,4,21,
23,25;117:2;118:2,12,
15,17,21
**shots (4)**
43:15,18;111:23;
113:8
**shoulder (8)**
37:12,13,14,16,17;
59:18;60:18,21
**shoulders (1)**
37:20
**show (8)**
34:23;35:5;64:12;
77:10;97:17;102:17;
104:9,10
**showed (4)**
23:16;44:2;68:19;
119:23
**showing (1)**
104:25
**shows (2)**
99:15;121:24
**sick (2)**
61:20,20
**side (5)**
26:16,19;59:16;
106:5;115:17
**sided (1)**
57:22
**signal (4)**
18:9,22;23:9,10
**simple (1)**

95:3
**siren (1)**
45:18
**sister (6)**
18:13;33:6;95:5;
97:22;109:8,12
**sits (1)**
25:21
**sitting (2)**
29:18;33:10
**situation (4)**
53:1,3;81:19;
117:15
**six (2)**
22:9;120:7
**size (1)**
75:12
**slammed (1)**
78:4
**slow (3)**
41:16;75:7;118:24
**slowly (3)**
25:24;26:3,6
**slur (1)**
56:21
**small (2)**
70:1;76:24
**smartest (1)**
20:20
**social (3)**
120:3,9;121:18
**solve (2)**
38:22;70:17
**solved (1)**
73:2
**somebody (11)**
19:19;26:8,11;
43:23;56:6,7;73:1,4;
78:21;84:7,23
**someone (15)**
11:1;26:9;55:15,21;
73:8;80:13;84:20,21;
89:21;90:9;91:9;97:5;
116:4;117:21;120:22
**someone's (1)**
116:19
**sometimes (6)**
5:15;18:9,9;25:11;
103:4,4
**son (1)**
6:21
**soon (1)**
31:23
**Sorry (17)**
17:17;30:13;34:8;
48:17,21;53:25;
54:13;58:3;68:23;
70:3;73:2;80:4;93:7;
106:4;119:16,20;
121:17
**space (2)**
76:17,24
**special (50)**

14:22,22;21:5,8;
58:4,8;63:10,14,17;
64:1,18;65:11;66:4,
15,19,22;67:2,7,10,
13,17;68:1,4,8,13,18,
25;69:2,5,18,22;70:4,
8;71:22;72:2;74:7,11,
15,18,21,25;75:19;
89:22;91:3,15;92:2,
16,18;93:18;119:12
**specifically (1)**
14:9
**spread (3)**
69:10,11;70:1
**Springs (2)**
7:15,16
**squashed (1)**
66:8
**SRO (2)**
61:20,23
**stairs (1)**
58:22
**stamp (4)**
105:17;107:20;
109:4;111:16
**stamps (2)**
103:1;111:17
**stance (2)**
104:22;105:21
**stand (2)**
52:1;57:17
**standards (1)**
22:15
**standing (8)**
42:15;46:10;55:8;
59:9;60:16;75:1;
76:13,16
**stark (1)**
68:11
**stars (1)**
42:13
**start (5)**
9:20;21:16;45:15;
100:11;102:20
**started (18)**
8:15;9:10,25;13:24;
14:2;24:21,22;26:3,6,
18;28:15;30:6;46:7;
58:12;59:13,18;
111:18;121:6
**starting (1)**
21:13
**STARTS (3)**
21:4;45:14;66:10
**State (11)**
5:16;10:7;20:15;
21:6;59:24;72:4,5;
77:20;79:11;119:8;
121:20
**statement (10)**
50:24;57:17;64:20;
65:13;71:2;72:11;
106:10;112:1;119:7;

120:18
**statements (1)**
120:3
**stay (5)**
42:13;43:24;50:15;
61:13;84:4
**stayed (2)**
11:9;92:23
**step (1)**
69:13
**stepped (3)**
39:13,23;42:11
**stepping (1)**
69:15
**still (15)**
9:13;11:3;12:16;
30:16;32:25;34:1,20;
35:1;38:1;42:18;
57:17;61:2,3;95:18;
111:10
**stones (1)**
95:5
**stop (15)**
22:5;31:16;39:20;
98:7,17;101:11;
103:15,18;104:2;
105:12;110:19,20;
115:15,25;117:18
**stopped (4)**
26:6;45:19;86:6;
100:14
**stopping (1)**
106:12
**story (4)**
83:1,2;116:19;
117:25
**strange (1)**
73:6
**street (7)**
22:11;30:23;46:4,
11;56:19;84:21;
117:24
**strength (1)**
37:18
**strong (2)**
72:3,7
**struck (1)**
70:5
**studied (1)**
116:14
**stuff (12)**
14:14;20:21;48:5,7;
52:6;57:9;62:17;
66:21;75:23;80:4;
92:21;115:7
**sudden (3)**
26:7;39:23;77:13
**suffering (2)**
87:4,5
**suicide (1)**
81:11
**suing (1)**
60:1

**summarize (2)**
64:20;65:13
**summer (1)**
12:11
**supposed (2)**
38:21,22
**sure (19)**
6:16;7:20;11:15;
12:12,25;20:18;
24:14;36:11;45:17;
52:11;58:5;64:20;
65:13;76:5;77:11;
95:22;104:12;116:9;
121:25
**surgeries (3)**
58:15;59:20;60:19
**survival (1)**
50:4
**suspended (2)**
119:5,6
**sustain (1)**
42:20
**sustainable (1)**
93:12
**swinging (1)**
118:21
**switched (1)**
107:22
**switches (1)**
102:23
**sworn (1)**
5:6
**swung (3)**
76:13,15;113:19
**system (1)**
52:4

**T**

**table (1)**
86:25
**tactics (1)**
115:4
**talk (17)**
19:23;21:11;26:23,
24;28:1,3,4;30:1;
45:23;46:1,12;80:14,
17;81:17;85:2;89:8;
90:17
**talked (10)**
59:5;74:8;81:11,14;
87:21;92:9;99:18;
104:16;107:1;111:3
**talking (14)**
15:19;28:2,6;40:24;
41:19;61:6;73:9;
81:16;89:25;90:1;
102:7;116:6;120:20,
22
**tape (2)**
93:24;94:2
**target (1)**
97:9

**Tase (2)**
46:12,14
**tased (9)**
51:12;53:10;57:1;
68:16;69:11;102:17;
104:5,8;117:1
**taser (33)**
30:4;33:14;37:10;
38:2,18,19,20,21,24;
39:3,10,10,11;46:20;
49:7,8;55:9;68:15,19,
20;69:2;72:13;74:19;
91:2,13,16,19,24;
96:20;97:13;102:11;
103:5;104:6
**tasers (1)**
97:15
**Tasing (4)**
48:11;69:15;104:9,
10
**TELEPHONE (2)**
6:1;8:25
**telling (8)**
27:6;46:21;56:6,7;
70:12;83:3;100:10;
109:5
**temple (1)**
117:6
**ten (10)**
38:20;58:11;68:11,
12;80:20,21,22;
88:12;89:14;91:14
**Terrace (4)**
17:19,22;22:24,25
**terrible (2)**
55:21;58:2
**terrorist (2)**
16:7;32:20
**terroristic (6)**
16:11,13,21;18:12;
66:18;95:4
**testified (1)**
5:8
**testify (1)**
5:6
**testimony (4)**
49:10,17;96:19;
118:11
**there'd (1)**
56:2
**THEREUPON (1)**
5:2
**thinking (3)**
42:24;50:3;71:3
**though (6)**
14:1;22:20;62:9;
88:18;118:15;120:6
**thought (35)**
23:6,6,23,24;24:3,
7;26:8,8,10;27:2;
37:14;38:20,22;39:2;
46:2,6;53:14;61:13;
62:13;64:5,7,7,11;

68:22,23;71:6;76:7;
78:21;84:25;85:1;
96:19;112:17;113:18,
18;114:9
**thoughts (1)**
113:24
**threat (1)**
115:25
**threaten (1)**
91:11
**threatened (2)**
101:4;110:12
**threatening (9)**
16:7,11,13,22;
18:13;32:20;66:18;
95:4,5
**three (19)**
22:16;30:23;54:5,
11,16,16,20,22;55:3;
58:12,13,15;60:19;
61:4;87:13;111:18;
117:23;118:2;120:7
**threw (4)**
39:10,11;56:19;
71:23
**throw (4)**
18:13;41:20,23;
95:5
**throwing (1)**
42:2
**thrown (1)**
51:10
**til (1)**
8:22
**timeline (1)**
39:22
**times (7)**
22:12;51:10;
102:23;103:17;
117:24;118:2;120:21
**today (6)**
17:1;70:14;96:2;
98:13;103:25;122:1
**told (42)**
7:23;23:19;24:17;
25:6;30:20;39:19;
44:13,20,22;46:10,13;
58:18,24;59:6,23;
60:9;67:3;69:25;
70:15;71:18,19;
72:19;74:8;77:16,17;
84:4,12,15,16;85:20,
21;115:5,5,7,8,15;
117:10,11,16;119:22;
120:13,17
**took (5)**
12:24;62:14;63:24;
68:10;121:3
**tool (2)**
68:24;93:3
**top (5)**
43:2;59:15;76:7,10;
113:19

**Totally (2)**
69:4;119:24
**touching (1)**
43:5
**toward (1)**
70:5
**towards (8)**
26:15,15;31:7;
38:17;68:17;72:21,
24;77:13
**to-wit (1)**
5:9
**traffic (1)**
79:18
**trained (1)**
97:15
**training (17)**
10:1,3;12:17,19,20,
21,22;13:2,6,11,12,
18,20;33:3;62:16;
93:4;119:12
**transcript (1)**
96:2
**transition (2)**
61:24;62:3
**transpired (1)**
21:12
**trauma (1)**
82:15
**TRAVIS (47)**
21:5,8;58:4,8;
63:10,14,17;64:1,18;
65:11;66:4,15,19,22;
67:2,7,10,13,17;68:1,
4,8,13,18,25;69:2,5,
18,22;70:4,8;71:22;
72:2;74:7,11,15,18,
21,25;75:19;89:22;
91:3,15;92:2,16,18;
93:18
**trespass (1)**
45:20
**trial (1)**
60:5
**trick (2)**
104:12;106:7
**Tried (21)**
41:17;43:25;45:9;
46:15;47:1;56:25;
62:21;72:17;75:4;
85:25;86:1;92:24;
93:2,3,4;99:24;
107:19;113:18;
115:15;116:22,24
**trigger (5)**
39:18;46:24,25;
48:15,15
**trouble (1)**
21:2
**truck (24)**
19:8;26:13,16,19;
27:2,9;32:19;45:22;
46:8,9;52:12;56:19;

57:6,7;66:13,24;
68:21;78:5,23;84:6;
91:5;92:14;101:2;
110:10
**trucks (1)**
52:16
**Trust (2)**
53:19;69:11
**truth (4)**
5:6,7,8;116:10
**try (7)**
17:14;37:7;41:18;
45:22;66:24;80:17;
115:17
**trying (18)**
7:23;14:7;25:12;
28:11;30:17;32:25;
43:24;45:7;47:5;
49:19;58:1;88:13;
93:2;104:12;106:7,8,
8;111:8
**turn (12)**
22:22;25:16,20;
26:1;29:22;46:5;48:8;
66:7;88:17;99:4;
107:10;109:3
**turned (8)**
24:15,15,17;30:6;
31:2;33:13;38:17;
86:7
**turning (1)**
107:7
**twice (7)**
43:11;68:2;93:11;
97:18;113:5,6;115:24
**Twitter (10)**
34:20,21;35:6,8,10,
19;36:9,12,15;120:5
**two (15)**
23:23;24:8;26:22;
40:5;41:4;49:6;55:5;
56:1,3;73:15,15;82:6;
87:4,15;113:8
**Tyler (1)**
6:23
**type (1)**
66:5

**U**

**unarmed (1)**
114:14
**uncertain (1)**
71:5
**uncommon (1)**
34:17
**under (8)**
36:12,23;72:19,20;
74:9;84:13,13,16
**unit (3)**
66:14;78:16;84:22
**unless (1)**
77:23

**unreasonable (1)**
39:16
**up (79)**
12:21;17:15;18:7,
22,23;23:9;26:6;
29:11,16;31:6;33:11;
36:24;37:10,23;39:1;
40:8;41:11;44:2,12,
20,21,22,25;45:7;
47:12,15;48:10,12;
49:4,9,13,25;50:3,5,6,
9;51:5,5;53:15;58:19,
21;60:9;64:5,7;67:14;
69:21,23;72:14,17,19;
75:12;76:13,16;
81:10,19;83:18;
84:22,24;85:17,19;
87:1;91:12,12;93:16;
98:8;99:4;100:14;
103:20;104:17,17,20,
21;105:1;107:10;
116:19,20;117:20;
119:23;121:11
**upset (2)**
28:10;85:8
**use (5)**
34:20;52:4;96:4,23;
116:18
**used (3)**
38:19;74:11;97:13
**using (1)**
116:13
**Usually (2)**
21:25;22:1

**V**

**vague (1)**
77:12
**vehicle (4)**
19:7;51:18,19;
66:11
**vehicles (1)**
52:16
**verbal (5)**
23:22;114:25;
115:2,5,13
**verbally (1)**
66:25
**verify (1)**
25:10
**vest (5)**
90:3,4,11;112:15,
16
**vicious (1)**
82:15
**video (27)**
30:18;75:7,25;77:6,
8;97:17,24;99:15;
100:17;101:16;102:2,
3,17;103:6,11;104:4,
8,10,25;112:20,25;
113:4,13;115:6;

118:24;121:24;122:1
**videoing (2)**
33:6;97:22
**videos (2)**
79:17;118:19
**Vietnam (2)**
80:11;116:5
**violence (3)**
52:19,25;54:3
**violent (22)**
14:25;15:7,9;29:20,
20;33:20,22;40:19;
50:18,20,22,25;51:8;
53:17;61:25;63:8,9;
104:24;105:20,20;
116:13,18
**vision (2)**
42:23;43:14
**voice (32)**
20:23;22:6;28:3;
63:21;98:4,7,9,17,20,
25;99:11;100:8,22;
101:8,10,14;103:12,
15,21;105:12,15;
106:19;107:17;
108:17,25;110:5,16,
18;111:7;112:6,14,18
**volunteer (5)**
55:2;65:5,21,23,23
**volunteered (2)**
65:3,4

**W**

**wait (3)**
30:7,8;115:11
**waiting (5)**
32:1;40:9,12;41:4;
121:11
**walk (3)**
38:16;92:13;116:22
**walked (8)**
27:8;31:2;33:11;
46:8;47:15;59:7;
60:13;85:1
**walking (5)**
30:7,10,15;31:6,7
**wants (2)**
60:10,12
**War (2)**
80:12,13
**warning (1)**
115:5
**warnings (3)**
114:25;115:2,13
**Washington (1)**
24:18
**Wasson (5)**
25:17,18,20;46:4;
66:5
**watch (7)**
97:18,20;100:16;
101:17;102:18;103:7;

104:11
**watching (1)**
32:24
**way (19)**
13:10;24:21,22,22;
28:10;30:21;31:23;
49:6;58:20;64:16;
65:9;85:9,9;87:8;
88:14,15;117:22;
119:10,12
**weapon (11)**
34:12;39:23,24,25;
40:1;43:8;44:10;
46:22,23;97:6;115:4
**weapons (2)**
32:6,10
**week (2)**
21:12;57:7
**weeks (1)**
82:6
**weigh (1)**
59:14
**weird (1)**
64:4
**welfare (1)**
15:20
**weren't (4)**
38:4;59:21;72:7;
121:8
**What's (10)**
6:22;10:11;14:24;
25:2;26:2;29:10;
37:13;42:2;105:16;
111:9
**whenever (1)**
14:19
**WHEREUPON (1)**
122:11
**whip (3)**
55:11,12,13
**whoa (5)**
30:1,1,1,1;64:14
**whole (5)**
5:7;59:8,12;87:8;
113:20
**Whose (1)**
19:1
**wife (2)**
59:23;70:15
**wife's (1)**
6:15
**willing (2)**
10:19;62:10
**win (1)**
55:17
**window (2)**
51:11;78:19
**wing (2)**
35:2,4
**wires (2)**
69:18,24
**wish (7)**
38:3,4;69:13;73:1,

2,4;91:8
**without (1)**
118:9
**WITNESS (9)**
5:4;24:11;30:11;
34:3;73:18;77:1;
94:24;110:24;122:13
**woods (1)**
58:20
**word (2)**
45:2;85:4
**words (6)**
14:5;18:15;48:10;
53:7;56:21;92:10
**work (17)**
6:8;8:24;9:5;11:20,
23;12:3,5;21:25;
31:13;32:25;52:7;
62:5;68:22;80:16;
88:25;91:21,23
**Worked (8)**
8:17,23,25;9:7,17;
23:14;89:1,1
**workers (2)**
59:21,24
**working (13)**
8:21;9:20,25;13:24;
14:3;23:2,2,4,6,7,10,
11;43:23
**works (1)**
60:21
**world (1)**
57:1
**worlds (1)**
20:20
**worry (1)**
70:16
**worse (1)**
71:21
**wrist (2)**
59:17;60:17
**write (1)**
119:1
**written (3)**
116:12;119:1;
121:19
**wrong (5)**
59:10;116:23,25;
117:2;121:15

**Y**

**yanked (2)**
39:1,3
**yard (1)**
116:21
**year (11)**
8:5;11:7,16;12:20;
13:17;14:10,21;
60:20;61:5,5;63:18
**years (16)**
5:18;22:2;38:20;
42:14;53:3;55:20;

58:11,12,13;61:4;
80:20,20,23;88:12,15;
91:14
**yelled (1)**
43:18
**yelling (1)**
66:23
**yesterday (1)**
86:24
**you-all (3)**
54:16;67:14;91:4
**young (3)**
53:4;71:3,4
**younger (2)**
33:17;76:20

**Z**

**zero (1)**
68:11
**zoomed (2)**
107:5,6

**1**

**1 (3)**
13:4,5,10
**1:19 (1)**
109:4
**1:39 (1)**
107:20
**1:56 (1)**
106:22
**11:15 (1)**
122:12
**16 (5)**
5:21;16:5,10,19;
17:3
**16th (1)**
61:8
**17 (2)**
7:5,7
**1980 (1)**
8:18
**1989 (1)**
6:12

**2**

**2 (3)**
20:12,14;21:3
**2:07 (1)**
21:6
**2:17 (1)**
104:3
**2:45 (1)**
93:22
**20 (5)**
21:6;53:3;55:19;
59:13;60:16
**2001 (1)**
9:7
**2002 (1)**

9:10
**2012 (1)**
35:11
**2013 (3)**
9:22;14:17;58:12
**2014 (2)**
9:22,25
**2022 (1)**
8:15
**2023 (6)**
5:21;13:6;15:8,23;
17:3;21:6
**22 (3)**
13:20,21;88:15
**23 (25)**
6:3;11:14,16;12:9,
11,17;13:3,11,12,19;
14:1,2,13,19,19,20;
15:7;16:6,10,14,19,
19,22,22;61:7
**24 (1)**
13:18
**25 (1)**
16:18
**27 (1)**
13:11

**3**

**3 (4)**
34:23,25;35:5;
36:17
**30 (1)**
112:11
**38 (1)**
20:23

**4**

**4 (2)**
112:24;113:1
**48 (1)**
111:17

**5**

**55 (1)**
105:19

**7**

**75 (4)**
5:18;6:3;22:2;
42:14
**75-year-old (1)**
42:15
**76-year-old (1)**
75:15

**8**

**89 (3)**
8:19,21,22

**9**

**90 (1)**
59:14
**911 (7)**
95:16;101:11,14,
15;111:7;112:18,19
**92 (1)**
8:22
**94 (1)**
9:7